United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA JONES,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION, et al.,<br><br>　　　　　Defendants. | Case No. 15-cv-02726-TSH<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 175, 185 |

## I.   INTRODUCTION

This case concerns alleged violations of the Americans with Disabilities Act and other civil rights laws and allegations of negligence after Plaintiff fell from her mobility device scooter while riding a bus operated by Defendants. Pending before the Court are Defendants' Motion for Summary Judgment, ECF No. 175, and Plaintiff's Motion for Partial Summary Judgment, ECF No. 185. The parties have filed oppositions (EFC Nos. 187, 188) and replies (ECF Nos. 192, 193). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Plaintiff's motion and **GRANTS** Defendants' motion.

## II.   BACKGROUND

On August 25, 2014, Plaintiff Amanda Jones, then a resident of Chicago, was in Santa Cruz to attend a three- to four-day research conference for her PhD program. Decl. of Amanda Jones in Supp. of Pl.'s Mot. for Partial Summ. J. ("Jones Decl.") ¶ 3, ECF No. 185-4; Howie Decl. ¶ 5, Ex. C at 11:24-12:2 (Jones Depo. Vol. 1), ECF No. 175-3. At some point during the day, Jones took the AMTRAK Highway 17 Express Bus #2310 (the "Hwy 17 Bus" or "Bus #2310"), from Santa Cruz to San Jose. Jones Decl. ¶ 3; TAC ¶ 14, ECF No. 155. The bus was operated by Santa Cruz Metropolitan Transit District ("SCMTD") in contract with the National Railroad

Passenger Corporation ("AMTRAK"). Pl.'s Controverting Statement of Facts ¶ 10, ECF No. 188-1; Howie Decl. ¶ 4, Ex. B. At that time, Jones was traveling with a motorized scooter because she was recovering from knee surgery and wanted to avoid walking long distances and on hills. Jones Decl. ¶ 4. Jones boarded the bus with her scooter. Once onboard, the coach operator, Sergio Gonzalez, tried to help Jones secure her scooter in place using securement equipment on the bus. Jones attempted to suggest a method of securing the device that was different from the method Gonzalez was using. Jones Decl. ¶ 5. Gonzalez insisted that he knew how to secure the device and used his own method. *Id.* After attempting to secure Jones's scooter, Gonzalez proceeded to start the drive from Santa Cruz to San Jose. *Id.* Jones remained seated on her scooter while on the bus.

At some point during the journey to San Jose, the scooter (with Jones on it) fell over, and Jones fell to the floor. *Id.* Gonzalez stopped the bus, and with the help of another passenger, helped Jones and her scooter off the floor. *Id.* ¶ 6; Howie Decl. ¶ 3, Ex. A ("Accident Report"). Gonzalez called his road supervisor and dispatch to report the accident. Accident Report; Jones Decl. ¶ 6; Gonzalez Decl. ¶ 6, ECF No. 187-5. Dispatch contacted emergency services, which arrived on the scene. Accident Report; Gonzalez Decl. ¶ 6; Howie Decl. ¶ 5, Ex. C at 49:17-23. Jones declined assistance from emergency services, and the bus continued to San Jose. Howie Decl. ¶ 5, Ex. C at 49:22-50:13; Gonzalez Decl. ¶ 6.

Jones filed suit against Defendants on June 17, 2015, alleging various violations of federal and California civil rights laws, as well as negligence, in connection with her fall. Five counts survive in her Third Amended Complaint ("TAC"):

I. Violation of Americans with Disabilities Act (AMTRAK)
II. Violation of Americans with Disabilities Act (SCMTD)
III. Violation of Section 504 of the Rehabilitation Act of 1973 (All Defendants)
IV. Violation of California Unruh Civil Rights Act (All defendants)
V. Negligence (All defendants)

The parties have cross-filed motions for summary judgment.

### III. LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court "'to scour the record in search of a genuine issue of triable fact.'" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). To survive summary judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

3

1047, 1061 (9th Cir. 2011) (citations omitted).

## IV. DISCUSSION

**A. Violations of the ADA, the Rehabilitation Act, and the Unruh Act**

**1. The Statutory Schemes**

**a. The ADA and the Rehabilitation Act**

Both Title II of the American with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act "include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities." *Updike v. Multnomah*, 870 F.3d 939, 949 (9th Cir. 2017) (citations omitted). To state claim under Title II of the ADA, "a plaintiff must show that: (1) he is a 'qualified individual with a disability'; (2) he was 'excluded from participation in or was denied the benefits of the services, programs, or activities of a public entity' or otherwise 'subjected to discrimination by any such entity'; and (3) the exclusion, denial, or discrimination was 'by reason of such disability.'" *Kimbro v. Miranda*, 735 Fed. Appx. 275, 277 (9th Cir. 2018) (citing 42 U.S.C. § 12132; *Weinreich v. Los Angeles Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). "Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act." *Updike*, 870 F.3d at 949 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)). Thus, under § 504 of the Rehabilitation Act, a plaintiff similarly must show: "(1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (citing 29 U.S.C. § 794). "There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). "Thus, courts have applied the same analysis to claims brought under both statutes[.]" *Id.* (citing *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995) ("Because the language of the two statutes is substantially the same, we apply the same analysis to both.").

