UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMANDA JONES,

              Plaintiff,

    v.

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,

         Defendants.

Case No. 15-cv-02726-TSH

**ORDER CONDITIONALLY DENYING
DEFENDANT SANTA CRUZ
METROPOLITAN TRANSIT
DISTRICT'S MOTION FOR A NEW
TRIAL**

Re: Dkt. No. 618

Defendant Santa Cruz Metropolitan Transit District (SCMTD) moves for a new trial following the entry of judgment against it. The Court conditionally denies the motion.[1]

## I.    BACKGROUND

### A.    Complaint, Summary Judgment Order, Court of Appeals Decision

Plaintiff Amanda Jones (AMJ) filed this lawsuit on June 17, 2015. ECF No. 1. Their[2] Third Amended Complaint ("TAC," ECF No. 155) alleged five claims for relief: (1) violation of the Americans with Disabilities Act ("ADA") against Defendant National Railroad Passenger Corporation, also known as Amtrak; (2) violation of the ADA against SCMTD; (3) violation of the Rehabilitation Act against both Defendants; (4) violation of the California Unruh Civil Rights Act against both Defendants; and (5) negligence against both Defendants. Their claims all arise from an August 25, 2014 incident on the Highway 17 bus en route from Santa Cruz to San Jose, when Plaintiff's scooter tipped over while they were on it. TAC ¶¶ 12-39. The essence of their claims is that the bus driver failed to properly secure the scooter so that it would not fall over

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 8, 12, 16.

[2] Plaintiff is nonbinary and uses they/them pronouns. The Court does the same for purposes of this order.

United States District Court
Northern District of California

during the course of the bus ride.  *Id.* ¶¶ 17-24, 26.

On October 10, 2019, the Court granted Defendants' motion for summary judgment on all claims.  ECF No. 197.  On May 18, 2021 the Ninth Circuit affirmed the grant of summary judgment on the ADA, Rehabilitation Act and Unruh Act claims and reversed the grant of summary judgment on the negligence claim.  ECF No. 221.

**B.    First Trial**

On March 22, 2023, at the conclusion of the first jury trial, the jury deadlocked, and the Court declared a mistrial.  ECF Nos. 399, 401.

**C.    Dismissal of Amtrak**

Following the first trial, Amtrak filed a renewed motion for judgment as a matter of law. ECF No. 413.  The Court granted the motion on May 4, 2023.  ECF No. 419.  After that point, SCMTD was the only Defendant remaining in the case.

**D.    Second Trial**

On November 29, 2023, during voir dire at the start of the second trial, defense counsel tainted the entire venire, and the Court declared a mistrial and later sanctioned him.  ECF Nos. 453, 454, 483.  The sanctions order (ECF No. 483) recounts what happened:

> November 29, 2023, was the first day of an anticipated two-week trial in the above-captioned matter. The scheduled trial was a retrial, following a trial in March 2023 in which the jury was unable to reach a verdict. Prior to trial, both Plaintiff and Defendant confirmed they were not planning to call any witnesses who did not testify in the previous trial. Pretrial Conf. Tr. at 12–13, ECF No. 461. On the first day of trial, following voir dire by the Court and Plaintiff's counsel, counsel for SCMTD, Robert G. Howie, began voir dire for the defense. Before asking the prospective jurors any questions, Howie informed the entire pool of prospective jurors that the Plaintiff (1) had multiple sclerosis (MS), and (2) was "confined to a wheelchair for reasons that have nothing to do with" the lawsuit. Trial Tr. at 12–13, ECF No. 460.

> In its oral ruling granting Plaintiff's motion for a mistrial, the Court stated the following:

>> The major issue in dispute in this case is causation, and Mr. Howie's statement in front of the prospective jurors that the plaintiff has MS goes directly to the issue of causation in a way that is prejudicial to Plaintiff's case. In the previous trial I do not recall there was any mention of MS, and both sides have told me that they were planning to call the same

2

> witnesses to testify at this trial as in the previous trial, and so I have no basis to think that evidence regarding MS would be admissible. I do think it is massively prejudicial the way that it was told to the prospective jurors, and, again, it goes directly to the core issue in this case, which is causation. Accordingly, the plaintiff's motion for a mistrial is granted.

*Id.* at 17.

The sanctions order further explained:

> The Court finds Howie's statements to the prospective jurors constituted the raising of a frivolous argument. Howie did not indicate that any witness would be called to testify that MS caused the injuries Plaintiff alleges, nor did he indicate that any such evidence would be admitted—or even admissible—at trial. *See* Trial Tr. at 16-17. Howie did state that Dr. Conte determined that Plaintiff has MS, and that her MS was not caused by the accident. But neither side was planning to call Dr. Conte as a witness at trial, which Howie acknowledged. *Id.* Further, as Plaintiff's counsel explained, whether the accident caused her MS is "not the issue. The comment is that she needs the wheelchair because she has MS. No one is going to say that." *Id.* at 16:10-12. No witness at the previous trial ever mentioned MS as a cause or potential cause of Plaintiff's alleged injuries, and Howie had confirmed he was not planning to call any new witnesses. Pretrial Conf. Tr. at 13.
>
> In the course of voir dire, attorneys sometimes make factual assertions to prospective jurors about the case, usually to help the prospective jurors understand why the attorney is asking about the subject. For example, if a plaintiff is disabled, counsel might mention that fact and then ask the prospective jurors whether they or their close friends or family members have a similar disability or what their experiences may have been in dealing with people who have a similar disability. When an attorney does this, he must have a reasonable belief that evidence will be admitted at trial to support his factual assertions to the prospective jurors about the case. This is basic common sense. Here, Howie had no basis to think there would be any evidence admitted at trial that Plaintiff has MS and that it is the reason she is in a wheelchair. And he knew that. When Plaintiff moved for a mistrial, Howie identified the witness who "would testify that she has MS" – Dr. Conte – and in the same breath said: "The fact is that Dr. Conte was not going to be called" to testify at trial. Trial Tr. at 16:5-7. Howie's statements to the prospective jurors were therefore frivolous.
>
> Howie contends he was merely looking to elicit information about possible bias regarding the cause of disability. Opp'n at 1–2, 8. Howie argues that by informing the jury that Plaintiff had MS and that she was "confined to a wheelchair" for reasons that had nothing to do with the incident at issue, he was conducting an inquiry into whether jurors would "presum[e] that a wheelchair-bound personal injury plaintiff" who was involved in an accident "is 'permanently disabled' and 'unable to walk' as a result of the accident versus an illness or otherwise." *Id.* at 5. But while Howie characterizes his statement to the prospective jurors as a question (*id.* at 1, 3, 5–6, 8–9), Howie's statements constituted an argument about causation, rather than an

3

inquiry into potential jurors' preconceptions about what causes disability:

> THE COURT: Let's have voir dire from the defense, please.
>
> MR. HOWIE: Thank you, Your Honor.
> Thank you, everyone, for being here. We appreciate it.
> I know what it's like to be in the jury box a little bit, and it's very -- sometimes people are recalcitrant about speaking up about bias, if that's exactly what was just the topic.
> The plaintiff suffers from MS, multiple sclerosis. She's confined to a wheelchair for reasons that have nothing to do with this accident.

Trial Tr. at 12–13.

The order concluded:

> The Court is likewise unpersuaded by Howie's explanation that a curative instruction would have sufficed. As Howie points out in his opposition, this is a personal injury case. The only claim remaining at issue for trial is negligence, for which causation of Plaintiff's injuries is a central issue. Further, MS is not an obscure disease that few people have heard of. Right off the bat Howie tainted the entire venire by implying that a highly recognizable disease was the true cause of Plaintiff's injuries, when he knew that no evidence to that effect was likely to be admitted at trial.

> Howie's conduct was thus extremely prejudicial, and the Court finds this conduct was reckless, in addition to frivolous. Howie's actions clearly multiplied the proceedings. As a direct result of the statements Howie made during voir dire, the Court will have to hold a third trial in this case, resulting in yet another jury selection process and some duplication of trial preparation efforts.

> Accordingly, pursuant to 28 U.S.C. § 1927, the Court **SANCTIONS** Howie and concludes he must personally satisfy the excess costs, expenses, and attorneys' fees reasonably incurred because of his conduct at trial.

**E.    Third Trial**

On March 19, 2025, the third trial concluded in a unanimous jury verdict in favor of Plaintiff and against SCMTD for $12,631,250 in noneconomic damages and $368,000 in economic damages. ECF No. 586. The Court entered judgment the same day. ECF No. 589. On April 16, 2024 SCMTD filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. ECF No. 618. On May 1, 2025 Plaintiff filed an opposition. ECF No. 640. On May 7, 2025, SCMTD filed a reply. ECF No. 642. This order follows.

In the discussion of the third trial, citations below are to the trial transcript ("TT"). The

1    trial transcript is spread across twelve volumes, with one volume for each day of trial and

2    continuous pagination across all twelve volumes. Citations herein are to the multi-volume

3    transcript page numbers. *See* ECF Nos. 591 (Transcript Vol. 1, pages 1–41), 592 (Vol. 2, pages

4    42–252), 593 (Vol. 3, pages 253–413), 594 (Vol. 4, pages 414–576), 595 (Vol. 5, pages 577–705),

5    596 (Vol. 6, pages 706–845), 597 (Vol. 7, pages 846–961), 598 (Vol. 8, pages 962–1154), 599

6    (Vol. 9, pages 1155–1307), 600 (Vol. 10, pages 1308–1446), 601 (Vol. 11, pages 1447–1559), and

7    603 (Vol. 12, pages 1560–1620).

## II.    DISCUSSION

### A.    Legal Standard

10    "The court may, on motion, grant a new trial on all or some of the issues – and to any party

11    – as follows:  (A) after a jury trial, for any reason for which a new trial has heretofore been

12    granted in an action at law in federal court . . ." Fed. R. Civ. Proc. 59(a)(1). "The district court

13    must grant a motion for a new trial where 'the verdict is against the weight of the evidence,' 'the

14    damages are excessive' or, 'for other reasons, the trial was not fair to the [moving] party.'"

15    *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (quoting *Montgomery Ward & Co. v.*

16    *Duncan*, 311 U.S. 243, 251 (1940)). "A new trial is warranted when the verdict is against the

17    great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous

18    result." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (cleaned up). "[T]he

19    district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage

20    of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir.

21    2014).

22    Where a damages verdict is excessive, the court may grant a new trial unless the plaintiff

23    accepts a remittitur, which "must reflect the maximum amount sustainable by the proof." *Oracle*,

24    765 F.3d at 1094 (cleaned up). When assessing remittiturs of state-law claims, federal courts

25    apply state law. *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 437 (1996). California

26    law expressly authorizes remittitur when there are "excessive damages." Cal. Code Civ. Proc. §

27    662.5(a)(2). Trial courts have broad discretion to remit excessive damages and sit as "independent

28    trier[s] of fact" when doing so. *Lane v. Hughes Aircraft Co.*, 22 Cal. 4th 405, 412 (2000) (cleaned

United States District Court
Northern District of California

up).

**B.      Plaintiff's MS Diagnosis**

SCMTD's first argument is that the jury should have heard evidence of Plaintiff's MS diagnosis.  Mot. at 4-7.

**1.      Legal Standard**

Federal Rule of Civil Procedure 61 states that "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  "A new trial is only warranted when an erroneous evidentiary ruling substantially prejudiced a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

**2.      Background**

Here is how the Court addressed the MS issue at trial:

THE COURT: LAST WEEK PLAINTIFF FILED A MOTION TO STRIKE, AND ON FRIDAY DEFENDANT RESPONDED.

I WANTED TO TALK ABOUT THAT MOTION AND THE RESPONSE TO MAKE SURE I UNDERSTAND THE ISSUES.

LET ME FIRST TURN TO THE PLAINTIFF.

MY UNDERSTANDING IS THAT DR. CONTE'S OPINION IS THAT THE INJURY ON THE BUS THAT'S THE SUBJECT OF THIS LAWSUIT DID NOT CAUSE THE PLAINTIFF'S M.S. TO WORSEN; IS THAT CORRECT?

MS. AIKENS: IN ESSENCE, YES.

THE COURT: OKAY. ARE YOU PLANNING TO CALL DR. CONTE AT TRIAL?

MS. AIKENS: NO.

THE COURT: AT THE FIRST TRIAL, THERE WAS NO MENTION OF PLAINTIFF'S M.S., AND CERTAINLY NO ASPECT OF HER DAMAGES CLAIM INCLUDED ANY SORT OF CLAIM THAT THE INJURY ON THE BUS AFFECTED HER M.S.