Federal regulations implementing Title II require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

4

discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The Ninth Circuit has stated that "[a]lthough Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards." *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) (citing *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999)).

"'Compensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent.'" *Updike*, 870 F.3d at 950 (quoting *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998), *as amended* (Oct. 8, 1998)). To show intentional discrimination, the Ninth Circuit requires that "the plaintiff show that a defendant acted with 'deliberate indifference,' which requires 'both knowledge that a harm to a federally protected right [wa]s substantially likely, and a failure to act upon that likelihood.'" *Updike*, 870 F.3d at 950-51 (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

### b. The Unruh Act

"The Unruh Act . . . 'entitle[s] individuals to full and equal access to public accommodations.'" *Kohler v. Flava Enters.*, 826 F. Supp. 2d 1221, 1231 (S.D. Cal. 2011) (quoting *Californians for Disability Rights v. Mervyn's LLC*, 165 Cal. App. 4th 571, 585 (Cal. Ct. App. 2008)). The Act provides that:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). To prevail on a disability discrimination claim under the Unruh Act, a plaintiff must prove "(1) she was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment; (2) her disability was a motivating factor for this denial; (3) defendants denied plaintiff the full and equal accommodations, advantages, facilities, privileges, or services; and (4) defendants' wrongful conduct caused plaintiff to suffer injury, damage, loss or harm." *Wilkins-Jones v. County of Alameda*, 859 F. Supp. 2d 1039, 1048 (N.D. Cal. Mar. 14, 2012) (quoting *Johnson v. Beahm*, 2011 WL 5508893, at \*4 (E.D. Cal. Nov.

5

8, 2011) (internal quotations omitted)).

A violation of the right of any individual under the ADA constitutes a violation of the Unruh Act. Cal. Civ. Code. 51(f). To establish a violation of the Unruh Act independent of a violation of the ADA, a party "must 'plead and prove intentional discrimination in public accommodations in violation of the terms of the Act.'" *Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Munson v. Del Taco, Inc.*, 208 P.3d 623, 627 (Cal. 2009)).

### 2. Plaintiff's Standing to Seek Injunctive Relief

Defendants challenge Jones's standing to seek injunctive relief, arguing that she has not shown a threat of future injury. With the ADA, "as with other civil rights statutes, to invoke the jurisdiction of the federal courts, a disabled individual claiming discrimination must satisfy the case or controversy requirement of Article III by demonstrating his standing to sue at each stage of the litigation." *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011). A plaintiff demonstrates standing by showing that she has suffered (1) an injury-in-fact, (2) that the injury is traceable to a defendant's actions, and (3) that the injury can be redressed by a favorable decision. *Id.* (citation omitted). In addition, to pursue injunctive relief, a plaintiff must demonstrate a "'real and immediate threat of repeated injury' in the future." *Id.* (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004). A plaintiff must show that she is "realistically"—as opposed to hypothetically—"threatened by a repetition" of her experience. *L.A. v. Lyons*, 461 U.S. 95, 109 (1983); *see also San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (plaintiff seeking injunctive relief must show "significant possibility" of future harm).

The party invoking federal jurisdiction bears the burden of establishing each of the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the summary

judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,'" as she can at the pleading stage, "but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)); *Ctr. for Biological Diversity v. Export-Import Bank of the United States*, 894 F.3d 1005, 1012 (9th Cir. 2018) ("[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element [of standing.]"); *No Casino in Plymouth v. Zinke*, 698 Fed. Appx. 531, 532 (9th Cir. 2017) ("The 'undisputed facts' cited by Plaintiffs were not stipulated to by Defendants or sworn to under oath, nor did they comply with 28 U.S.C. § 1746; accordingly, they cannot be considered for purposes of summary judgment.") (citation omitted); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 850 (9th Cir. 2007) ("The elements of standing are not mere pleading requirements, but rather must be supported by sufficient evidence.") (citing *Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 262 (4th Cir. 2001)).