1    DO YOU EXPECT THAT WILL BE THE SAME AT THIS COMING TRIAL?

2    MS. AIKENS: YES. AND IF I COULD JUST STATE A LITTLE BIT?

3    THE COURT: SURE.

4    MS. AIKENS: I THINK THE ISSUE CAME BECAUSE THE PRIOR DEFENSE

5    COUNSEL, IT WAS UNCLEAR, AND IF IT CAME UP, THEY WANTED TO RESERVE THE

6    RIGHT, WHICH IS WHY WE ALSO HAD DR. CONTE IN CASE THERE WAS ANY

7    INDICATION OF TRYING TO BRING THAT IN.

8    ONCE IT BECAME CLEAR THAT THEY WERE NOT GOING TO BE TALKING

9    ABOUT THE M.S., WE AGREED THAT WE WERE NOT GOING TO DO THAT EITHER,

10    AND SO THAT'S WHY WE WERE NOT INCLUDING THAT TO MUDDY THE WATERS, IF

11    YOU WILL, AND AS I STATED IN MY MOTION, THAT'S HOW WE GOT A MISTRIAL

12    THE LAST TIME, AND SO I'M NOT INTENDING TO ELICIT ANY OF THAT TESTIMONY.

13    THE COURT: THANK YOU. I APPRECIATE THE CLARIFICATION.

14    LET ME TURN TO THE DEFENDANT.

15    YOU HEARD THAT PLAINTIFF IS NOT GOING TO CALL DR. CONTE OR RAISE

16    ISSUES ABOUT M.S. AT ALL AT THE TRIAL. IN LIGHT OF THAT, DO YOU STILL SEE A

17    NEED FOR YOUR DESIGNATION OF THE EXCERPT OF HIS DEPOSITION TESTIMONY?

18    MR. CRIDLAND: YES, YOUR HONOR.

19    AND THE REASON FOR THAT IS THAT SOME OF THE DOCTORS WHO ARE

20    GOING TO BE TESTIFYING, IN PARTICULAR DR. PRIMUS, HAD AS PART OF THEIR

21    DIFFERENTIAL DIAGNOSIS BACK DURING THE TIMEFRAME THAT HE WAS

22    TREATING AMJ IN 2017 AND 2018, HE TESTIFIED THAT HE HAD A DIFFERENTIAL

23    DIAGNOSIS THAT SOME OF HER PROBLEMS WERE BEING CAUSED BY MATTERS

24    OTHER THAN THE ORTHOPEDIC INJURIES THAT HE WAS TREATING, AND WE

25    BELIEVE THAT THAT BRINGS IN, AND WILL BRING IN, SOME ISSUES RELATED TO

26    HER OTHER CONCERNS, INCLUDING M.S., INTO THIS TRIAL, AND WE WANT TO BE

27    ABLE TO PRESERVE DR. CONTE'S OPINION FOR USE AT TRIAL IN THE EVENT THAT

28    IT IS NECESSARY.

United States District Court
Northern District of California

1    IN ADDITION, I WOULD NOTE THAT -- EXCUSE ME -- AT THE TIME THE

2  DESIGNATION WAS SUBMITTED, DR. CONTE IS AND CONTINUES TO BE ON THE

3  TRIAL PARTICIPANT LIST SUBMITTED BY THE PLAINTIFF, AND IN THE EVENT

4  THAT HE IS CALLED TO TESTIFY, OBVIOUSLY WE WANT TO BE ABLE TO USE HIS

5  DEPOSITION, ALTHOUGH IN THAT CASE IT MIGHT NOT BE AS A FORMAL

6  DESIGNATION.

7    THE COURT: SO LET ME TURN BACK TO PLAINTIFF'S COUNSEL.

8    IN MY OPINION, THE TREATING PHYSICIANS SHOULD ONLY DISCUSS

9  INJURIES THAT ARE CAUSALLY RELATED TO THE ISSUE THAT IS AT ISSUE IN THIS

10  CASE.

11    DO YOU AGREE?

12    MS. AIKENS: I DO, YOUR HONOR.

13    THE COURT: OKAY.

14    MS. AIKENS: AND IF I COULD JUST ADD? I MEAN, THE DIFFERENTIAL

15  DIAGNOSIS IS A TYPICAL TO THE E.R. AND ALL OF THOSE THINGS. IT DOESN'T

16  MEAN THAT THIS WAS ONE OF THEM. AND ALSO HE'S AN ORTHOPEDIC SURGEON.

17  HE WASN'T DIAGNOSING HER WITH M.S., SO –

18    THE COURT: ALL RIGHT. SO I HAVE TWO CONCERNS ABOUT BRINGING UP

19  M.S., ONE IS RELEVANCE, AND THE OTHER IS UNFAIR PREJUDICE.

20    AS TO RELEVANCE, IN MY OPINION, MEDICAL CONDITIONS THAT THE

21  PLAINTIFF HAS THAT ARE NOT CAUSALLY RELATED TO THE INJURY AT ISSUE IN

22  THIS CASE ARE NOT RELEVANT, AND IRRELEVANT EVIDENCE IS NOT ADMISSIBLE.

23    SECOND, I'M CONCERNED THAT MENTIONING M.S. MAY BE UNFAIR

24  PREJUDICE FOR THE PLAINTIFF AND MAY CONFUSE THE JURY.

25    THE JURY, IF THEY HEAR ABOUT AN M.S. DIAGNOSIS, MIGHT THINK THAT IT

26  IS, OR IS PARTLY, THE CAUSE OF THE INJURIES AT ISSUE IN THIS CASE, AND I

27  HAVE CONCERN ABOUT THAT.

28    SO MY IN LIMINE RULING IS THAT THERE CAN BE NO MENTION OF M.S. AT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    TRIAL, AND THAT'S FOR BOTH RELEVANCE AND RULE 403 PURPOSES.

2        IF DURING THE TRIAL THE DEFENDANT BELIEVES THAT PLAINTIFF HAS IN

3    SOME MANNER OPENED THE DOOR SUCH THAT YOU BELIEVE THAT BRINGING UP

4    M.S., WHETHER THROUGH CONTE'S DEPOSITION EXCERPT OR OTHERWISE, SUCH

5    THAT YOU BELIEVE IT WOULD BE JUSTIFIED AND THAT MY IN LIMINE ORDER

6    SHOULD BE CHANGED, THEN I ORDER YOU TO RAISE THAT WITH ME OUTSIDE THE

7    PRESENCE OF THE JURY SO I CAN EVALUATE THAT ARGUMENT AND DECIDE

8    WHETHER IT IS CORRECT OR NOT.

9        BUT THE PARTIES ARE NOT TO MENTION THE M.S. DIAGNOSIS IN FRONT OF

10   THE JURY. INSTEAD -- AND THIS WOULD GO FOR THE PLAINTIFF AS WELL. IF

11   EITHER SIDE BELIEVES THAT THERE IS REASON TO MENTION IT IN THE CASE,

12   THEN YOU ARE TO BRING THAT ARGUMENT TO ME OUTSIDE OF THE PRESENCE OF

13   THE JURY SO I CAN EVALUATE IT FIRST. I DON'T WANT ANY SURPRISES ABOUT

14   THE M.S. DIAGNOSIS IN FRONT OF THE JURY.

15       YOU CAN RAISE THAT TO ME OUTSIDE OF THE PRESENCE OF THE JURY.

16       IS THAT UNDERSTOOD, PLAINTIFF?

17       MS. AIKENS: YES, YOUR HONOR.

18       THE COURT: IS THAT UNDERSTOOD, DEFENDANT?

19       MR. CRIDLAND: YES, YOUR HONOR.

20   TT 16:21-20:24

21       In other words, the Court excluded references to MS on relevance and unfair prejudice

22   grounds but stated that if either side believed there was a reason to mention it in the case, they

23   could bring it to the Court's attention outside the presence of the jury so the Court could evaluate

24   the argument.  Neither side did so.

25       **3.      Analysis**

26       It is unclear what error SCMTD thinks the Court committed.  Plaintiff's fall on the bus

27   injured their left knee, permanently disabling them.  SCMTD proffered no evidence at trial that

28   Plaintiff's MS caused or contributed to the left knee injury.  As Plaintiff rightly points out in their

United States District Court
Northern District of California

1  opposition to SCMTD's motion for a new trial, a showing that MS caused or contributed to an

2  injury to one specific joint in someone's body (here, the left knee) would require expert testimony,

3  and SCMTD did not proffer any such expert. The Court properly excluded references to MS for

4  both relevance and Rule 403 purposes in the absence of any evidence that it contributed to

5  Plaintiff's left knee injury.

6       At trial, SCMTD argued (as quoted above): "SOME OF THE DOCTORS WHO ARE

7  GOING TO BE TESTIFYING, IN PARTICULAR DR. PRIMUS, HAD AS PART OF THEIR

8  DIFFERENTIAL DIAGNOSIS BACK DURING THE TIMEFRAME THAT HE WAS

9  TREATING AMJ IN 2017 AND 2018, HE TESTIFIED THAT HE HAD A DIFFERENTIAL

10  DIAGNOSIS THAT SOME OF HER PROBLEMS WERE BEING CAUSED BY MATTERS

11  OTHER THAN THE ORTHOPEDIC INJURIES THAT HE WAS TREATING, AND WE

12  BELIEVE THAT THAT BRINGS IN, AND WILL BRING IN, SOME ISSUES RELATED TO

13  HER OTHER CONCERNS, INCLUDING M.S., INTO THIS TRIAL . . ." TT 18:9-17.

14       That argument was unpersuasive. First of all, it was factually inaccurate. In addition to

15  Plaintiff's physical therapist Jamie Jackson (who is not a medical doctor), there was only one

16  doctor who treated Plaintiff and who testified at trial, Gregory Primus – there were not "some"

17  doctors who treated them and testified. Primus did not treat the Plaintiff in 2017 and 2018, as

18  SCMTD wrongly stated. He stopped treating them in 2016. TT 766:16-24. SCMTD

19  acknowledges in its motion that Plaintiff was not diagnosed with MS until 2017 (Mot. at 4), after

20  Primus had stopped treating them.

21       Even if it were true that Primus thought "some of her problems were being caused by

22  matters other than the orthopedic injuries that was he treating," this lawsuit is not vaguely about

23  "some of her problems." The disabling injury at the heart of this case is the injury to Plaintiff's

24  left knee. Primus testified that Plaintiff's left knee injury was caused by the fall on the bus. TT

25  1022:13-1023:13. Any opinions he had that other problems were caused by other things are

26  irrelevant. It is particularly hard to understand how Primus's opinions formed in the course of

27  treating Plaintiff in 2014-16 (TT 741:10-13 (started in March 2014); TT 766:16-24 (ended in

28  August 2016)) make relevant an MS diagnosis that wasn't made until 2017 and that an orthopedic

surgeon like Primus would obviously have been unable to make.

The other argument SCMTD made at trial was: "AND WE WANT TO BE ABLE TO PRESERVE DR. CONTE'S OPINION FOR USE AT TRIAL IN THE EVENT THAT IT IS NECESSARY. [¶] IN ADDITION, I WOULD NOTE THAT -- EXCUSE ME -- AT THE TIME THE DESIGNATION WAS SUBMITTED, DR. CONTE IS AND CONTINUES TO BE ON THE TRIAL PARTICIPANT LIST SUBMITTED BY THE PLAINTIFF, AND IN THE EVENT THAT HE IS CALLED TO TESTIFY, OBVIOUSLY WE WANT TO BE ABLE TO USE HIS DEPOSITION, ALTHOUGH IN THAT CASE IT MIGHT NOT BE AS A FORMAL DESIGNATION." TT 18:17-25.

Plaintiff did not call Conte to testify, so SCMTD did not need to use his deposition to cross examine him. As to SCMTD's desire to "be able to preserve Dr. Conte's opinion for use at trial," Conte's opinion was: "the August 25, 2014, incident did not cause or exacerbate Miss Jones' underlying MS because 1) The scientific literature does not clearly support trauma or stress directly causing or exacerbating MS, and 2) It is more likely than not that her continued knee symptoms are an orthopedic issue rather than a neurological issue." ECF No. 619-2 at 15.

If Plaintiff had argued to the jury that the fall on the bus caused or exacerbated their MS, that could have opened the door to SCMTD calling Conte. The Court explicitly stated: "IF DURING THE TRIAL THE DEFENDANT BELIEVES THAT PLAINTIFF HAS IN SOME MANNER OPENED THE DOOR SUCH THAT YOU BELIEVE THAT BRINGING UP M.S., WHETHER THROUGH CONTE'S DEPOSITION EXCERPT OR OTHERWISE, SUCH THAT YOU BELIEVE IT WOULD BE JUSTIFIED AND THAT MY IN LIMINE ORDER SHOULD BE CHANGED, THEN I ORDER YOU TO RAISE THAT WITH ME OUTSIDE THE PRESENCE OF THE JURY SO I CAN EVALUATE THAT ARGUMENT AND DECIDE WHETHER IT IS CORRECT OR NOT." TT 20:4-10. But Plaintiff never mentioned MS to the jury and never made a claim that the fall on the bus caused or worsened their MS. Thus, Plaintiff did not open that door.

In the absence of such a door opening, nothing about Conte's opinion justifies mentioning MS. In particular, the second half of his opinion ("It is more likely than not that her continued

United States District Court
Northern District of California

11

knee symptoms are an orthopedic issue rather than a neurological issue.") underscores the irrelevance of MS to Plaintiff's knee injury.

In the motion for a new trial, SCMTD takes a new tact. First, it presents arguments as if there were evidence that Plaintiff's MS somehow contributed to their left knee injury, or perhaps that there doesn't need to be any such evidence. SCMTD says: "Not only would MS have affected AMJ's ability to recover from the 2014 incident, but the disease manifests in the reduced mobility that AMJ attributes solely to this incident." Mot at 4. Do you notice how SCMTD has exactly zero citations to support that assertion? There is nothing to cite. SCMTD never proffered any evidence that Plaintiff's MS affected their knee injury. Indeed, the expert opinion that SCMTD wanted to preserve for use at trial (Conte's) concluded the opposite of that.

SCMTD argues that "evidence of AMJ's diagnosis would have affected the jury's evaluation of AMJ's future noneconomic and economic damages *arising from the incident,*" Mot. at 5 (emphasis added). But that could only have been true if there were evidence that their MS contributed to the knee injury, which is the injury that arose from the incident. And there wasn't.

SCMTD also seems to argue that no evidence that the MS contributed to the left knee injury was needed because the jury could draw that inference itself: "[T]he jury should have been permitted to hear evidence of AMJ's MS diagnosis in order to evaluate whether SCMTD's alleged negligence was a substantial factor in causing AMJ's inability to walk." Mot. at 4-5. But no, that is the Rule 403 problem. Without evidence that Plaintiff's MS contributed to their left knee injury, the diagnosis wasn't relevant at all. Admitting evidence of the MS in that situation would be unduly prejudicial because it would invite the jury to speculate. In reality, if there were any merit to the notion that Plaintiff's MS contributed to the left knee injury, SCMTD would have retained a medical expert to testify to that effect. Although the number of experts who testified at trial was not large, the parties' expert disclosures contained numerous experts. SCMTD was apparently unable to find anyone who would testify under oath that Plaintiff's MS contributed to their left knee injury. In the absence of such evidence, the Court properly excluded references to

MS.[3]

SCMTD also contends that the Court's in limine order unfairly prevented SCMTD from cross-examining Primus. SCMTD points to the following testimony by Primus from the first trial:

> Q Okay. With respect to Amanda's being able to walk and the leg just giving out on her, do you have an explanation for that, from your perspective?
>
> A I note here --
>
> (Witness examines document)
>
> A -- that she still has quad weakness, and there's various things that we're thinking about that could be leading to her pronounced persistent quad weakness. We mention a spine cause; *we mention autoimmune issues that may be at play*.
>
> But we also know that for some people after knee surgery, and in particular, knee surgery that involves the kneecap or any type of ligament reconstruction, it could take a year, it could take up to 15, 18 months for their quadriceps to return. Some people have a dramatically delayed return of their quad function after surgery.
>
> That's why sometimes you hear very elite athletes, professional athletes requiring a year to return from ACL surgery, is because their quadriceps muscle took forever to come back.
>
> So we were expressing those concerns at this point, because I want to say we're about five or six months from surgery, and she still had significant quad weakness.
>
> Q Okay. Did you attribute that to the bus incident in 2014?