At the time of the incident alleged in her complaint, Jones was a resident of Chicago. She was visiting the Santa Cruz area for a few days for a conference in connection with the PhD she was pursuing at the University of Chicago. There is no evidence or allegation that Jones had ever been to Santa Cruz before that. Jones alleges that since the incident, "due to her inability to heal from her injuries," she has relocated to California to pursue her PhD remotely. TAC ¶ 34. She stated in a declaration that she is now a resident of Los Angeles. Decl. of Amanda Jones in Supp. of Pl.'s Mot. for Partial Summ. J. ¶ 1, ECF No. 185-4. In the operative complaint, she alleges that she is "likely to use Defendants' bus system in the future." TAC ¶ 34. She adds that, since the underlying incident, she has traveled on Defendants' "transportation system on other occasions." *Id.* ¶ 35. And she alleges one occasion in which a bus was apparently delayed because a wheelchair lift was not functioning and she "was forced to wedge herself in between regular seats and the bathroom of the bus." *Id.* ¶ 36-39.

Despite those allegations in her complaint, Jones has nevertheless failed to show she has standing for injunctive relief. Even though she has apparently moved permanently to California, she is a resident of Los Angeles. Los Angeles is some 350 miles from Santa Cruz. SCMTD's services go nowhere near as far as Los Angeles. System Map, SANTA CRUZ METRO,

https://www.scmtd.com/en/routes/schedule/map (last visited Oct. 4, 2019). Jones has provided no evidence that she has been to *Santa Cruz*, as opposed to southern California, since the visit in her complaint. Although she alleges in the operative complaint that she has used Defendants' transportation system on "other occasions," neither her Declaration nor any other evidence presents specific facts concerning if or when that was, or what transportation services she used, or which Defendant was operating the services, or if she intends to do so again. The mere allegation that Jones is "likely to use Defendants' bus system in the future" is not specific or supported by evidence and doesn't show more than a hypothetical possibility that Jones actually will.

Additionally, even if Jones had set forth evidence that she is likely to use Defendants' bus system in the future, she nonetheless fails to show a likelihood that in doing so she would encounter the same type of incident she faced before. Jones has provided specific facts and evidence for the single, underlying incident that forms the crux of her complaint. Concerning the other alleged incident Jones alleges in the TAC, the bus with the non-functioning wheelchair lift, she has provided no evidence of that incident. Nor did she even allege a specific date of the incident, or location where it happened, or bus or route number, or even which of the Defendants operated the bus, or that she was using her scooter at the time.[1] The incident therefore cannot be considered for purposes of summary judgment. Yet even assuming for a moment that the incident were supported by evidence and could be considered, that still wouldn't entitle Jones to injunctive relief. In *Midgett v. Tri-county Metro. Transp. Dist.*, the Ninth Circuit upheld a district court's denial of a permanent injunction. The court reasoned:

> Plaintiff's evidence establishes several frustrating, but isolated, instances of malfunctioning lift service on Tri-Met. The evidence also shows that, unfortunately, a few individual Tri-Met operators have not treated passengers as they are required and are trained to do. Under the regulations, these occasional problems do not, without more, establish a violation of the ADA. At most, the evidence shows past violations of the ADA. It does not, however, support an inference that Plaintiff faces a real and immediate threat of continued, future violations of the ADA in the absence of injunctive relief.

---

[1] A quick read of the allegation, TAC ¶¶ 36-39, gives the impression that Jones was using her scooter while a passenger on that bus. Parsing the language, though, there's no clear allegation that she was.

8

254 F.3d 848, 850 (9th Cir. 2001). Similarly, the two incidents alleged by Jones, even if both were supported by evidence, would at most show two potential past violations of the ADA. Those two incidents would not create a significant likelihood that Jones faces future violations enough for the Court to issue an injunction. *See id.* at 851 ("[I]t is clear that a plaintiff seeking an injunction against a local or state government must present facts showing a threat of immediate, irreparable harm before a federal court will intervene.") (citing *Rizzo v. Goode*, 423 U.S. 362, 378 (1976)).

Jones has failed to show that she is entitled injunctive relief.

### 3. The Allegations of Violations of the ADA, Rehabilitation Act, and Unruh Act

Jones is not entitled to injunctive relief, and the Court denies declaratory relief.[2] Therefore, all that remains under the ADA, Rehabilitation Act, and Unruh Act is Jones's claim for compensatory damages. To obtain compensatory damages under the ADA or Rehabilitation Act, she must meet the high bar of showing intentional discrimination. To show a violation under the Unruh Act, she must show either a violation of the ADA or, in the absence of a violation of the ADA, intentional discrimination. Here, Jones has not met those standards, and in fact, has not shown that Defendants violated the ADA, Rehabilitation Act or Unruh Act at all.