---

[3] In its reply brief, SCMTD says that in a retrial, it would call Dr. Sicotte, Dr. Beaber and Dr. Conte to testify. Reply at 15. SCMTD claims: "Each of these witnesses are experts on MS and treated AMJ. They are well-qualified to demonstrate that AMJ's MS diagnosis permeated all aspects of AMJ's daily life, including the severity of their alleged injuries arising from the 2014 incident, recovery and future treatment." *Id*. The argument about Dr. Sicotte and Dr. Beaber is waived because SCMTD did not proffer those experts at trial. It is also waived a second time because SCMTD did not make that argument or mention those experts in its motion for a new trial. New arguments in reply are not permitted because Plaintiff had no opportunity to respond to them. In addition, the argument as to all three experts fails for lack of factual support. SCMTD cites nothing to show that any of these experts would offer those opinions. As you know from reading the main text, Conte's report said the exact opposite of what SCMTD is now claiming ("It is more likely than not that her continued knee symptoms are an orthopedic issue rather than a neurological issue."). In its untimely and waived argument in its reply brief, SCMTD cites nothing to show what Sicotte's or Beaber's opinions actually are. The need for some factual support is apparent from the fact that SCMTD's argument about Conte in its reply brief flatly misrepresents what his opinions were.

A The quad weakness was attributed to the -- yes, the trauma from the bus accident, the surgery that was a direct result from the bus accident.

ECF No. 620-6 (emphasis added).

SCMTD also points to Primus's testimony in the third trial.  SCMTD points to TT 1030:15-1031:4.  Mot. at 6.  That testimony is as follows:

A. I BELIEVE SHE WOULD REQUIRE MORE PHYSICAL THERAPY. SHE'S NOT AT THIS TIME -- SHE'S STILL VERY MUCH IN THE HEALING PROCESS. SOMETIMES IT TAKES UPWARDS TO A FULL 12 MONTH PERIOD, AND EVEN 15 MONTHS, FOR ONE TO KIND OF MAXIMIZE WHAT THEIR QUAD STRENGTH IS GOING TO BE. SO SHE'S STILL EARLY IN THE PROCESS OF DEVELOPING HER QUADS, AND UNTIL THAT HAPPENS, WE – YOU KNOW, IT'S HARD TO KNOW WHAT HER ULTIMATE FUNCTION WOULD BE.

SO SHE CERTAINLY WOULD HAVE NEEDED TO CONTINUE WITH A QUAD HEAVY, QUAD STRENGTHENING TYPE OF PHYSICAL THERAPY.

BECAUSE OF HER CONCERNS ABOUT HER BACK AND HER WORSENING BACK ISSUES AND POTENTIAL -- THAT CONDITION'S POTENTIAL EFFECT ON HER OVERALL LEG AND LEG WEAKNESS AND FUNCTION, THERE DEFINITELY WOULD HAVE BEEN CONSIDERATION TO CONTINUE HER SPINE EVALUATION AND WORKUP, AS WELL TO ADDRESS HER GENERALIZED WEAKNESS.

SCMTD claims that the reference to "autoimmune issues" in the first trial and the reference to "her concerns about her back and her worsening back issues" are both references to MS.  Thus, SCMTD concludes that "Due to the Court's order excluding all references to MS, SCMTD's counsel was unable to question Dr. Primus regarding whether he ruled out AMJ's autoimmune disease from his differential diagnosis."  Mot. at 7.

That argument is not persuasive.  First, the Court's in limine order barred references to MS unless counsel, outside of the presence of the jury, persuaded the Court that there was a reason to mention MS.  The Court did not bar references to "autoimmune issues" or "worsening back issues."  Primus never mentioned MS, and as an orthopedic surgeon was not qualified to make and did not make a diagnosis of MS, and nothing prohibited SCMTD from cross examining Primus about why he concluded that any other problems he observed were not the cause Plaintiff's left knee injury.  The supposed constraint on SCMTD's ability to cross examine Primus is made up.

14

Second, SCMTD's argument ignores the fact that the Court told the parties that:

> IF EITHER SIDE BELIEVES THAT THERE IS REASON TO MENTION IT IN THE CASE, THEN YOU ARE TO BRING THAT ARGUMENT TO ME OUTSIDE OF THE PRESENCE OF THE JURY SO I CAN EVALUATE IT FIRST. I DON'T WANT ANY SURPRISES ABOUT THE M.S. DIAGNOSIS IN FRONT OF THE JURY.
>
> YOU CAN RAISE THAT TO ME OUTSIDE OF THE PRESENCE OF THE JURY.
>
> IS THAT UNDERSTOOD, PLAINTIFF?
>
> MS. AIKENS: YES, YOUR HONOR.
>
> THE COURT: IS THAT UNDERSTOOD, DEFENDANT?
>
> MR. CRIDLAND: YES, YOUR HONOR.

TT 20:14-24.  SCMTD did not bring the above excerpt from Primus's testimony in the first trial that references "autoimmune issues" to the Court's attention and argue that it justified referring to MS.  Nor did SCMTD argue that Primus's reference to "worsening back issues" in the third trial was a secret reference to MS that justified referring to MS.  The Court explicitly left the door open to either side raising the MS issue again, as long as they did so outside the presence of the jury. And neither side ever raised it again.  The Court did not commit error by failing to consider arguments and proffers that SCMTD never made.

## C.    Juror Misconduct

Second, SCMTD contends that there should be a new trial because Juror No. 6 slept through important parts of the trial.

By way of background, SCMTD raised the issue of Juror No. 6 being asleep with the Court on March 5, 2025:

> THE COURT: AND I BELIEVE THAT THE WITNESS'S TESTIMONY ADDRESSED THAT ISSUE.
>
> IS THERE ANYTHING ELSE THAT THE DEFENSE WOULD LIKE TO ADDRESS OUTSIDE OF THE PRESENCE OF THE JURY?
>
> MR. PAINTER: YES, THERE IS, YOUR HONOR.
>
> IT LOOKS LIKE WE MAY HAVE A SLEEPER. JUROR NUMBER 6 APPEARED TO BE NODDING OFF. I WOULD ASK THE

COURT TO KEEP AN EYE ON JUROR NUMBER 6 FOR US, PLEASE.

MR. HENDERSON, I THINK IT IS.

THE COURT: I SEE. THANK YOU FOR BRINGING THAT TO MY ATTENTION. I WILL KEEP AN EYE OUT FOR THAT.

TT 412:7-17.

The Court's attempted solution was to take more frequent breaks. At each break, the jurors were forced to get up and walk to the jury room, and at the end of the break to get up again and walk back to the courtroom. This met with limited success. The Court observed that on several occasions, Juror No. 6 still appeared to be asleep. Other than SCMTD's request, noted above, for the Court to "keep an eye on juror number 6 for us," neither side asked the Court to do anything further as to Juror No. 6. For example, neither side asked the Court to remove Juror No. 6 from the jury. Instead, they both waited to see what the jury verdict would be. After the jury verdict came back, SCMTD decided that "[b]ecause Juror 6 slept through key testimony, SCMTD did not receive a fair trial from an impartial, competent jury." Mot. at 8.

### 1.    Waiver

The Court agrees with Plaintiff that SCMTD waived this issue by not asking the Court to remove Juror No. 6 from the jury. In its new trial motion, SCMTD complains that having a juror who slept through part of the trial prejudiced it, but that alleged prejudice could have been cured by removing him from the jury, and SCMTD did not ask the Court to do that. The Eleventh Circuit has explained that "[o]ur cases teach that 'a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct.'" *United states v. Bollinger*, 837 F.2d 436, 438-39 (11th Cir. 1988) (quoting *United States v. Jones*, 597 F.2d 485, 588 n.3 (5th Cir. 1979)).[4]  "In *Jones,* the court explained that a motion for new trial based on juror misconduct is a form of new trial motion for newly discovered evidence." *Id*. at 439 (citing *Jones*,

---

[4] The Eleventh Circuit referred to the Fifth Circuit's decision in *Jones* as "[o]ur cases" because the Eleventh Circuit treats as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *Bollinger*, 837 F.2d at 439 n.1.

United States District Court
Northern District of California

597 F.2d at 488). "As such, the motion must be supported by proof that the evidence of misconduct was not discovered until after the verdict was returned. In the particular context of juror misconduct, this rule serves to ensure that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences." *Id*.; *accord*, *United States v. Dean*, 667 F.2d 729, 733 (8th Cir. 1982) ("The cases generally have dealt with the timeliness issue as in *United States v. Sorenson* [611 F.2d 701 (8th Cir. 1979)], where this court, without considering the degree of prejudice that might have been present, held that an objection based on known jury misconduct could not be raised for the first time after trial.").

The Eleventh Circuit followed that precedent in a case involving a sleeping juror. *See Cummings v. Department of Corrections*, 757 F.3d 1228, 1234 (11th Cir. 2014). In that case the plaintiff attempted to distinguish *Bollinger* on the ground that "because the Magistrate Judge was aware that Juror Linn slept through a portion of the trial, he was not required to object when she was allowed to remain on the jury." *Id*. "But that distinction is not material to the larger takeaway of *Bolinger:* a motion for a new trial is not a vehicle for sandbagging an opposing party after the jury returns an unfavorable verdict." *Id*. at 1235. "As the Magistrate Judge explained, parties are free to waive most trial errors in the interest of trial strategy, and Cummings's failure to object could have been such a strategy. Cummings was aware that Juror Linn appeared to be sleeping, or at the very least was inattentive. He should have objected when the Magistrate Judge permitted her to remain on the jury." *Id*. "Because Cummings was aware of Juror Linn's purported misconduct and declined to object to her retention on the jury, he cannot now get a second bite of the apple after the jury returned an unfavorable verdict." *Id*. (cleaned up); *see also Idom v. Natchez-Adams School Dist*., 178 F. Supp. 3d 426, 436 (S.D. Miss. 2016) ("The defendants allege that, on several occasions, the Court observed three jurors sleeping which highly prejudiced the defendants' right to a fair trial," but "[b]ecause the defendants failed to raise a timely objection at trial, and waited until after the conclusion of the evidence and entry of the verdict, their objection is waived.").

Here, SCMTD's claim that Juror No. 6 slept through important parts of the trial is based on its counsel's declaration attesting that he witnessed this during trial. Declaration of Charles S.

1    Painter, ECF No. 619, ¶¶ 16-18, 21.  That means the alleged juror misconduct was known to

2    SCMTD during trial, and Defendant could have objected and asked the Court to remove Juror No.

3    6 from the jury, which would have cured the alleged prejudice.  However, SCMTD chose not to

4    do so and instead gambled on a favorable verdict.  SCMTD has therefore waived its objection to

5    the sleeping juror.

6        **2.    Prejudice**

7        Although waiver is sufficient to address the issue of the sleeping juror, for the sake of

8    completeness, the Court also addresses the claim of prejudice.  "Every incident of juror

9    misconduct does not require a new trial."  *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir.

10   1987), *abrogated on other grounds by United States v. Benally*, 843 F.3d 350, 353-54 (9th Cir.

11   2016).  In the criminal context, what matters is "whether there was a deprivation of [Defendant's]

12   Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury."  *Id.*  In

13   *Springfield*, the Ninth Circuit held that "[t]he court had discretion to resolve the problem of the

14   sleeping juror.  It considered carefully the testimony missed during the nap and found that it was

15   insubstantial.  We find no abuse of discretion in the method used to remedy the situation."  *Id.*

16       "*Springfield* holds that the presence of a sleeping juror during trial does not, per se, deprive

17   a defendant of a fair trial.  Cast another way, *Springfield* makes clear that the presence of all

18   awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to

19   reliably serve its function as a vehicle for determination of guilt or innocence.  A single juror's

20   slumber thus is not per se plain error."  *United States v. Olano*, 62 F.3d 1180, 1189 (9th Cir.

21   1995); *see also Fuller v. Hill*, 292 Fed. Appx. 545, 546 (9th Cir. 2008) ("[E]ven assuming we

22   accept Fuller's argument that a juror was asleep . . . the claim still fails" because "[g]iven the

23   admitted brevity of the problem and the lack of specifics as to what testimony, if any, may have

24   been missed, Fuller cannot show that his counsel acted outside the wide range of reasonable

25   professional assistance or that there was a reasonable probability of a different outcome had his

26   counsel moved for a mistrial or removed the juror.").

27       "The test is whether or not the misconduct has prejudiced the defendant to the extent that

28   he has not received a fair trial."  *United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir. 1977)

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1    (citation and quotation marks omitted). "Where, as here, a sleeping juror is noted on the record

2    but not removed, the standard is not as stringent for civil cases as it might be for criminal cases

3    where Fifth Amendment and Sixth Amendment rights are impacted." *Jackson v. A-C Product*

4    *Liability Trust*, 622 F. Supp. 2d 641, 648 (N.D. Ohio 2009).

5            The evidentiary showing of prejudice that SCMTD attempts to make comes from

6    paragraphs 16-18 and 21 of Painter's declaration. Let's read those paragraphs closely. In terms of

7    the evidence[5] that Juror No. 6 missed, Painter testifies that "[o]n March 5, 2025," he observed

8    Juror No. 6 asleep during "the essential testimony of Leonardo Pena." ECF No. 619 ¶ 16. "On

9    March 6, 2025," he observed Juror No. 6 "asleep during the essential testimony of Sergio Lona

10   Gonzales, the driver of defendant's bus on the date of the incident." *Id.* ¶ 17. "On March 13,

11   2025," he observed Juror No. 6 "asleep during the essential testimony of Gregory Primus, Douglas

12   Cross and David Rishel." And "[o]n March 7, 2025, and March 10, 2025," he observed Juror No.

13   6 "asleep during almost all of my cross-examination of plaintiff." *Id.* ¶ 18. Thus, except for his

14   cross-examination of Plaintiff, Painter does not attempt to quantify how long Juror No. 6 was

15   asleep during any of these witnesses' testimony, or which testimony he slept through. Painter just

16   gives us his conclusion that Juror No. 6 slept through the "essential" testimony.