Jones has alleged one incident as the foundation of her ADA, Rehabilitation Act, and Unruh Act claims. The undisputed facts regarding that incident are that while using a motorized scooter for mobility, Jones boarded a bus operated by Defendants; the driver of the bus attempted to secure Jones's scooter on the bus using securement equipment on the bus; Jones attempted to suggest a method of securing the device; the driver insisted he knew how to secure the scooter and used his own, different method; and at some point after the driver started to drive the bus, Jones's

---

[2] "Declaratory relief should be denied when it will neither aid in clarifying and settling legal relations in issue nor terminate the proceedings and afford the parties relief from the uncertainty and controversy they faced." *Greater Los Angeles Council on Deafness v. Zolin*, 812 F.2d 1103, 1112 (9th Cir. 1987). Here, the evidence shows a single past incident in which Jones was injured. Largely for the same reasons as discussed in connection with Jones's request for injunctive relief, declaratory relief is inappropriate where there is no ongoing relationship between the parties or any significant likelihood that a purely past event will occur again. Accordingly, the Court denies declaratory relief. *See Doe v. Gallinot*, 657 F.2d 1017, 1024 (9th Cir. 1981) ("Whether or not to grant a declaratory judgment is a matter committed to the sound discretion of the district court.").

scooter fell over, and Jones fell to the floor. Jones does not provide any other evidence that could be construed as showing a failure to provide reasonable accommodation to people with disabilities, or any intentional discrimination. To the contrary, the rest of the record speaks to the opposite.

Leo Pena, the Safety & Training Coordinator for SCMTD, stated in his declaration that SCMTD achieves ADA compliance by installing devices and equipment on its fleet of buses to accommodate patrons with various disabilities, including equipment for the securement of wheeled devices. Pena Decl. ¶ 3,[3] ECF No. 175-2. He stated that he personally examined Bus #2310 on the date of the incident. *Id*. He stated that was personally familiar with the mobility-device securement equipment on Bus #2310, and that the equipment included a four-point retracting strap system which was an ADA-compliant strap system for securing mobility devices. *Id.* A three-point, seatbelt restraint system was also installed and operative. *Id.* Pena went on to state that SCMTD also achieves ADA compliance by training its personnel, including coach operators, regarding service of bus patrons with different disabilities. *Id.* ¶ 4. He stated that SCMTD has a training program for its coach operators relating to transportation of disabled bus passengers. *Id.* Coach operators receive intensive initial training and then an annual review of eight hours per year including the securement of mobility devices. *Id.* Pena stated that coach operators all receive copies of the SCMTD's rule book and guidelines regarding ADA compliance generally and specifically relating to securement of mobility devices. *Id.* With his Declaration, Pena submitted portions of the SCMTD's Accessibility Policies/Procedures Training Program relating to securement of mobility devices. *Id.* The material in the program includes a brief history of SCMTD accessibility, including some discussion of the history of technology used in SCMTD's accessibility services, and a discussion of the modern state of technology. *Id.*, Ex. A. The material specifically discusses an "integrated scooter ring" included on a mobility device front strap, which the material describes as "designed to better secure 3[-]wheel mobility device[s] and reduce tip-overs." Ex. A, 20-21.

---

[3] This declaration contains two paragraphs 3. This order cites to them both together as paragraph 3.

1 Gonzalez, the coach operator of Bus #2310, stated in his declaration that when he first became a coach operator with SCMTD, he received extensive training about the transportation of disabled passengers. Decl. ¶ 3. He stated that he receives eight hours of additional training annually, which includes training regarding transportation of disabled bus passengers. *Id.* He added that about one hour of that is devoted to the securement of mobility devices. *Id.* He stated that he has had hands-on training with scooters of various types on multiple occasions, and that he never, before or since the underlying incident, had an incident in which a scooter tipped over on his bus. *Id.* Along with his declaration, Gonzalez submitted records from the SCMTD Operations Department Safety and Training Program, and those records reflect that Gonzalez received multiple sessions on securement training through 2014. *Id.*, Ex. A.

Jones does not create a genuine dispute regarding the accuracy of that evidence. She asserts that Gonzalez admitted in his deposition that he was never trained on three-wheeled scooters such as the one Jones was riding, and that he admitted that he never received an operator's handbook. But in fact, Gonzalez testified that he had been trained on "regular scooters," but "not really on this – on this particular scooter with the real small tires – ." Declaration of Carla D. Aikens in Supp. of Pl.'s Mot. for Partial Summ. J. ("Aikens Decl.") ¶ 4, Ex. D. at 30:21-31:6. Also, even though Gonzalez did admit to not receiving an operator's handbook, *id.* at 28:9-15, Jones fails to show how not receiving the handbook would mean Gonzalez had not been properly trained (there is other evidence of Gonzalez' training), and Jones does not challenge the accuracy of Gonzalez' training records and assertions in his declaration regarding his annual training.