17           If you read Painter's declaration quickly and don't look at it too closely, you could be

18   forgiven for thinking he did something more ambitious than this. Surrounding his assertions of

19   when Juror No. 6 was asleep, Painter says that attached as Exhibits O, P, Q and S are "the relevant

20   pages of testimony." Does this mean that Painter has identified the portions of the testimony

21   during which Juror No. 6 was asleep? No. Exhibit O (ECF No. 621-1) is the colloquy with the

22   Court in which SCMTD said that Juror No. 6 was sleeping. Exhibit P (ECF No. 621-2) is an

23   excerpt from the direct examination of Plaintiff, when Painter does not claim Juror No. 6 was

24   sleeping. Exhibit Q (ECF No. 621-3) is testimony from March 12, 2025, when Painter doesn't

25

_____

26   [5] Aside from witness testimony, Painter also states that he observed Juror No. 6 asleep during the
     defense's opening statement. ECF No. 619 ¶ 16. However, the Ninth Circuit has said that "[t]he
27   basic problem" for a sleeping juror is that "the juror does not observe witness testimony." *Olano*,
     62 F.3d at 1189. Accordingly, in the main text the Court considers Painter's claims that Juror No.
28   6 slept through witness testimony. Regardless, Painter does not say how much or which parts of
     the defense opening the juror slept through.

1    claim he observed Juror No. 6 sleeping.  And Exhibit S (ECF No. 621-5) is testimony from March

2    17, 2025, another date that Painter does not claim Juror No. 6 was sleeping.

3            Thus, for Pena, Gonzales, Primus, Cross and Rishel, all we have is defense counsel's

4    conclusory opinion that Juror No. 6 slept through the "essential" testimony.  The Court doesn't

5    think this establishes anything meaningful.  It is too conclusory and empty of content.  The Court

6    has no idea how Painter came to the conclusion that testimony was essential, or what he means by

7    that.  After all, we are talking about a lawyer who witnessed a sleeping juror, did not think that

8    was a problem at the time and did not ask for the juror to be excused, but who now argues that the

9    presence of this juror requires a new trial.  This is a lawyer with flexible views and what he

10   thought it was essential for all the jurors to hear changed after the jury verdict.

11           Now let's talk about Painter's claim that he "observed" Juror No. 6 "asleep during almost

12   all of my cross-examination of plaintiff."  ECF No. 619 ¶ 18.  The Court finds that statement

13   unworthy of belief.  During both direct and cross-examination, Plaintiff was seated in a scooter at

14   Plaintiff's counsel's table, opposite the jury.  Painter was at the podium, which he had turned away

15   from the witness stand and toward Plaintiff.  This meant that Juror No. 6 was in Painter's left

16   peripheral vision during the cross-examination.  When the Court observed Juror No. 6 asleep at

17   times during the trial, the Court had to look directly at him for a couple of seconds to be sure he

18   really was asleep.  Painter wants us to believe that he didn't need to do that, but the Court doesn't

19   buy it.

20           During his cross-examination of Plaintiff, the Plaintiff was the center of Painter's attention

21   both physically (he was looking at them nearly the entire time) and mentally, as he was

22   questioning them, listening to them, and asking follow-up questions.  The Court would have been

23   willing to believe a declaration that Painter observed Juror No. 6 asleep at several points in his

24   cross-examination of Plaintiff, but the Court does not believe Painter's statement that he observed

25   Juror No. 6 to be asleep "during almost all" of his cross-examination.  During almost all of that

26   cross-examination, Painter was looking at and his attention was focused on the Plaintiff.

27           Thus, in addition to having waived this argument, the Court thinks that SCMTD has failed

28   to show prejudice.  For Pena, Gonzales, Primus, Cross and Rishel, SCMTD has not provided any

United States District Court
Northern District of California

20

1    particularity or quantification of how much testimony Juror No. 6 slept through, and nothing but

2    counsel's conclusory say-so that it was the "essential" parts.  For Plaintiff's cross-examination,

3    Painter's declaration is wholly unbelievable.  This is not a sufficient showing of prejudice to

4    overturn a civil jury verdict.  *See Jackson*, 622 F. Supp. 2d at 648-49 (juror "was asleep for much

5    of the trial," but "Defendant makes no showing of prejudice," so "[t]his ground for a new trial is

6    denied").[6]

7    **D.    Jury Instructions Concerning Damages**

8           Next, SCMTD contends that the Court's jury instructions on damages were erroneous.  In

9    section VII of its motion for a new trial, SCMTD challenges Instruction 29 (ECF No. 574).  It also

10   says that it is challenging the additional instructions the Court gave in response to the jury's

11   question (ECF No. 584).

12          **1.    Legal Standard**

13          "The district court must formulate jury instructions so that they fairly and adequately cover

14   the issues presented, correctly state the law, and are not misleading."  *Abromson v. American*

15   *Pacific Corp*., 114 F.3d 898, 901 (9th Cir. 1997).  "Prejudicial error results from jury instructions

16   that, when viewed as a whole, fail to fairly and correctly cover the substance of the applicable

17   law."  *White v. Ford Motor Co*., 312 F.3d 998, 1012 (9th Cir. 2002).  "A district court has

18   substantial latitude in tailoring jury instructions . . . as long as the district court's instructions

19   'fairly and adequately covered the issues presented, correctly stated the law, and were not

20   misleading,'" *Kendall-Jackson, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1051 (9th Cir. 1998)

21   (quoting *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir. 1988)).

22          "A party who objects to an instruction or the failure to give an instruction must do so on

23   the record, stating distinctly the matter objected to and the grounds for the objection."  Fed. R.

24   Civ. Proc. 51(c)(1).  To be timely, a party must "object on the record and out of the jury's hearing

25   before the instructions and arguments are delivered," or if "a party was not informed of an

26   instruction or action on a request before that opportunity to object," then "promptly after learning

27

28   ────────────────
     [6] The Court gives no consideration to the April 30, 2025 Declaration of Carla Aikens.  ECF No.
     640-1.

United States District Court
Northern District of California

that the instruction or request will be, or has been, given or refused." Fed. R. Civ. Proc. 51(c)(2), (b)(2). "Objections that a party fails to raise 'until after the jury has rendered its verdict and was discharged' are 'waived.'" *French v. City of Los Angeles*, 2022 WL 2189649, *4 (C.D. Cal. May 10, 2022) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

## 2.    Procedural Background

The Court filed its proposed jury instructions on March 10, 2025.  ECF No. 553.  SCMTD did not file any objections to the Court's proposed jury instructions.  The charging conference went from TT 1414:6-1445:9.  At the charging conference, SCMTD objected to Instruction 29[7] in part:

> THE COURT: THE COURT HAD ON MARCH 10TH FILED THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS AND THE COURT'S PROPOSED VERDICT FORM, AND I ORDERED THE PARTIES TO FILE ANY OBJECTIONS THAT THEY MAY HAVE TO EITHER BY MARCH 14TH.
>
> DEFENDANT FILED A PROPOSED VERDICT FORM BUT DID NOT FILE ANY OBJECTIONS TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS.
>
> DOES DEFENDANT HAVE ANY OBJECTIONS TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS?
>
> MR. CRIDLAND: YES, YOUR HONOR, WE HAVE A FEW THINGS -- EXCUSE ME -- NOW THAT THE EVIDENCE HAS CLOSED, YOUR HONOR.
>
> WITH RESPECT TO THE COURT'S PROPOSED JURY INSTRUCTION NUMBER 29, DAMAGES-PROOF, MEASURES OF TYPES OF PROOF.
>
> THE COURT: SO YOU HAVE AN OBJECTION TO NUMBER 29; IS THAT CORRECT?
>
> MR. CRIDLAND: YES, YOUR HONOR.
>
> THE COURT: OKAY.
>
> MR. CRIDLAND: IN PART.

TT 1414:6-23.

---

[7] Instruction 29 is based on Ninth Circuit model jury instructions 5.1 and 5.2.

1    THE COURT: OKAY. THAT'S FAIR ENOUGH.

2    THEN LET ME TURN TO DEFENDANT. YOU MENTIONED
3    INSTRUCTION 29. LET'S -- BUT WHY DON'T YOU GO AHEAD
     AND GIVE ME ANY AND ALL OBJECTIONS YOU HAVE TO
4    THE COURT'S PROPOSED FINAL INSTRUCTIONS.

5    MR. CRIDLAND: YES, YOUR HONOR, IT'S VERY SIMPLE.
     LINES 16 THROUGH 22 --

6    THE COURT: HOLD ON. IT'S 29 THAT YOU'RE TALKING
7    ABOUT?

8    MR. CRIDLAND: YES.

     THE COURT: OKAY. THANK YOU.
9
10   MR. CRIDLAND: THE COURT'S PROPOSED FINAL JURY
     INSTRUCTION 29, PAGE 30, LINE 16 THROUGH 22, THE
11   DEFENSE PROPOSE THAT THOSE BE ELIMINATED FROM
     THE INSTRUCTION BASED ON THE LACK OF EVIDENCE IN
12   THE RECORD OF THE REASONABLE VALUE OF MEDICAL
     CARE, THE REASONABLE VALUE OF NECESSARY
13   MEDICAL CARE IN THE FUTURE, AND THE REASONABLE
     VALUE OF WAGES OR EARNING CAPACITY.

14   THE COURT: PLAINTIFF, WHAT IS YOUR RESPONSE?

15   MS. AIKENS: THAT AMJ HAS PUT OUT -- THAT'S THE
16   JURY'S DETERMINATION TO MAKE, BUT THAT AMJ HAS
     GIVEN SUFFICIENT EVIDENCE TO SUPPORT THEM MAKING
17   THE FINDING THEMSELVES.

18   THE COURT: I AGREE WITH PLAINTIFF. I'M GOING TO
     KEEP IN THOSE LINES FOR INSTRUCTION NUMBER 29.

19   ARE THERE OTHER OBJECTIONS FROM THE DEFENDANT
20   TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS?

21   MR. CRIDLAND: NO, YOUR HONOR.

22   TT 1441:12-1442:13; *see also* TT 1445:2-9 (confirming no further objections to the jury

23   instructions).  In other words, this was SCMTD's proposed edit to Instruction 29:

24       It is the duty of the Court to instruct you about the measure of
         damages. By instructing you on damages, the Court does not mean to
25       suggest for which party your verdict should be rendered.

26       If you find for the plaintiff on her negligence claim, you must
         determine the plaintiff's damages. The plaintiff has the burden of
27       proving damages by a preponderance of the evidence. Damages
         means the amount of money that will reasonably and fairly
28       compensate the plaintiff for any injury you find was caused by the

defendant. You should consider the following:

The nature and extent of the injuries;

The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;

The physical pain and suffering experienced and that with reasonable probability will be experienced in the future;

~~The reasonable value of necessary medical care, treatment, and services received to the present time;~~

~~The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;~~

~~The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.~~

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

As you can see, all of SCMTD's timely objections to Instruction 29 concerned economic damages.

On March 18, 2025 the jury submitted a question. ECF No. 579. The jury asked: "Given that our award must be based upon evidence and not speculation, how do we reconcile that with: a) the fact that we don't know the exact cost of certain expenses? b) subjective aspects of damages like 'loss of enjoyment of life'?" On March 19, 2025, SCMTD proposed additional jury instructions in response to the jury's question. ECF No. 580. SCMTD's additional proposed instructions were adapted from CACI 3902, 3903, 3903A, 3903C, 3903D, 3903E. All of SCMTD's proposed additional instructions were about economic damages.

The Court discussed additional jury instructions with the parties from TT 1563:24-1611:24. The Court summarizes the arguments and objections that SCMTD made during the course of this discussion. SCMTD proposed that the Court provide an amended verdict form dividing economic from noneconomic damages, TT 1565:15-17 (which the Court did, ECF No. 585), and that the Court give CACI instructions 3902, 3903, 3903A, 3903C, 3903D, 3903E concerning economic damages. TT1565:15-21. With respect to noneconomic damages (question B from the jury), SCMTD proposed no change to the jury instructions and that the Court "simply indicate that: The instructions I have given you are the law you must apply to guide you in your

24

decision regarding Question B." TT 1567:8-10.  SCMTD made clear that its concern was about economic damages:

> MR. CRIDLAND: The Defense's concern is based on the fact that this is a diversity case; that the California law of damages applies. And it appears that the jury's question is essentially an indication that the jury is considering speculating about what economic damages may be at issue in the case with respect to their Question A. There is clear California law that there must be proof of the reasonable necessity of a particular amount of economic damages for those damages to be awarded; and there's a concern that if these instructions are not given, that the jury will simply speculate about the amount of those damages.

TT 1568:2-12.

The Court then took a break and filed its proposed additional jury instructions (ECF No. 581).  TT 1569:19-1570:10.  These were CACI 3902, 3903, 3903A, 3903C, 3903D, 3903E, 3905, 3905A and 3932.  As noted, CACI 3902, 3903, 3903A, 3903C, 3903D and 3903E are about economic damages.  CACI 3905 and 3905A are about noneconomic damages.  CACI 3932 is about life expectancy.

The Court then resumed the discussion with the parties.  TT 1570:18-22.  Plaintiff proposed a number of edits to the Court's proposed instructions.  TT 1579:8-1587:21.  SCMTD agreed with the Court's proposed additional instructions, except that it objected to CACI 3932 "on the basis previously stated, that there's no evidence that comports with Evidence Code Section 701 and 702 of lifetime damages as to the plaintiff.  With that expectation, we would argue that all of these instructions should be given as stated."  TT 1587:24-1588:8.

The Court then took another recess and proposed the additional jury instructions at ECF No. 583.  TT 1589:17-1590:11.  SCMTD objected to the Court's additional proposed jury instruction 2 concerning economic damages because it "fails to answer the Jury's Question []A.  It does not give them the standard under California law for the economic damages they are expected to identify and award, and it does not state that standard as it's stated in the CACI instruction and, instead, omits the language that states that standard."  TT1597:19-24.[8]  With respect to proposed instruction 3 concerning noneconomic damages, SCMTD did not object to the Court's proposed

---

[8] The transcript says counsel was objecting to "Instruction Number 1," (TT 1597:16-18) but he is clearly talking about instruction 2.

instruction, but did object to Plaintiff's request to delete the last two paragraphs (TT 1599:21-23), which Plaintiff argued were repetitive.  TT 1595:4-17.  SCMTD continued to object to the life expectancy instruction for the reason previously stated.  TT 1599:24-1600:1 ("further additional Instruction Number 4 is unchanged and I don't believe needs to be further discussed at this time.").

To summarize, here are SCMTD's timely objections to the jury instructions and additional jury instructions:

Instruction 29:  SCMTD objected to lines 16 through 22 of Instruction 29 "BASED ON THE LACK OF EVIDENCE IN THE RECORD OF THE REASONABLE VALUE OF MEDICAL CARE, THE REASONABLE VALUE OF NECESSARY MEDICAL CARE IN THE FUTURE, AND THE REASONABLE VALUE OF WAGES OR EARNING CAPACITY." TT1441:23-1442:4.

Additional Instruction 2:  SCMTD objected to the whole thing and said CACI should be used instead.  TT 1597:9-24.