Jones's opposition to Defendants' summary judgment motion does not clearly articulate a theory about how Defendants violated these disability statutes. Instead, "[i]n the interests of brevity, Plaintiff incorporates by reference her contemporaneously-filed Controverting Statement of Facts, including evidence cited therein, her Motion for Partial Summary Judgment (ECF 185), and all supporting documents (ECF 185-1, 185-2, 185-4 and 186)." ECF No. 188, page 2. Jones's controverting statement of facts contains her responses to Defendants' asserted facts, as well as additional proposed facts, but also does not specify a theory about how Defendants violated these

11

statutes. Jones's motion for partial summary judgment, however, does articulate three specific theories about how Defendants violated these statutes. The Court addresses each in turn.

First, Jones asserts that SCMTD violated 49 C.F.R. § 37.173, which states that "[e]ach public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities." Jones contends that this regulation obligated SCMTD to train its drivers to proficiency on all kinds of mobility aids. Jones says that the bus driver, Gonzalez, was not trained on how to secure 3-wheeled scooters, and this was a failure to train to proficiency.

The evidence does not support that argument. Jones's argument that Gonzalez was not trained on how to secure 3-wheeled scooters is made up. As noted above, Gonzalez testified that he was trained on how to secure "regular scooters" but not "on this particular scooter with the real small tires." It is unsurprising that Gonzalez was not trained on how to secure this particular scooter. The owner's manual for this scooter states that "[u]nder no circumstances should the scooter be used as a seat in a motor vehicle." Howie Decl., Ex. G at 5. Under a heading entitled "<u>TRANSPORTING YOUR SCOOTER</u>," the manual states: "When transporting your scooter by vehicle it should be securely stowed in the back of a van, truck, or trunk of a car." *Id*. at 11. "WARNING – Do not sit in your scooter while in a moving vehicle." *Id*.[4]

Fundamentally, Jones is faulting Gonzalez for not being trained to secure her scooter with her in it to ride in a moving bus when the owner's manual warns the user that this is dangerous and should not be done under any circumstances. The legal requirement of training to proficiency does not include training employees to do dangerous things that could harm the disabled. Jones seems to realize this flaw in her argument, so she tries to reframe it as a failure by SCMTD to train Gonzalez on how to secure 3-wheeled scooters in general, not her scooter in particular. However,

---

[4] The Court overrules Jones's cursory objections to the owner's manual, *see* ECF No. 188, page 16, and observes that Jones relies on the same owner's manual in her summary judgment motion to establish how long the scooter is. *See* ECF No. 185, pages 4 and 23 (citing Exhibit G to the Howie Decl.).

12

as a factual matter, Gonzalez testified that he *was* trained on securing regular scooters. In the testimony Jones relies on, Gonzalez was not asked about his training for 3-wheeled scooters. *See* Jones's Motion, ECF No. 185, page 15. After he said he was trained for "regular" scooters, he was asked about his training for *this particular scooter*. Any reasonable witness would have understood that to be a question about Jones's scooter, not the entire class of 3-wheeled scooters. And his reference to "this particular scooter with the real small tires" shows he did understand the questions that way. Jones's argument that Gonzalez was not trained on how to secure 3-wheeled scooters in general is simply based on nothing.

It's also not true that SCMTD's Safety and Training Coordinator admitted in his deposition that the district trains its drivers only on electric and manual wheelchairs and nothing else. In response to the question, "[b]ut as far as training goes with respect to devices that are not electric or manual wheelchairs, they don't receive training on any other devices; is that correct?" Pena testified: "Well, we – we've got suggested ways of how to secure it – secure other devices. Yeah, there's so many different types of devices out there, we – we cannot provide each exactly – you know, every single type of device that's out there. But yeah, they do get the best suggested method of securement." Pena Depo. at 9:21-10:9, Aikens Decl. ¶ 4, Ex. E. The regulation at issue requires training to proficiency, not to unattainable perfection, and training drivers specifically how to secure every single mobility device available for purchase on the market is unattainable perfection. Training drivers on how to do the best suggested method of securement is training to proficiency, and the evidence shows that SCMTD does that. Accordingly, Jones's failure to train to proficiency argument fails for lack of evidence.

Jones's second argument is that SCMTD failed to provide hardware on its buses that would allow a 3-wheeled scooter to be secured safely. She says this violates 49 C.F.R. § 38.23(d)(5), which states: "When the wheelchair or mobility aid is secured in accordance with manufacturer's instructions, the securement system shall limit the movement of an occupied wheelchair or mobility aid to no more than 2 inches in any direction under normal vehicle operating conditions." She argues that falling over constitutes more than a 2-inch move.