Additional Instruction 3:  SCMTD objected to the removal of the third and fourth paragraphs from the draft in ECF No. 583.  TT 1595:4-17, TT 1599:21-23.

Additional Instruction 4:  SCMTD objected to the inclusion of this instruction because "there's no evidence that comports with Evidence Code Section 701 and 702 of lifetime damages as to the plaintiff."  TT 1588:5-7.

**3.    Discussion**

**a.    Waiver**

SCMTD argues in Section VII of its motion for a new trial that the jury was incorrectly instructed on damages.  However, SCMTD does not link its arguments to objections it previously made.  Rather, SCMTD presents argument as if there were no requirement to make timely objections to jury instructions and does not discuss the subject of objections at all.  Further, plain error is not just for the Court of Appeals to think about.  Federal Rule of Civil Procedure 51(d)(2) says that "[a] court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  SCMTD does not contend that

1    any of the Court's rulings on jury instructions were plain error, and does not discuss plain error at

2    all in connection with the jury instructions.

3         Many of SCMTD's arguments concerning the jury instructions are waived.  For example,

4    SCMTD argues:

> The jury instructions on both economic and noneconomic damages
> misstated the law. Such instructions were inherently prejudicial,
> which shifts the burden to AMJ to show the same verdict would have
> been reached. The instructions regarding damages (Instruction
> Number 29) originally instructed the jury had to award damages
> "based upon evidence and not upon speculation, guesswork or
> conjecture." [Painter Decl., Ex. V, at 32 (emphasis added).] But that
> instruction did not delineate between the differing elements of
> economic and noneconomic damages. [*Id.*] The instructions did not
> adhere to the relevant CACI instructions that explain the standard to
> prove each type of economic and noneconomic damages.

11   Mot. at 9 (emphasis omitted).  But the only timely objection SCMTD made to Instruction 29 was

12   to the inclusion of three specific line items about economic damages.  None of the above

13   arguments were made at the time; they are all waived.

14        In addition, SCMTD contends:

> [T]he instructions do not specify that the jury should consider specific
> proof of medical expenses and that of AMJ's losses (including lost
> earning capacity and income) AMJ sustained from the injury, or that
> AMJ's lost income/earning capacity would be offset by the amounts
> AMJ is otherwise capable of earning. These omissions were fatal to
> the jury's understanding and legally incorrect. *Even after the jury
> asked for clarification* of the damages standards, the jury received
> inadequate guidance.

20   Mot. at 11-12 (emphasis added).  The reference to "even after the jury asked for clarification"

21   makes clear that everything preceding that was a criticism of Instruction 29.  But SCMTD did not

22   timely make those objections to Instruction 29.

23        Indeed, all of SCMTD's challenges to the jury instructions concerning noneconomic

24   damages in Instruction 29 are waived.  The only timely objection to Instruction 29 was to the

25   inclusion of three line items concerning economic damages that SCMTD said had no evidence to

26   support them.

27         **b.    Merits**

28        Having said that, the Court thinks that none of SCMTD's arguments about jury

United States District Court
Northern District of California

1    instructions in its motion for a new trial, whether waived or not waived, have any merit.

2          Let's go through them.  Paragraph 1 in section VII of SCMTD's motion for a new trial

3    states the standard of review and does not argue the jury instructions were erroneous.  Paragraph 2

4    argues:

5            The jury instructions on both economic and noneconomic damages
     misstated the law. Such instructions were inherently prejudicial,

6            which shifts the burden to AMJ to show the same verdict would have
     been reached. The instructions regarding damages (Instruction

7            Number 29) originally instructed the jury had to award damages
     "based upon evidence and not upon speculation, guesswork or

8            conjecture." [Painter Decl., Ex. V, at 32 (emphasis added).] But that
     instruction did not delineate between the differing elements of

9            economic and noneconomic damages. [*Id.*] The instructions did not
     adhere to the relevant CACI instructions that explain the standard to

10           prove each type of economic and noneconomic damages. Defense
     counsel also proposed the verdict separate economic and

11           noneconomic damages for clarity, but the verdict was ultimately
     submitted with only one line for all damages. [Ex. S, at 1443:5-12;

12           Ex. W.]

13         SCMTD does not explain how Instruction 29 supposedly "misstated the law."  It is based

14   on Ninth Circuit model jury instructions 5.1 and 5.2, instructions federal courts use all the time.

15   Also, SCMTD does not explain how Instruction 29 was "inherently prejudicial."  SCMTD says

16   that the instruction "did not delineate between the differing elements of economic and

17   noneconomic damages."  That is untrue.  Instruction 29 delineated each different type of economic

18   and noneconomic damages Plaintiff was claiming, stated that "[t]he plaintiff has the burden of

19   proving damages by a preponderance of the evidence," and that "[y]our award must be based upon

20   evidence and not upon speculation, guesswork or conjecture."  This is fully consistent with

21   California law.  If SCMTD's delineation argument is that economic and noneconomic damages

22   have to be in separate jury instructions, or that each type of economic damage must be in a

23   separate jury instruction, it provides no law to that effect.  "Prejudicial error results from jury

24   instructions that, when viewed as a whole, fail to fairly and correctly cover the substance of the

25   applicable law."  *White*, 312 F.3d at 1012.  Because jury instructions must be "viewed as a

26   whole," details about how they are organized likely do not matter, provided the organization is not

27   confusing.  Here, there was nothing about Instruction 29 that was confusing.

28         SCMTD is right that Instruction 29 followed the Ninth Circuit's model jury instructions

1    rather than CACI.  SCMTD does not cite any legal authority to suggest that CACI instructions are

2    mandatory for a claim arising under California law.  California state courts do not think CACI

3    instructions are mandatory:

4           Use of the Judicial Council instructions is strongly encouraged. If the
           latest edition of the jury instructions approved by the Judicial Council
5           contains an instruction applicable to a case and the trial judge
           determines that the jury should be instructed on the subject, it is
6           recommended that the judge use the Judicial Council instruction
           unless the judge finds that a different instruction would more
7           accurately state the law and be understood by jurors. Whenever the
           latest edition of the Judicial Council jury instructions does not contain
8           an instruction on a subject on which the trial judge determines that the
           jury should be instructed, or when a Judicial Council instruction
9           cannot be modified to submit the issue properly, the instruction given
           on that subject should be accurate, brief, understandable, impartial,
10          and free from argument.

11    Cal. R. Ct. 2.1050(f).  The issue is not whether the Court's instruction is identical to CACI but

12    whether it fairly states the law.  It does.

13           Further, SCMTD's complaint about the verdict form is odd, as the Court revised the

14    verdict form to break out economic and noneconomic into separate awards, and the jury awarded

15    them separately.  ECF No. 586.

16           For what it's worth, with one exception, Instruction 29 is not meaningfully different from

17    the CACI instructions that SCMTD proposed in any way that is relevant to this case.  The Court

18    did give CACI 3902 in Additional Instruction 1, when the Court revised the verdict form to break

19    out economic and noneconomic damages separately.  CACI 3903 enumerates the categories of

20    economic damages sought by the Plaintiff, but that content is already in Instruction 29.  CACI

21    3903A, 3903C, 3903D and 3903E break out medical expenses, lost earnings, lost earning capacity,

22    and loss of ability to provide household services and then reiterate the burden of proof in each

23    instruction.  Instruction 29 includes each item of economic damages in one place and states the

24    burden of proof.  The difference is largely organizational.  The one substantive difference between

25    Instruction 29 and the CACI instructions SCMTD proposed is that the Court did not include loss

26    of household services (CACI 3903E) in Instruction 29, but otherwise there is no meaningful

27    difference in the instructions in terms of substance.  Presumably SCMTD has no objection to the

28    Court's not including household services damages in Instruction 29, as it contends that "AMJ

United States District Court
Northern District of California

29

made no attempts to provide such evidence." Mot. at 11.

The Court's Additional Instructions also correctly state the law. As to both Instruction 29 and the Additional Instructions, SCMTD is not able to identify any manner in which they supposedly misstate California law.[9] SCMTD's argument really seems to be that the CACI instructions are mandatory and that any departure from them, even a difference in wording that is not different in substance, is not permitted. But as noted, that's wrong.

SCMTD argues that: "A new trial is warranted because the additional instructions misstated California's law on damages and directly led to the jury's confusion as well as an excessive damages award. AMJ sought economic damages in the form of past and future medical expenses, lost future earnings, lost earning capacity, and necessary past and future 'services.'" Mot. at 10. With respect to the burden under California law for past and future medical expenses, at page 10 of its motion, SCMTD cites *Bermudez v. Ciolek*, 237 Cal. App. 4th 1311, 1328 (2015), which held:

> Tort damages consist of "the amount which will compensate for all the detriment proximately caused" by the breach at issue. (Civ.Code § 3333.) "Detriment is a loss or harm suffered in person or property." (Civ.Code § 3282) "Damages must, in all cases, be reasonable...." (Civ.Code § 3359.) The jury was properly instructed in this case to determine "the reasonable cost of reasonably necessary medical care that [Bermudez] has received" and "the reasonable cost of reasonably necessary medical care that [Bermudez] is reasonably certain to need in the future."

That is consistent with Instruction 29, which stated in relevant part:

> If you find for the plaintiff on her negligence claim, you must determine the plaintiff's damages. The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant. You should consider the following:
>
> [¶¶]
>
> The reasonable value of necessary medical care, treatment, and services received to the present time;
>
> The reasonable value of necessary medical care, treatment, and

---

[9] Additional Instruction 1 is CACI 3902. SCMTD does not assert there is any error in this instruction.

> services that with reasonable probability will be required in the future;

Similarly, Additional Instruction No. 2 stated in relevant part:

> If you find for the plaintiff on her negligence claim, you must determine the plaintiff's economic damages. You should consider the following:
>
> A. The reasonable value of necessary medical care, treatment, and services received to the present time;
>
> B. The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future

In fact, the language in the cited case law concerning medical expenses is almost verbatim the same as the jury instructions in this case.

As to lost future earnings, on page 11 of its motion for a new trial, SCMTD argues that Plaintiff must be "reasonably certain" to lose those earnings in the future, citing *Atkins v. City of Los Angeles*, 8 Cal. App. 5th 696, 738 (2017), which held:

> Courts reviewing damages for the loss of future earnings have held such damages are recoverable "'where the evidence makes **reasonably certain** their occurrence and extent.'" (Toscano, at p. 694, 21 Cal.Rptr.3d 732; see Licudine v. Cedars-Sinai Medical Center (2016) 3 Cal.App.5th 881, 887, 208 Cal. Rptr.3d 170 ["the jury must fix a plaintiff's future earning capacity based on what it is **'reasonably probable'** she could have earned"].) Indeed, "[d]amages must, in all cases, be reasonable." (Civ.Code § 3359; see Licudine, at p. 891, 208 Cal.Rptr.3d 170; Bermudez, supra, 237 Cal.App.4th at p. 1328, 188 Cal.Rptr.3d 820.) Requiring the plaintiff to prove future economic losses are reasonably certain "ensures that the jury's fixing of damages is not wholly, and thus impermissibly, speculative." (Licudine, at p. 895, 208 Cal.Rptr.3d 170; see Piscitelli, at p. 989, 105 Cal.Rptr.2d 88 ["it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery'"].)

Presumably, SCMTD's objection is that Instruction 29 and Additional Instruction 2 said "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with *reasonable probability* will be lost in the future," rather than with *reasonable certainty*.  But look again at the language the Court bolded in the above case cited by SCMTD.  California case law treats "reasonably certain" and "reasonably probable" as synonyms on this issue, using the terms interchangeably:

> *The first, threshold requirement is met only if the plaintiff is "reasonably certain to suffer a loss of future earnings." But how*

31

United States District Court
Northern District of California

> *certain must the jury be in fixing what the plaintiff could have earned without the injury?* We know that a jury may not award "speculative damages," and the cases reviewing lost earning capacity awards seem to apply a consistent, yet unstated standard. No case has yet articulated what that standard is. *Today, we hold that the jury must fix a plaintiff's future earning capacity based on what it is "reasonably probable" she could have earned.*

*Licudine v. Cedars-Sinai Medical Ctr.*, 3 Cal. App. 5th 881, 887 (2016) (emphasis added).

Accordingly, there was no error in the Court's instructions, which accurately reflect California law.

SCMTD argues: "Likewise, as to lost earning capacity, AMJ must specifically prove it is reasonably certain the injury sustained will cause AMJ to earn less money in the future than AMJ otherwise could have earned as well as the reasonable value of that loss." Mot. at 11 (cleaned up). For that proposition, SCMTD cites *Licudine*, which held that "reasonably probable" and "reasonably certain" are the same thing. Accordingly, Instruction 29 and Additional Instruction 2 accurately reflect California law in requiring Plaintiff to prove lost earning capacity with "reasonable probability."

SCMTD makes a confusing argument that: "Further, it is unclear whether the term 'services' in the jury instructions relates to medical services or household services. Under California law, AMJ can only recover for loss of *ability* to provide future household services as part of a loss of future earnings. CACI 3903E; *see also Overly v. Ingalls Shipbuilding, Inc.*, 74 Cal. App. 4th 164, 171 n. 5 (1999). AMJ made no attempts to provide such evidence." Mot. at 11 (emphasis original). In the cited footnote, *Overly* explained:

> Although the parties do not distinguish between the different types of lost years damages that were awarded, we note that lost household services damages are different than the other types of future earnings included in this category. Generally, household services damages represent the detriment suffered when injury prevents a person from contributing some or all of his or her customary services to the family unit. (Cal. Tort Damages (Cont.Ed.Bar 1988) § 1.64, p. 44.) The justification for awarding this type of damage as part of the loss of future earnings award is that the plaintiff should be compensated for the value of the services he would have performed during the lost years which, because of the injury, will now have to be performed by someone else. It could also be argued that limiting household services damages to the period of actual life expectancy would grant the defendant a windfall for shortening a plaintiff's life as opposed to permanently disabling him.

The Court agrees that Plaintiff did not provide any evidence of household services damages. However, that is a reason *not* to give CACI 3903E. Further, the jury instructions were perfectly clear. Instruction 29 and Additional Instruction 2 both referred in separate paragraphs to:

> The reasonable value of necessary medical care, treatment, and services received to the present time;

> The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;

> The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.

Anyone who can read understands that in the first two paragraphs, "medical" modifies "care," "treatment," *and* "services." There is no error here.

SCMTD argues that "[p]rejudicial error also occurred when the jury was not instructed as to the standard for each element of economic damages. Rather, the jury was told to 'determine the plaintiff's economic damages,' by merely *considering* '[t]he reasonable value of necessary medical care, treatment, and services received to the present time;' '[t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;' and '[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.'" Mot. at 11 (emphasis original).