But notice that Jones has once again shifted discussion away from the scooter she was on

13

to the hypothetical case of 3-wheeled scooters generally. Because when her scooter "is secured in accordance with manufacturer's instructions" – the triggering condition of the regulation – it *won't be occupied*. The owner's manual could not be any clearer: "WARNING – Do not sit in your scooter while in a moving vehicle." Indeed, the owner's manual specifically states *how* the scooter should be secured: "When transporting your scooter by vehicle it should be securely stowed in the back of a van, truck, or trunk of a car." When the scooter is securely stowed in the trunk of a car, the user is obviously not in it. The "no more than 2 inches" requirement in 49 C.F.R. § 38.23(d)(5) applies to a mobility aid that when secured in accordance with the manufacturer's instructions *is occupied*. The purpose of the rule is to protect the occupant from being injured. Here, since the manufacturer's instructions require the scooter to be unoccupied in a moving vehicle, the "no more than 2 inches" rule is inapplicable. To accept Jones's contrary argument would require striking the first 13 words out of the plain language of the regulation like this:

> ~~When the wheelchair or mobility aid is secured in accordance with manufacturer's instructions,~~ the securement system shall limit the movement of an occupied wheelchair or mobility aid to no more than 2 inches in any direction under normal vehicle operating conditions.

Accordingly, Jones's argument that she was injured by SCMTD's failure to comply with this regulation has no merit.

Third, Jones argues that the securement area on the bus was too short. 49 C.F.R. § 38.23(d)(2) states that "[t]he securement area . . . shall have a clear floor area of 30 inches by 48 inches." After the incident and after Jones had been picked back up, Gonzalez took some pictures of her in the scooter in the securement area. The owner's manual states that the scooter is 42.5" long. Howie Decl., Ex. G at 33. Jones's expert, Ned Einstein, says that when he looks at one of those pictures, he can tell there is less than a combined 5.5" between the front and back of the securement area and the front and back of the scooter. Einstein Decl., ECF No. 185-2, Ex. B at 14, referring to ECF No. 185-2, page 65 of 67 (photo #2). That means, according to Jones, that the securement area is less than 48" long, in violation of the regulation.

From that picture and the two others next to it in Einstein's report, the Court cannot tell,

United States District Court
Northern District of California

and does not think anyone can reasonably tell, whether the securement area is longer or shorter than 48". For one thing, when the owner's manual states that the scooter is 42.5" long, it does not specify how that is measured. If the measurement is from the most forward part of the scooter to the very last part in the back, the most forward part could be the basket, which is adjustable, *see* Howie Decl., Ex. G at 21 ("The angle of the tiller can be adjusted to multiple positions to suit each user."), making the 42.5" inexact. Alternatively, for measurement purposes, it might be that the front of the scooter is the ledge above the front wheel. *See id*. at 24.

In any event, in photos 2 and 3, there is a person obscuring the space between the front basket of the scooter and the front of the securement area. If the person in photo 3 is leaning against the front of the securement area, which is what it looks like, there could have been a foot of distance between it and the front of the basket. In photos 2 and 3, the Court can make out what looks like the ledge above the front wheel, and there seems to be a metal thing several inches in front of it (judging by a comparison to the feet in the picture). In photo 2 the metal thing looks like a barrier, but in photo 3 it looks like the flat end of a larger metal piece that curves upward later, so maybe it is not a barrier. This leaves the distance between the ledge above the front wheel and the front of the securement area unclear. Photo 1 is at least missing the obscuring person, but the photo is at an angle that does not show the distance between the ledge above the front wheel and the front of the securement area. Photo 1 does seem to show several inches between the front of the basket and the front of the securement area, although it's unclear what the light blue thing is and how far that is from the basket.[5] Photos 1 and 2 show there is some space between the rear of the scooter and the rear of the securement area, but it's not clear how much. An essential problem with photo 2, which Einstein bases his opinion on, is that the scooter is centered in the picture and the angle of the picture is perpendicular to the scooter, so the distances between the scooter and the front and back of the securement area are not well depicted and probably appear smaller than they really are. The Court concludes that these pictures and

---

[5] Color versions of photos 1, 2 and 3 are at SCMTD-000313, 315 and 316 in Exhibit A of the Aikens Declaration in support of Jones's motion, ECF No. 185-3. They are higher quality than the copies submitted with the Einstein declaration.

15

Einstein's opinion establish nothing of evidentiary value.

By contrast, Defendants submit the declaration of David Rishel, their expert. ECF No. 187-4. He states that he "personally examined and measured" the securement area in the bus that Jones rode. *Id*. ¶ 7. He states that "[t]he securement area for mobility devices measured 60" in length and 38" in width . . ." *Id*. True, he performed this measurement five years after the fact, but there is no evidence before the Court that the securement area on this specific bus was altered since the time of the incident. At a minimum, this declaration based on personal knowledge is relevant evidence, and as discussed, Jones has submitted nothing of evidentiary value that constitutes contrary evidence. Accordingly, the Court finds that Jones's third theory of statutory breach is also meritless.