But that's not true. Instruction 29 stated the standard: "The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant." And for each category of damages Plaintiff was claiming, Instruction 29 stated the standard of reasonableness:

> The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;

> The physical pain and suffering experienced and that with reasonable probability will be experienced in the future;

> The reasonable value of necessary medical care, treatment, and services received to the present time;

> The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;
>
> The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.

Instruction 29 concluded: "Your award must be based upon evidence and not upon speculation, guesswork or conjecture." Additional Instruction 2 reiterated the relevant standard:

> Plaintiff Amanda Jones has the burden of proving by a preponderance of the evidence the amount of money that will reasonably and fairly compensate the plaintiff for these items of economic damage. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

It also stated the reasonableness requirement for each element of economic damage.

SCMTD argues that "the instructions do not specify that the jury should consider specific proof of medical expenses and that of AMJ's losses (including lost earning capacity and income) AMJ sustained from the injury, or that AMJ's lost income/earning capacity would be offset by the amounts AMJ is otherwise capable of earning." Mot. at 11-12. But that's not true either. As noted above, Instruction 29 and Additional Instruction 2 did tell the jury to consider "[t]he reasonable value of necessary medical care, treatment, and services received to the present time; [t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;" and "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future." As for "AMJ's lost income/earning capacity would be offset by the amounts AMJ is otherwise capable of earning," that's just a redundant argument that Plaintiff can't be awarded damages for lost income or earning capacity if they didn't really lose the income or earning capacity. A redundant jury instruction is not required. Instruction 29 and Additional Instruction 2 already stated that Plaintiff has the burden to prove their damages and that the damages can't be speculative or based on guesswork or conjecture.

With respect to economic damages, SCMTD also argues that Plaintiff did not submit sufficient evidence to warrant giving the jury instructions. For two of the categories, the Court disagrees. The first category of economic damages in Instruction 29 and Additional Instruction 2 is "[t]he reasonable value of necessary medical care, treatment, and services received to the

34

present time." Plaintiff provided sufficient evidence to warrant an instruction on this point. There was voluminous documentation of the medical care, treatment and services Plaintiff received. Exs. 37A, 37B, 31A, 31B, 31C, 31D, 31E, 31F, 31G, 31H, 31I, 31J, QQ-A. Further, the Court finds that medical care includes the cost of a wheelchair or mobility device that is necessitated by a medical condition. This is true as a matter of common sense: a wheelchair or mobility device is "medical care" when it is needed as a result of a medical condition, here Plaintiff's left knee injury. In addition, there was evidence at trial that a wheelchair is something that a health care provider may prescribe, which is an additional reason why it qualifies as medical care. TT 646:21-23 (Plaintiff); 1393:8-16 (Cross). There was also evidence at trial that the cost of a wheelchair can be out of pocket because insurance companies won't pay for a wheelchair replacement sooner than every five years, which can be, and for Plaintiff was, significantly longer than how long the wheelchair lasted. TT 651:7-25 (Plaintiff). Plaintiff personally paid $3000 for the scooter that they rode to court, and their insurance company refused to cover the cost because it deemed it a "personal mobility device." TT 646:17-20, 651:22-25 (Plaintiff). Even if insurance companies draw a distinction between a "wheelchair" and a "personal mobility device," there was evidence at trial that under the ADA, the definition of "wheelchair" includes scooters (TT 876:18-23 (Cross)), so there is sufficient evidence to conclude that the cost of a scooter necessitated by a medical condition constitutes medical care.

The second category of economic damages in Instruction 29 and Additional Instruction 2 is "[t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future." Because there is evidence that Plaintiff is permanently disabled as a result of their left knee injury, it is a reasonable inference that they will incur additional out of pocket costs in the future for wheelchairs and scooters, and Plaintiff's testimony, cited above, establishes how much they cost.

The third category of economic damages in Instruction 29 and Additional Instruction 2 is "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future." Here, the Court agrees with SCMTD that the evidence at trial did not support this portion of the jury

instructions.  There was ample evidence at trial to support a finding that Plaintiff's wages, earnings, earning capacity, salaries, employment, and employment opportunities will be reduced in the future.  Plaintiff is an Ivy League graduate.  TT 584:12-13 (University of Pennsylvania).  They moved to Los Angeles in 2016.  TT 644:11-16.  But for their disabling injury, they would be a strong job candidate with their solid education and in a major metropolitan market with lots of jobs.  However, Plaintiff testified that their disability significantly affected their ability to obtain employment, both because of the tremendous difficulties in getting to a job and because of the discrimination they faced as a result of their disability.  TT 640:23-643:10.  However, there is nothing in the evidence at trial that would allow the jury to determine the "reasonable value" of the injury to Plaintiff's earnings that "will be lost in the future."  Just nothing.  That is largely because of the Court's in limine and evidentiary rulings.  In any event, the Court's view is that in light of all the evidence that was admitted at trial, there is simply nothing that would allow the jury to determine this category of economic damages without speculating.  Below the Court issues a remittal as to Plaintiff's economic damages.  If Plaintiff accepts the remittal, the Court will enter an amended judgment, and if the Plaintiff declines the remittal, the Court will order a new trial.  This remedy cures the error in the Court's giving a jury instruction on this category of economic damages.

With respect to Additional Instruction 4 concerning life span, SCMTD does not discuss that instruction in section VII of its motion.  It addresses it in section VIII.A, which discusses the damages awards.  Accordingly, the Court discusses Additional Instruction 4 in connection with damages as well.

Finally, with respect to Additional Instruction 3, SCMTD objected to the removal of the third and fourth paragraphs from the draft in ECF No. 583.  SCMTD does not discuss that issue at all in the motion for a new trial, so it is waived.  Regardless, the argument has no merit.  Here is the edit the Court made:

> The following are the specific items of noneconomic damages claimed by Plaintiff Amanda Jones: the nature and extent of the injuries; the disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future; the physical pain and suffering experienced and that

1

with reasonable probability will be experienced in the future;

2

No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense.

3

4

~~To recover for future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering, Plaintiff Amanda Jones must prove that she is reasonably certain to suffer that harm.~~

5

6

~~For future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering, determine the amount in current dollars paid at the time of judgment that will compensate Plaintiff Amanda Jones for future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering.~~

7

8

9

10    The stricken paragraphs were redundant.  Paragraph 3 was redundant of paragraph 1,

11    which already explained the burden of proof as to future noneconomic injury ("that with

12    reasonable probability will be experienced in the future").  Paragraph 3 says "reasonably certain,"

13    but as explained above, California law treats that as a synonym for reasonably probable.

14    Paragraph 4 was duplicative of Instruction 31, which explained that economic damages must be

15    reduced to present cash value, but noneconomic damages are not.

16    Accordingly, with the exception of the instruction concerning "[t]he reasonable value of

17    wages, earnings, earning capacity, salaries, employment, and employment opportunities that with

18    reasonable probability will be lost in the future," the Court rejects SCMTD's challenges to the jury

19    instructions.  Concerning that exception, the Court finds that the remittal of economic damages

20    cures the error.

21    **E.      Damages Awards**

22    Next, SCMTD argues that the noneconomic and economic damages awards are excessive.

23    First, SCMTD says there is insufficient evidence to support the damages awards.  Second,

24    SCMTD contends that Plaintiff's counsel inflamed the jury during her closing argument.  Third,

25    SCMTD argues that comparable verdicts show the noneconomic damages award is an outlier.  The

26    Court addresses these argument in turn.

27    **1.      Sufficiency of the Evidence to Support the Damages Awards**

28    Because Plaintiff's negligence claim arises under California law, the Court applies

United States District Court
Northern District of California

37

California law for measuring excessiveness. *See generally Gasperini v. Center for Humanities*, 518 U.S. 415, 419 (1996) ("We hold that New York's law controlling compensation awards for excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if the review standard set out in [New York law] is applied by the federal trial court judge, with appellate control of the trial court's ruling limited to review for 'abuse of discretion.'"). Under California law, "'[t]he measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact.'" *Behr v. Redmond*, 193 Cal. App. 4th 517, 533 (2011) (quoting *Bertero v. National General Corp.*, 13 Cal. 3d 43, 65 n.12 (1974)). "When, however, the evidence is insufficient to establish that alleged prospective damages are reasonably certain to occur, a jury's award of such damages cannot be sustained on appeal. When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence." *Id*. "[I]t is not the function of a reviewing court to interfere with a jury's award of damages unless it is so grossly disproportionate to any reasonable limit of compensation warranted by the facts that it shocks the court's sense of justice and raises a presumption that it was the result of passion and prejudice." *Seffert v. Los Angeles Transit Lines*, 56 Cal. 2d 498, 508 (1961).

### a.    Economic Damages

The jury's award of $368,000 in economic damages is not supported by the evidence. As noted above, there is substantial evidence of Plaintiff's surgery, physical therapy and many medical appointments, but aside from wheelchair and scooter costs, there is no quantification of past or future medical costs. As to lost earnings, and so on, there is substantial evidence of the fact that the disabling injury to Plaintiff's left knee substantially affected their ability to obtain employment. However, there is simply nothing that allowed the jury to quantify that.

Accordingly, the Court will remit the economic damages. The Court must therefore determine "the maximum amount sustainable by the proof." *Oracle*, 765 F.3d at 1094. The Court thinks the only amount that can be sustained by the proof is the cost of wheelchairs and scooters.[10]

---

[10] Plaintiff testified that service dogs cost $25,000 to $30,000, but they also said that's why they didn't buy one. They paid an undisclosed adoption fee for what they (jokingly) called their

United States District Court
Northern District of California

1    The Court interprets Plaintiff's testimony at TT 646:17-20 and 651:7-25 to mean that since the

2    time of the incident Plaintiff purchased, at a minimum, a "main chair" and a "back-up chair," and

3    that the "back-up chair" costs $3,000.  That's two chairs in approximately eleven and a half years.

4    Assuming an average life expectancy, they are expected to live another 38.33 years (*see*

5    Additional Instruction No. 4, ECF No. 584).[11]  If we extrapolate that Plaintiff's future need for

6    chairs is similar to their past need, we can assume they will need to buy two additional chairs for

7    each of the next eleven and a half years.  That's approximately seven more chairs for the

8    remainder of their life.  Including the two chairs they already bought, that's nine chairs, which can

9    be valued at $27,000.

10        Accordingly, the Court remits Plaintiff's economic damages to $27,000.

**b.    Noneconomic Damages**

12        The jury's award of $12,631,250 in noneconomic damages is supported by evidence.  As a

13   result of SCMTD's negligence, Plaintiff suffered a permanent, disabling injury to their left knee.

14   For the rest of their life they will not be able to walk unassisted.  The loss of a functioning limb is

15   a grievous, life-altering injury.  Strolling down the sidewalk, walking through a park, climbing a

16   trail, playing most sports, dancing with a loved one – these pleasures of life that most of us take

17   for granted are now forever denied to Plaintiff.

18        Look at it this way:  When you were 33 years old, if someone had offered you $12.6

19   million in exchange for disabling your knee beyond repair such that you would never walk again

20   without assistance, would you have taken that deal?  Perhaps some people would.  But to many

21   people, bodily integrity and basic mobility are so core to their sense of self that this trade would

22   not be worth it.  And how can we say that a deal that many people would reject is too good for a

23   Plaintiff who had no choice in the matter?

---

"bootleg service dog."  TT 650:12-651:5.  Plaintiff also testified that they incurred several hundred thousand dollars in student loans.  TT 638:25-639:11.  However, Plaintiff never requested a jury instruction that included debt or educational expenses as a form of economic damage.  Instruction 29 and Additional Instruction 2 therefore did not include them as items of economic damage, and thus they cannot be a basis for the jury award.

[11] SCMTD argues that we should not assume an average life expectancy for Plaintiff because they have MS.  However, as explained later in this order, Defendant did not proffer any evidence at trial that MS affects life expectancy.

Plaintiff's testimony about the profound impact this permanent injury had on their life amply supports the award of noneconomic damages.  The effect on their career, on their mental state, on their self-care, on their ability to maintain friendships and participate in society, on their love life, on their relationships with family – their whole life changed as a result of this injury.  TT 636-656.

SCMTD states that the jury "had no idea how to calculate an award of noneconomic damages that would not be speculative."  Mot. at 13.  That's not true.  Instruction No. 29 stated in relevant part:

> If you find for the plaintiff on her negligence claim, you must determine the plaintiff's damages. The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant. You should consider the following:
>
> The nature and extent of the injuries;
>
> The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;
>
> The physical pain and suffering experienced and that with reasonable probability will be experienced in the future;
>
> ¶¶
>
> It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

And remember:  The above portion of Instruction 29 was not objected to by SCMTD.  Defendant objected only to the portion of Instruction 29 concerning economic damages.

Further, in response to the jury's question, the Court gave Additional Instruction No. 3, which gave additional guidance:  "No fixed standard exists for deciding the amount of these noneconomic damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense."  That language, taken right out of CACI 3905A (and CACI is where SCMTD argues that jury instructions should come from), and also not objected to by SCMTD, told the jury how to calculate an award of noneconomic damages:  evidence and common sense.

1    SCMTD argues:  "Regarding AMJ's noneconomic damages, AMJ's testimony

2    encompassed their experiences after the accident, which included depression, weight gain,

3    mobility loss and an inability to continue their studies.  As discussed above, those experiences

4    were likely caused—at least in part—by the MS that would have affected AMJ's recovery from

5    the incident."  Mot. at 13.  That argument is made up out of nothing.  Plaintiff's testimony is that

6    these were effects of their left knee injury.  There is no evidence that their MS caused or

7    contributed to their left knee injury, and also no evidence that MS contributed to their depression,

8    weight gain, mobility loss or inability to continue their studies.  SCMTD is just making that up.

9    SCMTD never proffered any evidence to support those assertions.

10    SCMTD argues that the Court should not have given Additional Instruction 4 concerning

11    life expectancy because Plaintiff's MS reduced their life expectancy below the actuarial estimate.