Putting everything in a nutshell, Jones has provided evidence of one incident on one of Defendants' buses in which one driver attempted to secure one scooter but was unable to do so well enough to keep the scooter secure.[6] The record does not support a finding that Defendants engaged in discrimination against Jones based on a disability. It does not show a failure by Defendants to make reasonable accommodations to avoid discriminating against persons using mobility devices. Nor does it reflect a failure by Defendants to adopt policies or procedures to properly train drivers proficiently in how to provide services to persons with disabilities. To the contrary, the record reflects that Defendants' efforts to accommodate and train employees were regular, but that one driver attempted to assist a disabled passenger and failed. But one bad driver (or instance of bad driving) does not establish a violation of the ADA. *Midgett*, 254 F.3d at 850 ("Occasional problems, do not, without more, establish a violation of the ADA."). Jones has not shown a violation of the ADA or the Rehabilitation Act.

Even clearer is that Jones has provided no evidence showing a "deliberate indifference" to Jones's protected rights[7] or "willful, affirmative misconduct" on Defendants' part. *See Garedakis*

---

[6] There is of course the allegation that Gonzalez was speeding at the time of the incident, but even if Gonzalez were speeding, that would not be evidence of discrimination—speeding would be dangerous to all passengers, and Gonzalez' speeding would show no failure by Defendants to train employees in compliance with the ADA. Further, as discussed below, Jones has failed to raise a triable question of fact that Gonzalez was speeding.

[7] Jones alleges that, "By ignoring Ms. Jones's instructions and by failing to figure out how to

16

*v. Brentwood Union Sch. Dist.*, 183 F. Supp. 3d 1032, (N.D. Cal. Apr. 29, 2016) ("deliberate indifference" standard under ADA and Rehabilitation Act "is a stringent standard of fault, 'even higher than gross negligence'" (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)); *Greater L.A.*, 742 F.3d 414 at 427 ("[T]he Unruh Act requires a showing of willful, affirmative misconduct to establish intentional discrimination[.]"). For example, she has not shown that Gonzalez said anything to her that indicates a discriminatory intent or an animus toward her because of her disability.[8] And she has provided no evidence at all that Defendants had any knowledge of any risk of harm to her federally protected rights. At most the evidence shows an imperfect system, and "[t]he regulations implementing the ADA do not contemplate perfect service for wheelchair-using bus commuters." *Midgett*, 254 F.3d at 849.

Without a showing of intentional discrimination, Jones would not be entitled to compensatory damages even if she had shown a violation of the ADA and the Rehabilitation Act, which she has not. Additionally, since Jones has not shown a violation of the Title II or § 504, and she has not produced any evidence of intentional discrimination, she has not shown a violation of the Unruh Act either. Summary judgment is appropriate in favor of Defendants on Counts I through IV.

**B.     Negligence**

To establish negligence, a party must prove "a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017) (citations and internal quotations omitted). Jones asserts that Defendants duties arose out their duties under the ADA, the Rehabilitation Act, and the applicable regulations. She alleges a litany of purported breaches: Gonzalez failing to

---

properly secure Ms. Jones's scooter, Defendant acted with deliberate indifference . . . ." TAC ¶ 25. That Gonzalez was unable to secure this scooter in this one instance does not show deliberate indifference. The regulations require an entity to "use best efforts to restrain or confine the wheelchair to the securement area." 49 C.F.R. § 37.165, App. D. There is no evidence that Gonzalez failed to do this.

[8] Jones testified that she thought Gonzalez "got fussy" about her trying to help him with securing her scooter. But she does not show (or even allege that) Gonzalez said anything suggesting he was upset about having to help her onto the bus, or that he was reluctant to offer help. Being "fussy" or in a "bad mood" can be evidence of a lot of things, like having a bad day.

17

secure her scooter; Gonzalez failing to follow the speed limit; Gonzalez failing to slow down when entering the curve where Jones fell; Defendants failing to adequately train Gonzalez; Defendants hiring an "incompetent driver" to operate Bus # 2310; Defendants failing to provide adequate equipment safely transport; Defendants failing to properly maintain or repair the "track system in question"; Defendants violating governmental statutes, regulations, and requirements with respect to the #2310 Bus; Defendants failing to properly inspect, maintain, and repair the "signal system associated with the train and train tracks in question"; Defendants failing to comply with the their own safety, operating, and other rules, procedures, and regulations; Defendants allowing improperly trained and unqualified personnel to operate the bus in question; Defendants failing to provide nondiscriminatory, safe access to bus services; Defendants failing to ensure that its personnel were trained to proficiency regarding the safe operation of vehicles and equipment and the provision of respectful and courteous service to passengers with disabilities; and Defendants failing to comply with federal and state disability rights statutes. TAC ¶ 78(a)-(m).