12    However, there are several problems with this argument.  First, it is waived.  SCMTD's only

13    objection to Additional Instruction 4 was:  "We object to additional Instruction Number 4 on the

14    basis previously stated, that there's no evidence that comports with Evidence Code Section 701

15    and 702 of lifetime damages as to the plaintiff."  TT 1588:4-7.  When SCMTD stated that it

16    objected to the instruction "on the basis previously stated," it was referring to the charging

17    conference at which Plaintiff had initially proposed the life expectancy instruction.  SCMTD said:

18    > MR. CRIDLAND: YES, YOUR HONOR. THE DEFENSE
    OBJECTS TO THE INCLUSION OF THIS PARTICULAR JURY
19    INSTRUCTION ON MULTIPLE GROUNDS. I THINK THE
    PRIMARY GROUND WOULD BE THAT THERE'S NO
20    EVIDENCE IN THE RECORD TO SUPPORT LIFETIME
    DAMAGES IN THE FIRST INSTANCE. THERE WAS NO
21    MEDICAL TESTIMONY THAT SHE WILL SUFFER DAMAGES
    FOR THE REST OF HER LIFE, AND THE JURY HAS NO BASIS
22    TO CONSIDER LIFE EXPECTANCY ON THE EVIDENCE
    THAT'S IN THE RECORD, AND, THEREFORE, THIS WOULD
23    INVITE THE JURY TO SPECULATE WITHOUT EVIDENCE,
    WITHOUT ADDING ANYTHING ABOUT THEIR ABILITY TO
24    CONSIDER THE CASE.

25    TT 1421:22-1422:6.

26    The parties then argued:

27    THE COURT: PLAINTIFF, PLEASE RESPOND.

28    MS. AIKENS: I DON'T THINK THAT IS TRUE. I THINK WE

1    HAVE ELICITED TESTIMONY RELATED TO THE
PERMANENCY AS OF THE TIME. I THINK THE ISSUE WAS --
2    THAT THEY HAD RAISED WITH RESPECT TO DR. PRIMUS
AND WHETHER SHE WAS GOING TO BE DISABLED AT THE
3    POINT THAT HE TALKED TO HER ON THE PHONE.

4    BUT AT THE TIME THAT HE HAD SEEN HER, I THINK HE
SUFFICIENTLY STATED THAT HE DID NOT EXPECT IT TO
5    IMPROVE. THERE'S DR. NASSOS WHO SAW HER ROUGHLY
FIVE YEARS LATER AND WAS STILL HAVING ISSUES.

6    I THINK ESPECIALLY WHEN HE TALKS ABOUT THINGS
WRAPPING UP IN SIX MONTHS AND THERE'S STILL
7    PROBLEMS GOING INTO SEVERAL YEARS, THAT IT WOULD
BE -- THAT THAT TESTIMONY CERTAINLY HAD BEEN
8    GIVEN WITH RESPECT TO PERMANENCY AND DISABILITY
GOING INTO THE FUTURE.

9
10   MR. CRIDLAND: YOUR HONOR, IF I MAY RESPOND
BRIEFLY?

11   THE COURT: GO AHEAD.

12   MR. CRIDLAND: DR. PRIMUS WAS A TREATING PHYSICIAN.
HE'S ONLY PERMITTED TO TESTIFY AS TO HIS OPINIONS
13   DEVELOPED IN THE COURSE OF HIS TREATMENT WHICH
ENDED BACK IN 2016 AND DURING WHICH HE EXPRESSED
14   NO OPINIONS ON PERMANENCY.

15   TT 1422:7-1423:2.  The Court at the time declined to give that instruction for other reasons.  TT

16   1423:17-1425:19.

17       At the charging conference, SCMTD's objection to the life expectancy instruction was that

18   there was no evidence that the Plaintiff was permanently disabled, i.e., that they would suffer

19   damages for the rest of their life.  That was the objection SCMTD renewed in response to

20   proposed Additional Instruction 4:  "We object to additional Instruction Number 4 on the basis

21   previously stated, that there's no evidence that comports with Evidence Code Section 701 and 702

22   *of lifetime damages* as to the plaintiff."  TT 1588:4-7 (emphasis added).  That objection was

23   wrong, and the Court overruled it, because there was evidence of the permanency of Plaintiff's

24   injury.

25       In its motion for a new trial, SCMTD does not renew the objection it made at trial to

26   Additional Instruction 4 (no evidence of permanent disability), so that is waived.  Instead,

27   SCMTD now makes a new and completely different argument that "[i]n light of AMJ's [MS]

28   diagnosis, this projection of AMJ's estimated lifespan is inaccurate."  Mot. at 14.  But SCMTD

United States District Court
Northern District of California

did not object at trial to the *accuracy* of the life expectancy information stated in Additional Instruction 4. And SCMTD certainly did not make the new argument that Plaintiff's MS affected their life expectancy. This is a brand new argument that surfaced for the first time in SCMTD's motion for a new trial. It is not proper to wait until after the jury returns a verdict to dream up new objections to the jury instructions. *See* Fed. R. Civ. Proc. 51(b)(2)(c)(2). That objection is waived.

The undersigned judge is not a medical doctor and does not know whether MS affects life expectancy, and if it does, whether that is true for everyone who has the condition or just some people. But any argument to that effect would obviously need to be supported by evidence. SCMTD never argued or suggested during trial that MS affects life expectancy, and also did not proffer any evidence that it is in fact true that MS affects life span. Further, although a motion for a new trial in not a proper vehicle to proffer evidence that was not offered during trial, SCMTD also doesn't offer any evidence in its motion for a new trial that MS affects life span, let alone that it does so for everyone who has that condition. SCMTD's new argument that MS affects life expectancy is just attorney say-so. It is unsupported by any evidence, and it is a new argument that SCMTD came up with after the jury verdict.

In its reply brief, SCMTD offers a new argument, not set forth in its motion, that "AMJ did not present any testimony by a life expectancy expert. AMJ's counsel merely stated without support that AMJ is likely to live another 38.33 years . . ." Reply at 6. The Court is not sure what argument SCMTD is making, but whatever it is, it is waived because this argument was not in SCMTD's motion. A new argument in reply is not permitted because Plaintiff had no opportunity to respond to it.

In any event, the Court observes that SCMTD cites to nothing in the record in support of this argument. The Court has reviewed Plaintiff's counsel's closing argument, and she did not say that Plaintiff is likely to live another 38.33 years. Rather, Additional Instruction 4 said:

> If you decide that Plaintiff Amanda Jones has suffered damages that will continue for the rest of her life, you must determine how long she will probably live. According to the Social Security Administration's actuarial table, a 43-year-old female is expected to live another 38.33 years. This is the average life expectancy. Some people live longer

and others die sooner.

> This published information is evidence of how long a person is likely to live but is not conclusive. In deciding a person's life expectancy, you should also consider, among other factors, that person's health, habits, activities, lifestyle, and occupation.

If SCMTD meant to say in its reply brief that the Court should not have given Additional Instruction 4 because Plaintiff did not present testimony by a life expectancy expert, that argument is doubly waived. SCMTD waived it the first time at trial by not objecting to proposed Additional Instruction 4 on that basis. And SCMTD waived it a second time by not making that argument in its motion for a new trial.

Further, on the merits, SCMTD's reply brief does not explain why a life expectancy expert was necessary to give Additional Instruction 4 or cite to any legal authorities in support of that argument. Plaintiff's negligence claim arises under California law, and under California law, "life expectancy . . . is a question of fact for the jury to decide, considering all relevant factors including the [person's] health, lifestyle and occupation. Life expectancy figures from mortality tables are admissible but are not conclusive." *Allen v. Toledo*, 109 Cal. App. 3d 415, 424 (1980). And such life expectancy figures are properly included in a jury instruction: "Here the jury was correctly told the figure given was not conclusive evidence of Charlene's life expectancy. It was merely 'a factor which you may consider,' along with the evidence of Charlene's health, habits, occupation and activities." *Id*. Additional Instruction 4 in this case properly instructed the jury in accordance with California law.

SCMTD's new argument in its reply brief that a life expectancy expert was required is also hard to square with California case law holding that "absent mortality tables, the trier of fact may still approximate the life expectancy of a statutory beneficiary who appeared in court." *Francis v. Sauve*, 222 Cal. App. 2d 102, 121 (1963); *see also Kawamura v. Honek*, 127 Cal. App. 509, 511 (1932) ("It is obvious that the jury could take the testimony given them, including its own view of respondent and his demeanor, and with the aid of common knowledge approximate the latter's age and life expectancy."); *Rickards v. Noonan*, 40 Cal. App. 2d 266, 274 (1940) ("Although the evidence does not disclose the age of the father, the trial court remarked, after seeing the witness on the stand, that in this regard he used his own judgment and considered his personal experience

1   and to him he appeared to be a little older than 53 years.  It has been held, under such

2   circumstances, that a trier of facts may approximate the witness's age and life expectancy.").

3          SCMTD also complains about a slide Plaintiff's counsel briefly showed to the jury during

4   closing requesting that Plaintiff receive $418,00 per year for the rest of her life.  Here is what

5   happened:

6                    AND TO PAY FOR THAT IS $414,078.67 PER YEAR. AND I
                     CAME UP WITH THAT BASED ON --
7
                     MR. CRIDLAND: I'LL OBJECT, YOUR HONOR. BEYOND THE
8                    EVIDENCE.

9                    THE COURT: SUSTAINED.

10                   MS. AIKENS: CAN I MAKE A RECORD?

11                   THE COURT: OKAY.

12                   MS. AIKENS: ALL RIGHT. UNDER CALIFORNIA LAW I
                     BELIEVE WE ARE ALLOWED TO PROVIDE WHAT WE
13                   BELIEVE TO BE A REASONABLE NUMBER. I'M NOT AWARE
                     OF ANY AUTHORITY TO THE CONTRARY.
14
                     THE COURT: THERE'S NO EVIDENCE OF THIS, AND YOU
15                   ARE AT 28 MINUTES.

16                   MS. AIKENS: OKAY. ALL RIGHT. I'LL TAKE IT DOWN
                     FOR THIS ONE.
17

18   TT 1480:4-18.

19          On the left hand side of the trial transcript, the time is noted in hours and minutes, and you

20   can see the slide was on the screen for less than a minute.  There was no prejudice to SCMTD.

21   Defendant objected to the slide and the Court immediately sustained the objection.  In response to

22   the Court's ruling, Plaintiff's counsel told the jury "you're to disregard that."  TT 1481:1.

23   SCMTD complains that the Court did not admonish the jury, Mot. at 13-14, but SCMTD did not

24   request an admonition.  Further, the jury was instructed that arguments by lawyers, including

25   closing arguments, are not evidence (ECF No. 574, Instruction 5) and that it must decide the case

26   based solely on the evidence (*id.*, Instruction 1).  There is no reason to think the jury did not

27   follow these instructions.

28          Next, SCMTD advances another new argument in its reply brief:  "AMJ provided no

United States District Court
Northern District of California

admissible medical testimony on causation" and the only testimony about causation was that "AMJ . . . self-diagnosed as disabled due to the 2014 incident." Reply at 6. This argument is waived because it was not made in SCMTD's motion. On the merits, the argument is also wrong. But first please note the argument that SCMTD is now making. At trial, as discussed above, SCMTD objected to proposed Additional Instruction 4 on the ground that there was no evidence of the permanence of Plaintiff's disability. After the jury verdict, SCMTD has now completely reversed course and argues – without any evidence at all – that Plaintiff's permanent disability was caused by her MS, not the injury on the bus. In other words, SCMTD's new, post-verdict position is that Plaintiff *is* permanently disabled, but that the cause was MS. Mot. at 13 ("By preventing the jury from hearing about AMJ's MS, the jury was left to conclude that AMJ is now wheelchair bound due to the incident."); Reply at 6 ("That AMJ is now disabled and wheelchair bound is a result of the progression of MS—not tipping over while riding a bus.").

Thus, the new argument in reply is not a quibble about permanence but about causation, i.e., linking the left knee injury to the fall on the bus. Here, SCMTD is wrong that there is no medical evidence of causation. Plaintiff's orthopedic surgeon, Dr. Primus, gave this causation testimony. TT 1000:13-1004:5, 1022:13-1023:13.[12] This testimony was admitted. Further, Plaintiff's physical therapist, Jamie Jackson, also gave testimony on causation. TT 676:20-

_____

[12] In its reply brief, SCMTD also raises a new argument (not contained in its motion for a new trial, and thus, one that Plaintiff had no opportunity to respond to) that (1) Primus's "testimony as to AMJ's current condition was beyond the scope of his treatment, which concluded in 2016, and SCMTD's objection to Dr. Primus's testimony was sustained." Reply at 6 (citing nothing in the trial transcript.); and (2) "Primus last treated AMJ on August 12, 2016. However, Dr. Primus testified at trial regarding AMJ's future treatment options and current condition far beyond 2016. [Exh. Q, 1036:2-25.] Dr. Primus gave this testimony over SCMTD's recurring objections that such testimony exceeded the scope of his opinions." Reply at 15. The Court does not know what SCMTD is complaining about on page 6 of its reply because there are no citations to the record. But because SCMTD reports that its objection was sustained, SCMTD is not saying the Court made an error. As to page 15 of the reply, the citation to Exhibit Q (ECF No. 621-3) enables the Court to see that SCMTD is referring to TT 1030:15-1031:4, the lines that it underlined in Exhibit Q. True, the reply brief refers to TT 1036:2-25 on page 15, but that's cross-examination, and SCMTD is not allowed to complain about the questions it asked at trial. As for the exchange at TT 1030:15-1031:4, Primus was testifying about what he expected back in August 2016, when he was treating Plaintiff, their future medical care needs would likely be. That was not beyond the scope of his treatment and is not testimony about Plaintiff's current condition. *See* TT 1036:14-15 (Primus explaining he was referring "to the possible treatment options in the future"). There was no error in admitting that testimony.

1    677:15.  This testimony was also admitted.

2         Further, although SCMTD is not now contesting permanence, the evidence at trial

3    supported such a finding.  Plaintiff testified (without objection) that her chiropractor determined

4    the injury was permanent.  TT 617:23-618:13.  The jury was also permitted to infer that an injury

5    that had not gotten better in the eleven and a half years since the incident was permanent.  Jackson

6    likewise testified that Plaintiff's knee condition was "chronic."  TT 673:12-674:7, 678:10-13.

7    Further, SCMTD's orthopedic surgeon, Dr. Jonathan Nassos, while disputing that the fall on the

8    bus caused a serious injury, acknowledged that during his examination of Plaintiff in 2019,

9    Plaintiff needed help ambulating, wasn't lying or faking, and he couldn't explain the continued

10   symptoms.  TT 1134:21-1135:18; *see also* TT 1144:8-10 ("AND THEN I'M NOT SURE WHAT

11   HAPPENED AFTER THAT, THERE ARE MORE COMPLAINTS, AND SHE REMAINS IN

12   THE SCOOTER. I CAN'T EXPLAIN IT. I REALLY CAN'T.").  Nassos also basically testified to

13   permanence.  TT 1135:19-20 ("AND SHE SUBSEQUENT UNDERWENT ANOTHER

14   SURGERY, RIGHT? AND DID SHE GET BETTER? IT DOESN'T APPEAR SO.").

15        Accordingly, for all these reasons, the Court rejects SCMTD's challenges to the jury's

16   award of noneconomic damages.