Defendants counter that Jones's negligence claim is precluded by reason of primary assumption of risk. They cite Jones's preference to remain seated on her scooter, without the use of a seatbelt or similar restraint, even though other seats were available on Bus #2310. Defendants place much emphasis on the operator's manual for Jones's scooter, in which is clearly written: "Under no circumstances should the scooter be used as a seat in a motor vehicle." Howie Decl. ¶ 9, Ex. G at 4. Before considering Defendants' assumption-of-risk argument, however, it is necessary to first consider whether Defendants committed any breach of duty.

The Court notes first that Jones has provided no evidence of a train or train travel by Jones. Therefore, Jones's negligence claim fails to the extent it references trains, train tracks, or train systems. *See, e.g.*, TAC ¶ 78(h) (alleging Defendants were negligent for "[f]ailing to properly inspect, maintain, and repair the signal system associated with the train and train tracks in question").

Moving on, Jones asserts that Gonzalez "failed to adhere to a proper speed to prevent Ms. Jones from falling over in her wheeled apparatus." TAC ¶ 78(b). The only evidence Jones points to for this assertion is her deposition testimony. During her deposition, she was asked, "So do you

know how fast the bus was going at the time when you fell?" Howie Decl. ¶ 5, Ex. C at 36:12-13. Jones responded, "I can't – you know, I couldn't see the speedometer, but I did feel like we were moving at a rather rapid pace, especially when we hit the curve and everybody got jostled around." *Id.* at 36:14-17. However, another passenger on the bus, Christian Nieto, who had been riding the bus for three years, testified that the bus wasn't speeding, and that "traffic was passing the bus," including when Jones fell. Howie Decl. ¶ 7, Ex. E at 22:4-11, 23:1-11. And Gonzalez stated in his declaration that "[t]he bus was not exceeding the speed limit at the time of accident" and that "I was travelling slower than traffic passing me during the travel to the Mt. Herman exit where I stopped." Gonzalez Decl. ¶ 5. Up against this evidence, the one statement by Jones that "I couldn't see the speedometer, but I did *feel like* we were moving at a rather rapid pace" is not enough to raise a genuine issue as to whether Bus #2310 was traveling at an appropriate speed.

Regarding Jones's assertions that Gonzalez breached a duty in assisting her onto the bus or securing her, the Court is similarly unpersuaded. As already discussed, there is insufficient evidence in the record to conclude that Gonzalez behaved in a way inconsistent with Defendants' obligations under the ADA, the Rehabilitation Act, or the Unruh Act. There is no evidence that Defendants failed to train Gonzalez, or anyone else, in compliance with those acts, or any evidence that Defendants failed to provide adequate equipment to offer safe transport to Jones. Even if Gonzalez failed to ask Jones to move from her scooter to a regular bus seat (that fact remains in dispute), that would not show negligence. As Defendants point out, the federal regulations direct that an entity *may* recommend to a user of a wheelchair that the individual transfer to a vehicle seat, but they do not require an entity to do so. 49 C.F.R. § 37.165(e). Thus, even though SCMTD trains its drivers to ask people to move[9] and even if Gonzalez in this

---

[9] *See* Aikens Decl. ¶ 5, Ex. E at 41:2-10 (Leonardo Pena Dep.):
    Q: Okay. So you're saying that they are instructed, if somebody is in a scooter, because it has a – it's known to tip, that they're instructed to tell them to sit in a seat?
    A: Not instructed to tell them. To ask or request. We cannot force them to move to the seat.
    Q: Okay. Is it a requirement that they ask?
    A: Yes. They are required to ask them, or request that they move to another seat.

19

instance did not,[10] that wouldn't show Defendants negligently failed to comply with the law, only that Gonzalez failed to comply with SCMTD's own standards. Appendix D to § 37.165 states that the section reflects "a mandate to use best efforts to restrain or confine the wheelchair to the securement area. The entity does the best it can, given its securement technology and the nature of the wheelchair." App. D. The evidence reflects that that is what Gonzalez did here. Gonzalez Decl. ¶ 7. There is insufficient evidence to show negligence.

## V. CONCLUSION

Based on the analysis above, the Court hereby **ORDERS** as follows:

(1) Defendants' Motion for Summary Judgment is **GRANTED**; and

(2) Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 10, 2019

THOMAS S. HIXSON
United States Magistrate Judge

---

[10] This point is disputed. Jones testified in her deposition that Gonzalez did not "say that [she] should sit in a seat[.]" Howie Decl. ¶ 6, Ex. D at 265:14-16. Gonzalez stated in his declaration that, "I suggested that she sit in a bus seat but she refused." Gonzalez Decl. ¶ 4. Nieto testified that "And the guy [Gonzalez] asked her if she could want – if she wanted to move to a safer area, as you would call it, on the disable people chairs that they have next to him, and she denied. She said that she never had a problem. She never had a problem with this scooter before and that she wanted to be on the scooter." Howie Decl. ¶ 7, Ex. E at 38:25-39:6.

20