17        **2.       Alleged Misconduct by Counsel**

18        SCMTD contends that Plaintiff's closing argument inflamed the jury.

19             **a.       Legal Standard**

20        "A trial lawyer's job . . . is to present his client's case in the most sympathetic light

21   consistent with the evidence.  Using some degree of emotionally charged language during closing

22   argument in a civil case is a well-accepted tactic in American courtrooms."  *Settlegoode v.*

23   *Portland Public Schools*, 371 F.3d 503, 518 (9th Cir. 2004).  "Generally, misconduct by trial

24   counsel results in a new trial if the 'flavor of misconduct sufficiently permeate[s] an entire

25   proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching

26   its verdict.'"  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (quoting *Kehr v.*

27   *Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1994)).  The Ninth Circuit has "held that

28   where offending remarks occurred principally during opening statement and closing argument,

United States District Court
Northern District of California

47

1  rather than throughout the course of the trial, we are less inclined to find the statements pervaded

2  the trial and thus prejudiced the jury." *Settlegoode*, 371 F.3d at 518.

3      "The federal courts erect a high threshold to claims of improper closing arguments in civil

4  cases raised for the first time after trial." *Hemmings*, 285 F.3d at 1193.  "The rationale for this

5  high threshold is two-fold.  First, raising an objection after the closing argument and before the

6  jury begins deliberations permits the judge to examine the alleged prejudice and to admonish . . .

7  counsel or issue a curative instruction, if warranted." *Id.* (cleaned up).  "The second rationale

8  stems from courts' concern that allowing a party to wait to raise the error until after the negative

9  verdict encourages that party to sit silent in the face of claimed error." *Id.*

10     Overturning a jury verdict based on an improper closing argument is a "remedy" that "is

11 available only in extraordinary cases." *Id.*; *see also Cooper v. Firestone Tire & Rubber Co.*, 945

12 F.2d 1103, 1107 (9th Cir. 1991) (declining to find reversible error where "the alleged misconduct

13 occurred only in the argument phase of the trial . . . the remarks were isolated rather than

14 persistent, . . . most of counsel's comments were not objected to at trial and appellants did not

15 move for a mistrial at the end of the argument").

16                              **b.     Analysis**

17     In its motion for a new trial, SCMTD complains about several portions of Plaintiff's

18 closing.  They are TT 1466:13-1467:13 (objection by SCMTD), 1468:7-9 (no objection), 1479:25-

19 1481:7 (objection by SCMTD), 1481:9 (objection by SCMTD), 1481:15-16 (no objection),

20 1482:7-8 (no objection), 1482:15-1483:5 (no objection), 1484:17-1486:18 (no objection), 1540:3-

21 5 (no objection).  Mot. at 17-18.

22     For two thirds of these portions, SCMTD did not make a contemporaneous objection.

23 Thus, for the most part, SCMTD's claims of improper closing argument were "raised for the first

24 time after trial" and are therefore subject to a "high threshold." *Hemmings*, 285 F.3d at 1193.

25 Several of these unobjected-to portions were summaries of the evidence in a way that was

26 sympathetic to the Plaintiff and were plainly proper.  TT 1481:15-16 ("YOU MISSED OUT ON

27 SCHOLARSHIPS AND FELLOWSHIPS YOUR CLASSMATES RECEIVE."), TT 1482:15-

28 1483:5 ("NEVER SLEEP WELL, NEVER SLEEP ON YOUR LEFT SIDE. HAVE KNEE

United States District Court
Northern District of California

1    SURGERY. RESTART YEARS OF PHYSICAL THERAPY. NEVER KNOW WHEN YOUR

2    LEG MIGHT GIVE OUT AS YOU'RE DOING ANYTHING, INCLUDING CROSSING THE

3    STREET. NEVER RUN AGAIN. NEVER TRAVEL ANYWHERE ON A PLANE DUE TO

4    SWELLING IN THE KNEE. NEED SERVICE PETS. RELOCATE TO A WARMER CLIMATE

5    AND MOVE TO A PLACE THAT'S MORE EXPENSIVE WHERE YOU DON'T KNOW

6    ANYONE AND YOU HAVE NO FAMILY OR FRIENDS. LOSE FAMILY, FRIEND, AND

7    DATING RELATIONSHIPS. INCUR HUNDREDS OF THOUSANDS IN DEBT.

8    EXPERIENCE LIFE AS A DISABLED PERSON IN A WORLD NOT BUILT FOR YOU.

9    TAKE MORE TIME TO DO EVERYTHING."). And, yes, there were a couple of objections that

10   the Court sustained. After the closing argument, SCMTD did not move for a mistrial.

11        Let's remember that to result in a new trial, the misconduct has to "permeate[] an entire

12   proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching

13   its verdict." *Hemmings*, 285 F.3d at 1192. And "where offending remarks occurred principally

14   during opening statement and closing argument, rather than throughout the course of the trial, we

15   are less inclined to find the statements pervaded the trial and thus prejudiced the jury."

16   *Settlegoode*, 371 F.3d 518. Here, the allegedly offending remarks – mostly not objected to, and

17   some that were not offending – occurred solely in closing. "The question is whether counsel's

18   misconduct so permeated the trial as to lead to the conclusion the jury was necessarily influenced

19   by passion and prejudice in reaching its verdict." *Cooper*, 945 F.2d at 1107. The answer is no.

20   SCMTD comes nowhere close to establishing that.

21        **3.    Whether Comparable Verdicts Show the Noneconomic Damages Award Is an**
22              **Outlier**

23        Some courts have held that "[i]n order to determine whether a particular award is

24   excessive, courts have found it useful to review awards in other cases involving similar injuries,

25   while bearing in mind that any given judgment depends on a unique set of facts and

26   circumstances." *Nairn v. National R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988).

27   Others disagree. *See Dolenz v. United States*, 443 F.3d 1320, 1322 (10th Cir. 2006) ("[I]t is a

28   difficult and often fruitless task to compare damages in one case with those in another, and we do

*United States District Court*
*Northern District of California*

49

United States District Court
Northern District of California

1    not generally countenance such comparisons.").  Regardless, "such comparisons are rarely

2    dispositive given the fact-specific nature of damages claims."  *Hendrickson v. Cooper*, 589 F.3d

3    887, 892 (7th Cir. 2009).  Courts should also be mindful about the cherry-picking problem:

4    "[C]ourts have upheld or set aside jury verdicts in significantly differing amounts and in

5    significantly different circumstances.  Invariably, one could find a case to support nearly any

6    award of damages in nearly any amount."  *Thornton v. Kaplan*, 958 F. Supp. 502, 505 (D. Colo.

7    1996).

8         SCMTD's "comparable verdicts" argument has a huge cherry picking problem.  SCMTD

9    provides three California Superior Court jury verdicts *from the last two decades* and says these are

10   the comparable ones.  Painter Decl., Exs. DD (2004 verdict), EE (2018 verdict), FF (2019 verdict),

11   ECF Nos. 622-8, 622-9, 622-10.  California is the largest state in the country and likely has the

12   most litigation of any state.  Every year its Superior Courts have hundreds of jury verdicts in civil

13   matters.  The idea that you could show that one particular verdict is an outlier by searching

14   through electronic databases of jury verdicts to find three among the thousands of jury verdicts in

15   the state over the past 21 years is ridiculous.  That methodology could prove that every jury

16   verdict is an outlier and also that every jury verdict is not an outlier because with a diligent search

17   you could always find three jury verdicts for similar injuries that are similar to or very different

18   from the verdict in your case.  The Court rejects SCMTD's argument about comparable verdicts

19   because the methodology it employes is so manipulable that it is meaningless.

20        Having said that, let's look at the three cases SCMTD came up with to see if they are

21   comparable.  This case is about a then-33 year old (Ex 37A (subtract date of birth from date of

22   visit to get Plaintiff's age)) who suffered a permanently disabling injury to their left knee.  So, a

23   comparable case would be a disabling knee injury to someone of approximately Plaintiff's age.

24        In Ex. EE (ECF No. 622-9), SCMTD provides a summary of *Marie Green v. Empire*

25   *Transportation, Inc., et al*.  In that case, a 77 year old disabled woman was in her wheelchair on a

26   public bus traveling in Paris when the wheelchair tipped and fell.  The main issue at trial was that

27   Green claimed she sustained a traumatic brain injury, and as a result she needed to live in a facility

28   24 hours a day, seven days a week for the rest of her life.  Defendant denied that Green suffered a

50

traumatic brain injury and argued that Green already had a 24/7 caretaker (her son) for the last 17 years due to prior age-related degeneration.

A 77 year old woman is not similar to our then-33 year old Plaintiff.  The injury in dispute in that case – traumatic brain injury – has nothing to do with a knee injury.  And the causation defense (she was already under 24/7 care) is also not similar to this case.  SCMTD did not contend at trial that Plaintiff was permanently disabled *before* they got on the bus.  This case is not comparable.

In Ex. FF (ECF No. 622-10), SCMTD offers *Laura Rubin v. One Level World Inc., et al.*  In that case, a 68 year old disabled woman alleged that she sustained neck and back injuries when her wheelchair lift in her condominium failed and she was ejected onto the staircase with the wheelchair strapped to her back.  Once again, this is an elderly woman who was permanently disabled before the alleged injury happened.  *See id.* ("The plaintiff's physical rehabilitation expert opined that Rubin was recovering from her 2013 fall, which made the wheelchair necessary for the rest of Rubin's life, at the time of the subject fall," which was in 2014).  This is not comparable to a young adult who *became* permanently disabled *because* of Defendant's conduct.  Notice, also, that the injury in that case (neck and back problems) is not similar to the injury in this case (disabling knee injury).  This is not a comparable case.

SCMTD does better in Ex. DD (ECF No. 622-8) with *Borja v. Santa Clara County Transportation Authority*.  The case is from 21 years ago, but defense counsel are probably patting themselves on the back that they found it.  Plaintiff was a 54 year old woman.  She was using a three-wheeled electric motor scooter (it was a three-wheeled electric motor scooter in this case too) and wanted to take the #77 bus.  The driver, April Jones, lowered the passenger lift, and Plaintiff maneuvered her scooter onto the lift and was able to board the bus.  Jones raised the seats designated as the securement area (there was a securement area in this case too).  "At this point, the stories of plaintiff and Jones conflict."  (Plaintiff and the bus driver disagreed in this case too.)  Plaintiff said she asked Jones for help securing the scooter onto the bus with the use of a seatbelt.  Jones said she offered the seatbelt and plaintiff refused it.  (The bus driver said that in this case too.)  In any event, plaintiff was not properly secured, and when the bus took a right turn (it was a

1    right turn in this case too), "the centrifugal forces were great enough to tip plaintiff's scooter

2    over." The claimed injuries included a "left knee contusion," though it appears that the permanent

3    loss of use was to her left arm.

4          This is a comparable case. It's not exactly the same, as lifetime noneconomic damages are

5    larger for a then-33 year old than for a then-54 year old. But it also involves the permanent loss of

6    function of a limb. But notice something else: The damages the jury awarded in *Borja* --

7    $2,165,327 – are far larger than in the two non-comparable cases cited by SCMTD. So, it seems

8    that the points of distinction the Court has been emphasizing (age of the plaintiff, whether the

9    injury caused the disability) are relevant. The jury's award of noneconomic damages in this case

10   was about 5.8 times the size of the verdict in *Borja*, but that verdict was 21 years ago and that

11   plaintiff was 21 years older at the time of the injury. Once you account for inflation and the fact

12   that our Plaintiff likely had twice as long left to live as Borja did, the jury verdict in this case is

13   still larger than an adjusted *Borja* verdict, but not so much as to make this verdict an "outlier."

14         In sum, SCMTD's argument that the jury verdict in this case was an outlier is flawed

15   methodologically because it relies on cherry picking a handful of examples from thousands of jury

16   verdicts. In addition, SCMTD did not pick good cherries. Two of the cases are not comparable

17   and the third does not show the verdict in this case was an outlier.

18   **F.    Scope of the Retrial if the Remittitur Is Declined**

19         As noted, the Court remits Plaintiff's economic damages to $27,000. In keeping with the

20   Seventh Amendment, Plaintiff may accept or reject this remittitur. *See Hetzel v. Prince William*

21   *County*, 523 U.S. 208, 211-12 (1998). If the Plaintiff declines the remittitur, the Court will order a

22   new trial. The Court must decide the scope of the new trial. *See D'Hedouville v. Pioneer Hotel*

23   *Co.*, 552 F.2d 886, 897 (9th Cir. 1977) (scope of new trial is within trial court's discretion).

24   "Partial retrials 'may not properly be resorted to unless it clearly appears that the issue to be

25   retried is so distinct and separable from others that a trial of it alone may be had without

26   injustice.'" *Pumphrey v. K.W. Thompson Co.*, 62 F.3d 1128, 1133-34 (9th Cir. 1995) (quoting

27   *Gasoline Products Co., Inc. v. Champlain Refining Co.*, 283 U.S. 494, 500 (1931)).

28         It would not be just to have a retrial limited to economic damages. The jury's

United States District Court
Northern District of California

United States District Court
Northern District of California

determination of both economic and noneconomic damages required deciding whether Plaintiff is permanently disabled and, if so, whether Plaintiff's injury on the bus is the cause of that.  The two measures of damages cannot sensibly be tried separately from each other.

However, damages are distinct and separable from liability.  Accordingly, as SCMTD requests, "if AMJ does not consent to the remittitur," the Court will "hold a partial new trial limited to the issue of damages."  Mot. at 1.

### III.    CONCLUSION

SCMTD's motion for a new trial is **CONDITIONALLY DENIED** based on Plaintiff accepting a remittitur to $27,000 in compensatory damages, for a total damages award of $12,658,250.  Plaintiff shall file a notice on the docket within 30 days stating whether they accept or reject the remittitur (and a proposed amended judgment if they accept it).  At that point the Court will, as appropriate, either enter an order granting a new trial on damages or enter a final, appealable order denying SCMTD's motion for a new trial.

**IT IS SO ORDERED.**

Dated: May 14, 2025

THOMAS S. HIXSON
United States Magistrate Judge