1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7     AMANDA JONES,                           Case No.  15-cv-02726-TSH

8                    Plaintiff,

9           v.                                **CORRECTED ORDER
                                              CONDITIONALLY DENYING
10    NATIONAL RAILROAD PASSENGER             DEFENDANT SANTA CRUZ
      CORPORATION, et al.,                    METROPOLITAN TRANSIT
11                                            DISTRICT'S MOTION FOR A NEW
                     Defendants.              TRIAL[1]**

12                                            Re: Dkt. No. 618

13

14          Defendant Santa Cruz Metropolitan Transit District (SCMTD) moves for a new trial

15    following the entry of judgment against it.  The Court conditionally denies the motion.[2]

16                                **I.    BACKGROUND**

17    **A.    Complaint, Summary Judgment Order, Court of Appeals Decision**

18          Plaintiff Amanda Jones (AMJ) filed this lawsuit on June 17, 2015.  ECF No. 1.  Their[3]

19    Third Amended Complaint ("TAC," ECF No. 155) alleged five claims for relief:  (1) violation of

20    the Americans with Disabilities Act ("ADA") against Defendant National Railroad Passenger

21    Corporation, also known as Amtrak; (2) violation of the ADA against SCMTD; (3) violation of

22    the Rehabilitation Act against both Defendants; (4) violation of the California Unruh Civil Rights

23    Act against both Defendants; and (5) negligence against both Defendants.  Their claims all arise

24    ─────────────────────────

25    [1] The Court's order at ECF No. 645 stated on pages 39 and 47 that eleven and a half years elapsed
      between the incident and the third trial.  However, it was ten and a half years.  This order corrects
26    those misstatements, which do not affect the outcome.  The Court also corrects a pronoun on page
      47.
27    [2] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 8,
      12, 16.
28    [3] Plaintiff is nonbinary and uses they/them pronouns.  The Court does the same for purposes of
      this order.

United States District Court
Northern District of California

from an August 25, 2014 incident on the Highway 17 bus en route from Santa Cruz to San Jose, when Plaintiff's scooter tipped over while they were on it.  TAC ¶¶ 12-39.  The essence of their claims is that the bus driver failed to properly secure the scooter so that it would not fall over during the course of the bus ride.  *Id.* ¶¶ 17-24, 26.

On October 10, 2019, the Court granted Defendants' motion for summary judgment on all claims.  ECF No. 197.  On May 18, 2021 the Ninth Circuit affirmed the grant of summary judgment on the ADA, Rehabilitation Act and Unruh Act claims and reversed the grant of summary judgment on the negligence claim.  ECF No. 221.

**B.    First Trial**

On March 22, 2023, at the conclusion of the first jury trial, the jury deadlocked, and the Court declared a mistrial.  ECF Nos. 399, 401.

**C.    Dismissal of Amtrak**

Following the first trial, Amtrak filed a renewed motion for judgment as a matter of law.  ECF No. 413.  The Court granted the motion on May 4, 2023.  ECF No. 419.  After that point, SCMTD was the only Defendant remaining in the case.

**D.    Second Trial**

On November 29, 2023, during voir dire at the start of the second trial, defense counsel tainted the entire venire, and the Court declared a mistrial and later sanctioned him.  ECF Nos. 453, 454, 483.  The sanctions order (ECF No. 483) recounts what happened:

> November 29, 2023, was the first day of an anticipated two-week trial in the above-captioned matter. The scheduled trial was a retrial, following a trial in March 2023 in which the jury was unable to reach a verdict. Prior to trial, both Plaintiff and Defendant confirmed they were not planning to call any witnesses who did not testify in the previous trial. Pretrial Conf. Tr. at 12–13, ECF No. 461. On the first day of trial, following voir dire by the Court and Plaintiff's counsel, counsel for SCMTD, Robert G. Howie, began voir dire for the defense. Before asking the prospective jurors any questions, Howie informed the entire pool of prospective jurors that the Plaintiff (1) had multiple sclerosis (MS), and (2) was "confined to a wheelchair for reasons that have nothing to do with" the lawsuit. Trial Tr. at 12–13, ECF No. 460.
>
> In its oral ruling granting Plaintiff's motion for a mistrial, the Court stated the following:

2

United States District Court
Northern District of California

> The major issue in dispute in this case is causation, and Mr. Howie's statement in front of the prospective jurors that the plaintiff has MS goes directly to the issue of causation in a way that is prejudicial to Plaintiff's case. In the previous trial I do not recall there was any mention of MS, and both sides have told me that they were planning to call the same witnesses to testify at this trial as in the previous trial, and so I have no basis to think that evidence regarding MS would be admissible. I do think it is massively prejudicial the way that it was told to the prospective jurors, and, again, it goes directly to the core issue in this case, which is causation. Accordingly, the plaintiff's motion for a mistrial is granted.

*Id*. at 17.

The sanctions order further explained:

> The Court finds Howie's statements to the prospective jurors constituted the raising of a frivolous argument. Howie did not indicate that any witness would be called to testify that MS caused the injuries Plaintiff alleges, nor did he indicate that any such evidence would be admitted—or even admissible—at trial. *See* Trial Tr. at 16-17. Howie did state that Dr. Conte determined that Plaintiff has MS, and that her MS was not caused by the accident. But neither side was planning to call Dr. Conte as a witness at trial, which Howie acknowledged. *Id*. Further, as Plaintiff's counsel explained, whether the accident caused her MS is "not the issue. The comment is that she needs the wheelchair because she has MS. No one is going to say that." *Id*. at 16:10-12. No witness at the previous trial ever mentioned MS as a cause or potential cause of Plaintiff's alleged injuries, and Howie had confirmed he was not planning to call any new witnesses. Pretrial Conf. Tr. at 13.

> In the course of voir dire, attorneys sometimes make factual assertions to prospective jurors about the case, usually to help the prospective jurors understand why the attorney is asking about the subject. For example, if a plaintiff is disabled, counsel might mention that fact and then ask the prospective jurors whether they or their close friends or family members have a similar disability or what their experiences may have been in dealing with people who have a similar disability. When an attorney does this, he must have a reasonable belief that evidence will be admitted at trial to support his factual assertions to the prospective jurors about the case. This is basic common sense. Here, Howie had no basis to think there would be any evidence admitted at trial that Plaintiff has MS and that it is the reason she is in a wheelchair. And he knew that. When Plaintiff moved for a mistrial, Howie identified the witness who "would testify that she has MS" – Dr. Conte – and in the same breath said: "The fact is that Dr. Conte was not going to be called" to testify at trial. Trial Tr. at 16:5-7. Howie's statements to the prospective jurors were therefore frivolous.

> Howie contends he was merely looking to elicit information about possible bias regarding the cause of disability. Opp'n at 1–2, 8. Howie argues that by informing the jury that Plaintiff had MS and that she

3

was "confined to a wheelchair" for reasons that had nothing to do with the incident at issue, he was conducting an inquiry into whether jurors would "presum[e] that a wheelchair-bound personal injury plaintiff" who was involved in an accident "is 'permanently disabled' and 'unable to walk' as a result of the accident versus an illness or otherwise." *Id.* at 5. But while Howie characterizes his statement to the prospective jurors as a question (*id.* at 1, 3, 5–6, 8–9), Howie's statements constituted an argument about causation, rather than an inquiry into potential jurors' preconceptions about what causes disability:

> THE COURT: Let's have voir dire from the defense, please.
>
> MR. HOWIE: Thank you, Your Honor.
> Thank you, everyone, for being here. We appreciate it.
> I know what it's like to be in the jury box a little bit, and it's very -- sometimes people are recalcitrant about speaking up about bias, if that's exactly what was just the topic.
> The plaintiff suffers from MS, multiple sclerosis. She's confined to a wheelchair for reasons that have nothing to do with this accident.

Trial Tr. at 12–13.

The order concluded:

> The Court is likewise unpersuaded by Howie's explanation that a curative instruction would have sufficed. As Howie points out in his opposition, this is a personal injury case. The only claim remaining at issue for trial is negligence, for which causation of Plaintiff's injuries is a central issue. Further, MS is not an obscure disease that few people have heard of. Right off the bat Howie tainted the entire venire by implying that a highly recognizable disease was the true cause of Plaintiff's injuries, when he knew that no evidence to that effect was likely to be admitted at trial.
>
> Howie's conduct was thus extremely prejudicial, and the Court finds this conduct was reckless, in addition to frivolous. Howie's actions clearly multiplied the proceedings. As a direct result of the statements Howie made during voir dire, the Court will have to hold a third trial in this case, resulting in yet another jury selection process and some duplication of trial preparation efforts.
>
> Accordingly, pursuant to 28 U.S.C. § 1927, the Court **SANCTIONS** Howie and concludes he must personally satisfy the excess costs, expenses, and attorneys' fees reasonably incurred because of his conduct at trial.

E.    **Third Trial**

On March 19, 2025, the third trial concluded in a unanimous jury verdict in favor of Plaintiff and against SCMTD for $12,631,250 in noneconomic damages and $368,000 in economic damages. ECF No. 586. The Court entered judgment the same day. ECF No. 589. On

1    April 16, 2024 SCMTD filed a motion for a new trial pursuant to Federal Rule of Civil Procedure

2    59.  ECF No. 618.  On May 1, 2025 Plaintiff filed an opposition.  ECF No. 640.  On May 7, 2025,

3    SCMTD filed a reply.  ECF No. 642.  This order follows.

4        In the discussion of the third trial, citations below are to the trial transcript ("TT").  The

5    trial transcript is spread across twelve volumes, with one volume for each day of trial and

6    continuous pagination across all twelve volumes.  Citations herein are to the multi-volume

7    transcript page numbers.  *See* ECF Nos. 591 (Transcript Vol. 1, pages 1–41), 592 (Vol. 2, pages

8    42–252), 593 (Vol. 3, pages 253–413), 594 (Vol. 4, pages 414–576), 595 (Vol. 5, pages 577–705),

9    596 (Vol. 6, pages 706–845), 597 (Vol. 7, pages 846–961), 598 (Vol. 8, pages 962–1154), 599

10   (Vol. 9, pages 1155–1307), 600 (Vol. 10, pages 1308–1446), 601 (Vol. 11, pages 1447–1559), and

11   603 (Vol. 12, pages 1560–1620).

## II.    DISCUSSION

### A.    Legal Standard

14       "The court may, on motion, grant a new trial on all or some of the issues – and to any party

15   – as follows:  (A) after a jury trial, for any reason for which a new trial has heretofore been

16   granted in an action at law in federal court . . ."  Fed. R. Civ. Proc. 59(a)(1).  "The district court

17   must grant a motion for a new trial where 'the verdict is against the weight of the evidence,' 'the

18   damages are excessive' or, 'for other reasons, the trial was not fair to the [moving] party.'"

19   *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (quoting *Montgomery Ward & Co. v.*

20   *Duncan*, 311 U.S. 243, 251 (1940)).  "A new trial is warranted when the verdict is against the

21   great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous

22   result."  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014) (cleaned up).  "[T]he

23   district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage

24   of justice."  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir.

25   2014).

26       Where a damages verdict is excessive, the court may grant a new trial unless the plaintiff

27   accepts a remittitur, which "must reflect the maximum amount sustainable by the proof."  *Oracle*,

28   765 F.3d at 1094 (cleaned up).  When assessing remittiturs of state-law claims, federal courts

1    apply state law.  *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 437 (1996).  California

2    law expressly authorizes remittitur when there are "excessive damages."  Cal. Code Civ. Proc. §

3    662.5(a)(2).  Trial courts have broad discretion to remit excessive damages and sit as "independent

4    trier[s] of fact" when doing so.  *Lane v. Hughes Aircraft Co.*, 22 Cal. 4th 405, 412 (2000) (cleaned

5    up).

6    **B.    Plaintiff's MS Diagnosis**

7        SCMTD's first argument is that the jury should have heard evidence of Plaintiff's MS

8    diagnosis.  Mot. at 4-7.

9        **1.    Legal Standard**

10       Federal Rule of Civil Procedure 61 states that "[u]nless justice requires otherwise, no error

11   in admitting or excluding evidence – or any other error by the court or a party – is ground for

12   granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing

13   a judgment or order.  At every stage of the proceeding, the court must disregard all errors and

14   defects that do not affect any party's substantial rights."  "A new trial is only warranted when an

15   erroneous evidentiary ruling substantially prejudiced a party."  *Ruvalcaba v. City of Los Angeles*,

16   64 F.3d 1323, 1328 (9th Cir. 1995).

17       **2.    Background**

18       Here is how the Court addressed the MS issue at trial:

19       THE COURT: LAST WEEK PLAINTIFF FILED A MOTION TO STRIKE, AND ON

20   FRIDAY DEFENDANT RESPONDED.

21       I WANTED TO TALK ABOUT THAT MOTION AND THE RESPONSE TO MAKE

22   SURE I UNDERSTAND THE ISSUES.

23       LET ME FIRST TURN TO THE PLAINTIFF.

24       MY UNDERSTANDING IS THAT DR. CONTE'S OPINION IS THAT THE INJURY

25   ON THE BUS THAT'S THE SUBJECT OF THIS LAWSUIT DID NOT CAUSE THE

26   PLAINTIFF'S M.S. TO WORSEN; IS THAT CORRECT?

27       MS. AIKENS: IN ESSENCE, YES.

28       THE COURT: OKAY. ARE YOU PLANNING TO CALL DR. CONTE AT TRIAL?

United States District Court
Northern District of California

6

1    MS. AIKENS: NO.

2    THE COURT: AT THE FIRST TRIAL, THERE WAS NO MENTION OF PLAINTIFF'S

3    M.S., AND CERTAINLY NO ASPECT OF HER DAMAGES CLAIM INCLUDED ANY SORT

4    OF CLAIM THAT THE INJURY ON THE BUS AFFECTED HER M.S.

5    DO YOU EXPECT THAT WILL BE THE SAME AT THIS COMING TRIAL?

6    MS. AIKENS: YES. AND IF I COULD JUST STATE A LITTLE BIT?

7    THE COURT: SURE.

8    MS. AIKENS: I THINK THE ISSUE CAME BECAUSE THE PRIOR DEFENSE

9    COUNSEL, IT WAS UNCLEAR, AND IF IT CAME UP, THEY WANTED TO RESERVE THE

10   RIGHT, WHICH IS WHY WE ALSO HAD DR. CONTE IN CASE THERE WAS ANY

11   INDICATION OF TRYING TO BRING THAT IN.

12   ONCE IT BECAME CLEAR THAT THEY WERE NOT GOING TO BE TALKING

13   ABOUT THE M.S., WE AGREED THAT WE WERE NOT GOING TO DO THAT EITHER,

14   AND SO THAT'S WHY WE WERE NOT INCLUDING THAT TO MUDDY THE WATERS, IF

15   YOU WILL, AND AS I STATED IN MY MOTION, THAT'S HOW WE GOT A MISTRIAL

16   THE LAST TIME, AND SO I'M NOT INTENDING TO ELICIT ANY OF THAT TESTIMONY.

17   THE COURT: THANK YOU. I APPRECIATE THE CLARIFICATION.

18   LET ME TURN TO THE DEFENDANT.

19   YOU HEARD THAT PLAINTIFF IS NOT GOING TO CALL DR. CONTE OR RAISE

20   ISSUES ABOUT M.S. AT ALL AT THE TRIAL. IN LIGHT OF THAT, DO YOU STILL SEE A

21   NEED FOR YOUR DESIGNATION OF THE EXCERPT OF HIS DEPOSITION TESTIMONY?

22   MR. CRIDLAND: YES, YOUR HONOR.

23   AND THE REASON FOR THAT IS THAT SOME OF THE DOCTORS WHO ARE

24   GOING TO BE TESTIFYING, IN PARTICULAR DR. PRIMUS, HAD AS PART OF THEIR

25   DIFFERENTIAL DIAGNOSIS BACK DURING THE TIMEFRAME THAT HE WAS

26   TREATING AMJ IN 2017 AND 2018, HE TESTIFIED THAT HE HAD A DIFFERENTIAL

27   DIAGNOSIS THAT SOME OF HER PROBLEMS WERE BEING CAUSED BY MATTERS

28   OTHER THAN THE ORTHOPEDIC INJURIES THAT HE WAS TREATING, AND WE

United States District Court
Northern District of California

1  BELIEVE THAT THAT BRINGS IN, AND WILL BRING IN, SOME ISSUES RELATED TO

2  HER OTHER CONCERNS, INCLUDING M.S., INTO THIS TRIAL, AND WE WANT TO BE

3  ABLE TO PRESERVE DR. CONTE'S OPINION FOR USE AT TRIAL IN THE EVENT THAT

4  IT IS NECESSARY.

5  IN ADDITION, I WOULD NOTE THAT -- EXCUSE ME -- AT THE TIME THE

6  DESIGNATION WAS SUBMITTED, DR. CONTE IS AND CONTINUES TO BE ON THE

7  TRIAL PARTICIPANT LIST SUBMITTED BY THE PLAINTIFF, AND IN THE EVENT

8  THAT HE IS CALLED TO TESTIFY, OBVIOUSLY WE WANT TO BE ABLE TO USE HIS

9  DEPOSITION, ALTHOUGH IN THAT CASE IT MIGHT NOT BE AS A FORMAL

10  DESIGNATION.

11  THE COURT: SO LET ME TURN BACK TO PLAINTIFF'S COUNSEL.

12  IN MY OPINION, THE TREATING PHYSICIANS SHOULD ONLY DISCUSS

13  INJURIES THAT ARE CAUSALLY RELATED TO THE ISSUE THAT IS AT ISSUE IN THIS

14  CASE.

15  DO YOU AGREE?

16  MS. AIKENS: I DO, YOUR HONOR.

17  THE COURT: OKAY.

18  MS. AIKENS: AND IF I COULD JUST ADD? I MEAN, THE DIFFERENTIAL

19  DIAGNOSIS IS A TYPICAL TO THE E.R. AND ALL OF THOSE THINGS. IT DOESN'T

20  MEAN THAT THIS WAS ONE OF THEM. AND ALSO HE'S AN ORTHOPEDIC SURGEON.

21  HE WASN'T DIAGNOSING HER WITH M.S., SO –

22  THE COURT: ALL RIGHT. SO I HAVE TWO CONCERNS ABOUT BRINGING UP

23  M.S., ONE IS RELEVANCE, AND THE OTHER IS UNFAIR PREJUDICE.

24  AS TO RELEVANCE, IN MY OPINION, MEDICAL CONDITIONS THAT THE

25  PLAINTIFF HAS THAT ARE NOT CAUSALLY RELATED TO THE INJURY AT ISSUE IN

26  THIS CASE ARE NOT RELEVANT, AND IRRELEVANT EVIDENCE IS NOT ADMISSIBLE.

27  SECOND, I'M CONCERNED THAT MENTIONING M.S. MAY BE UNFAIR

28  PREJUDICE FOR THE PLAINTIFF AND MAY CONFUSE THE JURY.

8

United States District Court
Northern District of California

1    THE JURY, IF THEY HEAR ABOUT AN M.S. DIAGNOSIS, MIGHT THINK THAT IT IS, OR IS PARTLY, THE CAUSE OF THE INJURIES AT ISSUE IN THIS CASE, AND I HAVE CONCERN ABOUT THAT.

SO MY IN LIMINE RULING IS THAT THERE CAN BE NO MENTION OF M.S. AT TRIAL, AND THAT'S FOR BOTH RELEVANCE AND RULE 403 PURPOSES.

IF DURING THE TRIAL THE DEFENDANT BELIEVES THAT PLAINTIFF HAS IN SOME MANNER OPENED THE DOOR SUCH THAT YOU BELIEVE THAT BRINGING UP M.S., WHETHER THROUGH CONTE'S DEPOSITION EXCERPT OR OTHERWISE, SUCH THAT YOU BELIEVE IT WOULD BE JUSTIFIED AND THAT MY IN LIMINE ORDER SHOULD BE CHANGED, THEN I ORDER YOU TO RAISE THAT WITH ME OUTSIDE THE PRESENCE OF THE JURY SO I CAN EVALUATE THAT ARGUMENT AND DECIDE WHETHER IT IS CORRECT OR NOT.

BUT THE PARTIES ARE NOT TO MENTION THE M.S. DIAGNOSIS IN FRONT OF THE JURY. INSTEAD -- AND THIS WOULD GO FOR THE PLAINTIFF AS WELL. IF EITHER SIDE BELIEVES THAT THERE IS REASON TO MENTION IT IN THE CASE, THEN YOU ARE TO BRING THAT ARGUMENT TO ME OUTSIDE OF THE PRESENCE OF THE JURY SO I CAN EVALUATE IT FIRST. I DON'T WANT ANY SURPRISES ABOUT THE M.S. DIAGNOSIS IN FRONT OF THE JURY.

YOU CAN RAISE THAT TO ME OUTSIDE OF THE PRESENCE OF THE JURY.

IS THAT UNDERSTOOD, PLAINTIFF?

MS. AIKENS: YES, YOUR HONOR.

THE COURT: IS THAT UNDERSTOOD, DEFENDANT?

MR. CRIDLAND: YES, YOUR HONOR.

TT 16:21-20:24

In other words, the Court excluded references to MS on relevance and unfair prejudice grounds but stated that if either side believed there was a reason to mention it in the case, they could bring it to the Court's attention outside the presence of the jury so the Court could evaluate the argument. Neither side did so.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Analysis

It is unclear what error SCMTD thinks the Court committed.  Plaintiff's fall on the bus injured their left knee, permanently disabling them.  SCMTD proffered no evidence at trial that Plaintiff's MS caused or contributed to the left knee injury.  As Plaintiff rightly points out in their opposition to SCMTD's motion for a new trial, a showing that MS caused or contributed to an injury to one specific joint in someone's body (here, the left knee) would require expert testimony, and SCMTD did not proffer any such expert.  The Court properly excluded references to MS for both relevance and Rule 403 purposes in the absence of any evidence that it contributed to Plaintiff's left knee injury.

At trial, SCMTD argued (as quoted above):  "SOME OF THE DOCTORS WHO ARE GOING TO BE TESTIFYING, IN PARTICULAR DR. PRIMUS, HAD AS PART OF THEIR DIFFERENTIAL DIAGNOSIS BACK DURING THE TIMEFRAME THAT HE WAS TREATING AMJ IN 2017 AND 2018, HE TESTIFIED THAT HE HAD A DIFFERENTIAL DIAGNOSIS THAT SOME OF HER PROBLEMS WERE BEING CAUSED BY MATTERS OTHER THAN THE ORTHOPEDIC INJURIES THAT HE WAS TREATING, AND WE BELIEVE THAT THAT BRINGS IN, AND WILL BRING IN, SOME ISSUES RELATED TO HER OTHER CONCERNS, INCLUDING M.S., INTO THIS TRIAL . . ."  TT 18:9-17.

That argument was unpersuasive.  First of all, it was factually inaccurate.  In addition to Plaintiff's physical therapist Jamie Jackson (who is not a medical doctor), there was only one doctor who treated Plaintiff and who testified at trial, Gregory Primus – there were not "some" doctors who treated them and testified.  Primus did not treat the Plaintiff in 2017 and 2018, as SCMTD wrongly stated.  He stopped treating them in 2016.  TT 766:16-24.  SCMTD acknowledges in its motion that Plaintiff was not diagnosed with MS until 2017 (Mot. at 4), after Primus had stopped treating them.

Even if it were true that Primus thought "some of her problems were being caused by matters other than the orthopedic injuries that was he treating," this lawsuit is not vaguely about "some of her problems."  The disabling injury at the heart of this case is the injury to Plaintiff's left knee.  Primus testified that Plaintiff's left knee injury was caused by the fall on the bus.  TT

1    1022:13-1023:13.  Any opinions he had that other problems were caused by other things are

2    irrelevant.  It is particularly hard to understand how Primus's opinions formed in the course of

3    treating Plaintiff in 2014-16 (TT 741:10-13 (started in March 2014); TT 766:16-24 (ended in

4    August 2016)) make relevant an MS diagnosis that wasn't made until 2017 and that an orthopedic

5    surgeon like Primus would obviously have been unable to make.

6         The other argument SCMTD made at trial was:  "AND WE WANT TO BE ABLE TO

7    PRESERVE DR. CONTE'S OPINION FOR USE AT TRIAL IN THE EVENT THAT IT IS

8    NECESSARY.  [¶] IN ADDITION, I WOULD NOTE THAT -- EXCUSE ME -- AT THE TIME

9    THE DESIGNATION WAS SUBMITTED, DR. CONTE IS AND CONTINUES TO BE ON

10   THE TRIAL PARTICIPANT LIST SUBMITTED BY THE PLAINTIFF, AND IN THE EVENT

11   THAT HE IS CALLED TO TESTIFY, OBVIOUSLY WE WANT TO BE ABLE TO USE HIS

12   DEPOSITION, ALTHOUGH IN THAT CASE IT MIGHT NOT BE AS A FORMAL

13   DESIGNATION."  TT 18:17-25.

14        Plaintiff did not call Conte to testify, so SCMTD did not need to use his deposition to cross

15   examine him.  As to SCMTD's desire to "be able to preserve Dr. Conte's opinion for use at trial,"

16   Conte's opinion was:  "the August 25, 2014, incident did not cause or exacerbate Miss Jones'

17   underlying MS because 1) The scientific literature does not clearly support trauma or stress

18   directly causing or exacerbating MS, and 2) It is more likely than not that her continued knee

19   symptoms are an orthopedic issue rather than a neurological issue."  ECF No. 619-2 at 15.

20        If Plaintiff had argued to the jury that the fall on the bus caused or exacerbated their MS,

21   that could have opened the door to SCMTD calling Conte.  The Court explicitly stated:  "IF

22   DURING THE TRIAL THE DEFENDANT BELIEVES THAT PLAINTIFF HAS IN SOME

23   MANNER OPENED THE DOOR SUCH THAT YOU BELIEVE THAT BRINGING UP M.S.,

24   WHETHER THROUGH CONTE'S DEPOSITION EXCERPT OR OTHERWISE, SUCH THAT

25   YOU BELIEVE IT WOULD BE JUSTIFIED AND THAT MY IN LIMINE ORDER SHOULD

26   BE CHANGED, THEN I ORDER YOU TO RAISE THAT WITH ME OUTSIDE THE

27   PRESENCE OF THE JURY SO I CAN EVALUATE THAT ARGUMENT AND DECIDE

28   WHETHER IT IS CORRECT OR NOT."  TT 20:4-10.  But Plaintiff never mentioned MS to the

United States District Court
Northern District of California

11

1    jury and never made a claim that the fall on the bus caused or worsened their MS.  Thus, Plaintiff

2    did not open that door.

3        In the absence of such a door opening, nothing about Conte's opinion justifies mentioning

4    MS.  In particular, the second half of his opinion ("It is more likely than not that her continued

5    knee symptoms are an orthopedic issue rather than a neurological issue.") underscores the

6    irrelevance of MS to Plaintiff's knee injury.

7        In the motion for a new trial, SCMTD takes a new tact.  First, it presents arguments as if

8    there were evidence that Plaintiff's MS somehow contributed to their left knee injury, or perhaps

9    that there doesn't need to be any such evidence.  SCMTD says:  "Not only would MS have

10    affected AMJ's ability to recover from the 2014 incident, but the disease manifests in the reduced

11    mobility that AMJ attributes solely to this incident."  Mot at 4.  Do you notice how SCMTD has

12    exactly zero citations to support that assertion?  There is nothing to cite.  SCMTD never proffered

13    any evidence that Plaintiff's MS affected their knee injury.  Indeed, the expert opinion that

14    SCMTD wanted to preserve for use at trial (Conte's) concluded the opposite of that.

15        SCMTD argues that "evidence of AMJ's diagnosis would have affected the jury's

16    evaluation of AMJ's future noneconomic and economic damages *arising from the incident,*" Mot.

17    at 5 (emphasis added).  But that could only have been true if there were evidence that their MS

18    contributed to the knee injury, which is the injury that arose from the incident.  And there wasn't.

19        SCMTD also seems to argue that no evidence that the MS contributed to the left knee

20    injury was needed because the jury could draw that inference itself:  "[T]he jury should have been

21    permitted to hear evidence of AMJ's MS diagnosis in order to evaluate whether SCMTD's alleged

22    negligence was a substantial factor in causing AMJ's inability to walk."  Mot. at 4-5.  But no, that

23    is the Rule 403 problem.  Without evidence that Plaintiff's MS contributed to their left knee

24    injury, the diagnosis wasn't relevant at all.  Admitting evidence of the MS in that situation would

25    be unduly prejudicial because it would invite the jury to speculate.  In reality, if there were any

26    merit to the notion that Plaintiff's MS contributed to the left knee injury, SCMTD would have

27    retained a medical expert to testify to that effect.  Although the number of experts who testified at

28    trial was not large, the parties' expert disclosures contained numerous experts.  SCMTD was

United States District Court
Northern District of California

1   apparently unable to find anyone who would testify under oath that Plaintiff's MS contributed to

2   their left knee injury.  In the absence of such evidence, the Court properly excluded references to

3   MS.[4]

4        SCMTD also contends that the Court's in limine order unfairly prevented SCMTD from

5   cross-examining Primus.  SCMTD points to the following testimony by Primus from the first trial:

6        Q Okay. With respect to Amanda's being able to walk and the
         leg just giving out on her, do you have an explanation for
7        that, from your perspective?

8        A I note here --

9        (Witness examines document)

10       A -- that she still has quad weakness, and there's various
         things that we're thinking about that could be leading to her
11       pronounced persistent quad weakness. We mention a spine cause;
         *we mention autoimmune issues that may be at play*.

12
         But we also know that for some people after knee surgery,
13       and in particular, knee surgery that involves the kneecap or
         any type of ligament reconstruction, it could take a year, it
14       could take up to 15, 18 months for their quadriceps to return.
         Some people have a dramatically delayed return of their quad
15       function after surgery.

16       That's why sometimes you hear very elite athletes,
         professional athletes requiring a year to return from ACL
17       surgery, is because their quadriceps muscle took forever to
         come back.
18
         So we were expressing those concerns at this point,
19       because I want to say we're about five or six months from

20

21   [4] In its reply brief, SCMTD says that in a retrial, it would call Dr. Sicotte, Dr. Beaber and Dr.
     Conte to testify.  Reply at 15.  SCMTD claims:  "Each of these witnesses are experts on MS and
22   treated AMJ. They are well-qualified to demonstrate that AMJ's MS diagnosis permeated all
     aspects of AMJ's daily life, including the severity of their alleged injuries arising from the 2014
23   incident, recovery and future treatment."  *Id*.  The argument about Dr. Sicotte and Dr. Beaber is
     waived because SCMTD did not proffer those experts at trial.  It is also waived a second time
24   because SCMTD did not make that argument or mention those experts in its motion for a new
     trial.  New arguments in reply are not permitted because Plaintiff had no opportunity to respond to
25   them.  In addition, the argument as to all three experts fails for lack of factual support.  SCMTD
     cites nothing to show that any of these experts would offer those opinions.  As you know from
26   reading the main text, Conte's report said the exact opposite of what SCMTD is now claiming ("It
     is more likely than not that her continued knee symptoms are an orthopedic issue rather than a
27   neurological issue.").  In its untimely and waived argument in its reply brief, SCMTD cites
     nothing to show what Sicotte's or Beaber's opinions actually are.  The need for some factual
28   support is apparent from the fact that SCMTD's argument about Conte in its reply brief flatly
     misrepresents what his opinions were.

surgery, and she still had significant quad weakness.

Q Okay. Did you attribute that to the bus incident in 2014?

A The quad weakness was attributed to the -- yes, the trauma from the bus accident, the surgery that was a direct result from the bus accident.

ECF No. 620-6 (emphasis added).

SCMTD also points to Primus's testimony in the third trial.  SCMTD points to TT 1030:15-1031:4.  Mot. at 6.  That testimony is as follows:

A. I BELIEVE SHE WOULD REQUIRE MORE PHYSICAL THERAPY. SHE'S NOT AT THIS TIME -- SHE'S STILL VERY MUCH IN THE HEALING PROCESS. SOMETIMES IT TAKES UPWARDS TO A FULL 12 MONTH PERIOD, AND EVEN 15 MONTHS, FOR ONE TO KIND OF MAXIMIZE WHAT THEIR QUAD STRENGTH IS GOING TO BE. SO SHE'S STILL EARLY IN THE PROCESS OF DEVELOPING HER QUADS, AND UNTIL THAT HAPPENS, WE – YOU KNOW, IT'S HARD TO KNOW WHAT HER ULTIMATE FUNCTION WOULD BE.

SO SHE CERTAINLY WOULD HAVE NEEDED TO CONTINUE WITH A QUAD HEAVY, QUAD STRENGTHENING TYPE OF PHYSICAL THERAPY.

BECAUSE OF HER CONCERNS ABOUT HER BACK AND HER WORSENING BACK ISSUES AND POTENTIAL -- THAT CONDITION'S POTENTIAL EFFECT ON HER OVERALL LEG AND LEG WEAKNESS AND FUNCTION, THERE DEFINITELY WOULD HAVE BEEN CONSIDERATION TO CONTINUE HER SPINE EVALUATION AND WORKUP, AS WELL TO ADDRESS HER GENERALIZED WEAKNESS.

SCMTD claims that the reference to "autoimmune issues" in the first trial and the reference to "her concerns about her back and her worsening back issues" are both references to MS.  Thus, SCMTD concludes that "Due to the Court's order excluding all references to MS, SCMTD's counsel was unable to question Dr. Primus regarding whether he ruled out AMJ's autoimmune disease from his differential diagnosis."  Mot. at 7.

That argument is not persuasive.  First, the Court's in limine order barred references to MS unless counsel, outside of the presence of the jury, persuaded the Court that there was a reason to mention MS.  The Court did not bar references to "autoimmune issues" or "worsening back issues."  Primus never mentioned MS, and as an orthopedic surgeon was not qualified to make and

14

did not make a diagnosis of MS, and nothing prohibited SCMTD from cross examining Primus about why he concluded that any other problems he observed were not the cause Plaintiff's left knee injury.  The supposed constraint on SCMTD's ability to cross examine Primus is made up.

Second, SCMTD's argument ignores the fact that the Court told the parties that:

> IF EITHER SIDE BELIEVES THAT THERE IS REASON TO MENTION IT IN THE CASE, THEN YOU ARE TO BRING THAT ARGUMENT TO ME OUTSIDE OF THE PRESENCE OF THE JURY SO I CAN EVALUATE IT FIRST. I DON'T WANT ANY SURPRISES ABOUT THE M.S. DIAGNOSIS IN FRONT OF THE JURY.
>
> YOU CAN RAISE THAT TO ME OUTSIDE OF THE PRESENCE OF THE JURY.
>
> IS THAT UNDERSTOOD, PLAINTIFF?
>
> MS. AIKENS: YES, YOUR HONOR.
>
> THE COURT: IS THAT UNDERSTOOD, DEFENDANT?
>
> MR. CRIDLAND: YES, YOUR HONOR.

TT 20:14-24.  SCMTD did not bring the above excerpt from Primus's testimony in the first trial that references "autoimmune issues" to the Court's attention and argue that it justified referring to MS.  Nor did SCMTD argue that Primus's reference to "worsening back issues" in the third trial was a secret reference to MS that justified referring to MS.  The Court explicitly left the door open to either side raising the MS issue again, as long as they did so outside the presence of the jury.  And neither side ever raised it again.  The Court did not commit error by failing to consider arguments and proffers that SCMTD never made.

**C.      Juror Misconduct**

Second, SCMTD contends that there should be a new trial because Juror No. 6 slept through important parts of the trial.

By way of background, SCMTD raised the issue of Juror No. 6 being asleep with the Court on March 5, 2025:

> THE COURT: AND I BELIEVE THAT THE WITNESS'S TESTIMONY ADDRESSED THAT ISSUE.
>
> IS THERE ANYTHING ELSE THAT THE DEFENSE WOULD LIKE TO ADDRESS OUTSIDE OF THE PRESENCE OF THE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

JURY?

MR. PAINTER: YES, THERE IS, YOUR HONOR.

IT LOOKS LIKE WE MAY HAVE A SLEEPER. JUROR NUMBER 6 APPEARED TO BE NODDING OFF. I WOULD ASK THE COURT TO KEEP AN EYE ON JUROR NUMBER 6 FOR US, PLEASE.

MR. HENDERSON, I THINK IT IS.

THE COURT: I SEE. THANK YOU FOR BRINGING THAT TO MY ATTENTION. I WILL KEEP AN EYE OUT FOR THAT.

TT 412:7-17.

The Court's attempted solution was to take more frequent breaks. At each break, the jurors were forced to get up and walk to the jury room, and at the end of the break to get up again and walk back to the courtroom. This met with limited success. The Court observed that on several occasions, Juror No. 6 still appeared to be asleep. Other than SCMTD's request, noted above, for the Court to "keep an eye on juror number 6 for us," neither side asked the Court to do anything further as to Juror No. 6. For example, neither side asked the Court to remove Juror No. 6 from the jury. Instead, they both waited to see what the jury verdict would be. After the jury verdict came back, SCMTD decided that "[b]ecause Juror 6 slept through key testimony, SCMTD did not receive a fair trial from an impartial, competent jury." Mot. at 8.

### 1.   Waiver

The Court agrees with Plaintiff that SCMTD waived this issue by not asking the Court to remove Juror No. 6 from the jury. In its new trial motion, SCMTD complains that having a juror who slept through part of the trial prejudiced it, but that alleged prejudice could have been cured by removing him from the jury, and SCMTD did not ask the Court to do that. The Eleventh Circuit has explained that "[o]ur cases teach that 'a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct.'" *United states v. Bollinger*, 837 F.2d 436, 438-39 (11th Cir. 1988) (quoting *United States v. Jones*, 597 F.2d 485,

588 n.3 (5th Cir. 1979)).[5]  "In *Jones,* the court explained that a motion for new trial based on juror misconduct is a form of new trial motion for newly discovered evidence." *Id*. at 439 (citing *Jones*, 597 F.2d at 488).  "As such, the motion must be supported by proof that the evidence of misconduct was not discovered until after the verdict was returned.  In the particular context of juror misconduct, this rule serves to ensure that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences." *Id*.; *accord*, *United States v. Dean*, 667 F.2d 729, 733 (8th Cir. 1982) ("The cases generally have dealt with the timeliness issue as in *United States v. Sorenson* [611 F.2d 701 (8th Cir. 1979)], where this court, without considering the degree of prejudice that might have been present, held that an objection based on known jury misconduct could not be raised for the first time after trial.").

The Eleventh Circuit followed that precedent in a case involving a sleeping juror.  *See Cummings v. Department of Corrections*, 757 F.3d 1228, 1234 (11th Cir. 2014).  In that case the plaintiff attempted to distinguish *Bollinger* on the ground that "because the Magistrate Judge was aware that Juror Linn slept through a portion of the trial, he was not required to object when she was allowed to remain on the jury." *Id*.  "But that distinction is not material to the larger takeaway of *Bollinger*: a motion for a new trial is not a vehicle for sandbagging an opposing party after the jury returns an unfavorable verdict." *Id*. at 1235.  "As the Magistrate Judge explained, parties are free to waive most trial errors in the interest of trial strategy, and Cummings's failure to object could have been such a strategy.  Cummings was aware that Juror Linn appeared to be sleeping, or at the very least was inattentive.  He should have objected when the Magistrate Judge permitted her to remain on the jury." *Id*.  "Because Cummings was aware of Juror Linn's purported misconduct and declined to object to her retention on the jury, he cannot now get a second bite of the apple after the jury returned an unfavorable verdict." *Id*. (cleaned up); *see also Idom v. Natchez-Adams School Dist*., 178 F. Supp. 3d 426, 436 (S.D. Miss. 2016) ("The defendants allege that, on several occasions, the Court observed three jurors sleeping which highly prejudiced the

_____

[5] The Eleventh Circuit referred to the Fifth Circuit's decision in *Jones* as "[o]ur cases" because the Eleventh Circuit treats as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *Bollinger*, 837 F.2d at 439 n.1.

17

1
2
3

defendants' right to a fair trial," but "[b]ecause the defendants failed to raise a timely objection at trial, and waited until after the conclusion of the evidence and entry of the verdict, their objection is waived.").

4
5
6
7
8
9
10

Here, SCMTD's claim that Juror No. 6 slept through important parts of the trial is based on its counsel's declaration attesting that he witnessed this during trial. Declaration of Charles S. Painter, ECF No. 619, ¶¶ 16-18, 21. That means the alleged juror misconduct was known to SCMTD during trial, and Defendant could have objected and asked the Court to remove Juror No. 6 from the jury, which would have cured the alleged prejudice. However, SCMTD chose not to do so and instead gambled on a favorable verdict. SCMTD has therefore waived its objection to the sleeping juror.

11

### 2.    Prejudice

12
13
14
15
16
17
18
19
20

Although waiver is sufficient to address the issue of the sleeping juror, for the sake of completeness, the Court also addresses the claim of prejudice. "Every incident of juror misconduct does not require a new trial." *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987), *abrogated on other grounds by United States v. Benally*, 843 F.3d 350, 353-54 (9th Cir. 2016). In the criminal context, what matters is "whether there was a deprivation of [Defendant's] Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury." *Id.* In *Springfield*, the Ninth Circuit held that "[t]he court had discretion to resolve the problem of the sleeping juror. It considered carefully the testimony missed during the nap and found that it was insubstantial. We find no abuse of discretion in the method used to remedy the situation." *Id.*

21
22
23
24
25
26
27
28

"*Springfield* holds that the presence of a sleeping juror during trial does not, per se, deprive a defendant of a fair trial. Cast another way, *Springfield* makes clear that the presence of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to reliably serve its function as a vehicle for determination of guilt or innocence. A single juror's slumber thus is not per se plain error." *United States v. Olano*, 62 F.3d 1180, 1189 (9th Cir. 1995); *see also Fuller v. Hill*, 292 Fed. Appx. 545, 546 (9th Cir. 2008) ("[E]ven assuming we accept Fuller's argument that a juror was asleep . . . the claim still fails" because "[g]iven the admitted brevity of the problem and the lack of specifics as to what testimony, if any, may have

United States District Court
Northern District of California

1    been missed, Fuller cannot show that his counsel acted outside the wide range of reasonable

2    professional assistance or that there was a reasonable probability of a different outcome had his

3    counsel moved for a mistrial or removed the juror.").

4        "The test is whether or not the misconduct has prejudiced the defendant to the extent that

5    he has not received a fair trial." *United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir. 1977)

6    (citation and quotation marks omitted). "Where, as here, a sleeping juror is noted on the record

7    but not removed, the standard is not as stringent for civil cases as it might be for criminal cases

8    where Fifth Amendment and Sixth Amendment rights are impacted." *Jackson v. A-C Product*

9    *Liability Trust*, 622 F. Supp. 2d 641, 648 (N.D. Ohio 2009).

10        The evidentiary showing of prejudice that SCMTD attempts to make comes from

11    paragraphs 16-18 and 21 of Painter's declaration. Let's read those paragraphs closely. In terms of

12    the evidence[6] that Juror No. 6 missed, Painter testifies that "[o]n March 5, 2025," he observed

13    Juror No. 6 asleep during "the essential testimony of Leonardo Pena." ECF No. 619 ¶ 16. "On

14    March 6, 2025," he observed Juror No. 6 "asleep during the essential testimony of Sergio Lona

15    Gonzales, the driver of defendant's bus on the date of the incident." *Id*. ¶ 17. "On March 13,

16    2025," he observed Juror No. 6 "asleep during the essential testimony of Gregory Primus, Douglas

17    Cross and David Rishel." And "[o]n March 7, 2025, and March 10, 2025," he observed Juror No.

18    6 "asleep during almost all of my cross-examination of plaintiff." *Id*. ¶ 18. Thus, except for his

19    cross-examination of Plaintiff, Painter does not attempt to quantify how long Juror No. 6 was

20    asleep during any of these witnesses' testimony, or which testimony he slept through. Painter just

21    gives us his conclusion that Juror No. 6 slept through the "essential" testimony.

22        If you read Painter's declaration quickly and don't look at it too closely, you could be

23    forgiven for thinking he did something more ambitious than this. Surrounding his assertions of

24    when Juror No. 6 was asleep, Painter says that attached as Exhibits O, P, Q and S are "the relevant

25

---

26    [6] Aside from witness testimony, Painter also states that he observed Juror No. 6 asleep during the
defense's opening statement. ECF No. 619 ¶ 16. However, the Ninth Circuit has said that "[t]he
27    basic problem" for a sleeping juror is that "the juror does not observe witness testimony." *Olano*,
62 F.3d at 1189. Accordingly, in the main text the Court considers Painter's claims that Juror No.
28    6 slept through witness testimony. Regardless, Painter does not say how much or which parts of
the defense opening the juror slept through.

1   pages of testimony." Does this mean that Painter has identified the portions of the testimony

2   during which Juror No. 6 was asleep? No. Exhibit O (ECF No. 621-1) is the colloquy with the

3   Court in which SCMTD said that Juror No. 6 was sleeping. Exhibit P (ECF No. 621-2) is an

4   excerpt from the direct examination of Plaintiff, when Painter does not claim Juror No. 6 was

5   sleeping. Exhibit Q (ECF No. 621-3) is testimony from March 12, 2025, when Painter doesn't

6   claim he observed Juror No. 6 sleeping. And Exhibit S (ECF No. 621-5) is testimony from March

7   17, 2025, another date that Painter does not claim Juror No. 6 was sleeping.

8        Thus, for Pena, Gonzales, Primus, Cross and Rishel, all we have is defense counsel's

9   conclusory opinion that Juror No. 6 slept through the "essential" testimony. The Court doesn't

10  think this establishes anything meaningful. It is too conclusory and empty of content. The Court

11  has no idea how Painter came to the conclusion that testimony was essential, or what he means by

12  that. After all, we are talking about a lawyer who witnessed a sleeping juror, did not think that

13  was a problem at the time and did not ask for the juror to be excused, but who now argues that the

14  presence of this juror requires a new trial. This is a lawyer with flexible views and what he

15  thought it was essential for all the jurors to hear changed after the jury verdict.

16       Now let's talk about Painter's claim that he "observed" Juror No. 6 "asleep during almost

17  all of my cross-examination of plaintiff." ECF No. 619 ¶ 18. The Court finds that statement

18  unworthy of belief. During both direct and cross-examination, Plaintiff was seated in a scooter at

19  Plaintiff's counsel's table, opposite the jury. Painter was at the podium, which he had turned away

20  from the witness stand and toward Plaintiff. This meant that Juror No. 6 was in Painter's left

21  peripheral vision during the cross-examination. When the Court observed Juror No. 6 asleep at

22  times during the trial, the Court had to look directly at him for a couple of seconds to be sure he

23  really was asleep. Painter wants us to believe that he didn't need to do that, but the Court doesn't

24  buy it.

25       During his cross-examination of Plaintiff, the Plaintiff was the center of Painter's attention

26  both physically (he was looking at them nearly the entire time) and mentally, as he was

27  questioning them, listening to them, and asking follow-up questions. The Court would have been

28  willing to believe a declaration that Painter observed Juror No. 6 asleep at several points in his

cross-examination of Plaintiff, but the Court does not believe Painter's statement that he observed Juror No. 6 to be asleep "during almost all" of his cross-examination. During almost all of that cross-examination, Painter was looking at and his attention was focused on the Plaintiff.

Thus, in addition to having waived this argument, the Court thinks that SCMTD has failed to show prejudice. For Pena, Gonzales, Primus, Cross and Rishel, SCMTD has not provided any particularity or quantification of how much testimony Juror No. 6 slept through, and nothing but counsel's conclusory say-so that it was the "essential" parts. For Plaintiff's cross-examination, Painter's declaration is wholly unbelievable. This is not a sufficient showing of prejudice to overturn a civil jury verdict. *See Jackson*, 622 F. Supp. 2d at 648-49 (juror "was asleep for much of the trial," but "Defendant makes no showing of prejudice," so "[t]his ground for a new trial is denied").[7]

## D.    Jury Instructions Concerning Damages

Next, SCMTD contends that the Court's jury instructions on damages were erroneous. In section VII of its motion for a new trial, SCMTD challenges Instruction 29 (ECF No. 574). It also says that it is challenging the additional instructions the Court gave in response to the jury's question (ECF No. 584).

### 1.    Legal Standard

"The district court must formulate jury instructions so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Abromson v. American Pacific Corp.*, 114 F.3d 898, 901 (9th Cir. 1997). "Prejudicial error results from jury instructions that, when viewed as a whole, fail to fairly and correctly cover the substance of the applicable law." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). "A district court has substantial latitude in tailoring jury instructions . . . as long as the district court's instructions 'fairly and adequately covered the issues presented, correctly stated the law, and were not misleading,'" *Kendall-Jackson, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1051 (9th Cir. 1998) (quoting *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir. 1988)).

---

[7] The Court gives no consideration to the April 30, 2025 Declaration of Carla Aikens. ECF No. 640-1.

"A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. Proc. 51(c)(1). To be timely, a party must "object on the record and out of the jury's hearing before the instructions and arguments are delivered," or if "a party was not informed of an instruction or action on a request before that opportunity to object," then "promptly after learning that the instruction or request will be, or has been, given or refused." Fed. R. Civ. Proc. 51(c)(2), (b)(2). "Objections that a party fails to raise 'until after the jury has rendered its verdict and was discharged' are 'waived.'" *French v. City of Los Angeles*, 2022 WL 2189649, *4 (C.D. Cal. May 10, 2022) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

### 2. Procedural Background

The Court filed its proposed jury instructions on March 10, 2025. ECF No. 553. SCMTD did not file any objections to the Court's proposed jury instructions. The charging conference went from TT 1414:6-1445:9. At the charging conference, SCMTD objected to Instruction 29[8] in part:

> THE COURT: THE COURT HAD ON MARCH 10TH FILED THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS AND THE COURT'S PROPOSED VERDICT FORM, AND I ORDERED THE PARTIES TO FILE ANY OBJECTIONS THAT THEY MAY HAVE TO EITHER BY MARCH 14TH.
>
> DEFENDANT FILED A PROPOSED VERDICT FORM BUT DID NOT FILE ANY OBJECTIONS TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS.
>
> DOES DEFENDANT HAVE ANY OBJECTIONS TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS?
>
> MR. CRIDLAND: YES, YOUR HONOR, WE HAVE A FEW THINGS -- EXCUSE ME -- NOW THAT THE EVIDENCE HAS CLOSED, YOUR HONOR.
>
> WITH RESPECT TO THE COURT'S PROPOSED JURY INSTRUCTION NUMBER 29, DAMAGES-PROOF, MEASURES OF TYPES OF PROOF.
>
> THE COURT: SO YOU HAVE AN OBJECTION TO NUMBER 29;

---

[8] Instruction 29 is based on Ninth Circuit model jury instructions 5.1 and 5.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  IS THAT CORRECT?

2  MR. CRIDLAND: YES, YOUR HONOR.

3  THE COURT: OKAY.

4  MR. CRIDLAND: IN PART.

5  TT 1414:6-23.

6  THE COURT: OKAY. THAT'S FAIR ENOUGH.

7  THEN LET ME TURN TO DEFENDANT. YOU MENTIONED
INSTRUCTION 29. LET'S -- BUT WHY DON'T YOU GO AHEAD
8  AND GIVE ME ANY AND ALL OBJECTIONS YOU HAVE TO
THE COURT'S PROPOSED FINAL INSTRUCTIONS.

9
MR. CRIDLAND: YES, YOUR HONOR, IT'S VERY SIMPLE.
10  LINES 16 THROUGH 22 --

11  THE COURT: HOLD ON. IT'S 29 THAT YOU'RE TALKING
ABOUT?
12
MR. CRIDLAND: YES.
13
THE COURT: OKAY. THANK YOU.
14
MR. CRIDLAND: THE COURT'S PROPOSED FINAL JURY
15  INSTRUCTION 29, PAGE 30, LINE 16 THROUGH 22, THE
DEFENSE PROPOSE THAT THOSE BE ELIMINATED FROM
16  THE INSTRUCTION BASED ON THE LACK OF EVIDENCE IN
THE RECORD OF THE REASONABLE VALUE OF MEDICAL
17  CARE, THE REASONABLE VALUE OF NECESSARY
MEDICAL CARE IN THE FUTURE, AND THE REASONABLE
18  VALUE OF WAGES OR EARNING CAPACITY.

19  THE COURT: PLAINTIFF, WHAT IS YOUR RESPONSE?

20  MS. AIKENS: THAT AMJ HAS PUT OUT -- THAT'S THE
JURY'S DETERMINATION TO MAKE, BUT THAT AMJ HAS
21  GIVEN SUFFICIENT EVIDENCE TO SUPPORT THEM MAKING
THE FINDING THEMSELVES.
22
THE COURT: I AGREE WITH PLAINTIFF. I'M GOING TO
23  KEEP IN THOSE LINES FOR INSTRUCTION NUMBER 29.

24  ARE THERE OTHER OBJECTIONS FROM THE DEFENDANT
TO THE COURT'S PROPOSED FINAL JURY INSTRUCTIONS?
25
MR. CRIDLAND: NO, YOUR HONOR.
26

27  TT 1441:12-1442:13; *see also* TT 1445:2-9 (confirming no further objections to the jury

28  instructions). In other words, this was SCMTD's proposed edit to Instruction 29:

23

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for the plaintiff on her negligence claim, you must determine the plaintiff's damages. The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant. You should consider the following:

The nature and extent of the injuries;

The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;

The physical pain and suffering experienced and that with reasonable probability will be experienced in the future;

~~The reasonable value of necessary medical care, treatment, and services received to the present time;~~

~~The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;~~

~~The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.~~

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

As you can see, all of SCMTD's timely objections to Instruction 29 concerned economic damages.

On March 18, 2025 the jury submitted a question. ECF No. 579. The jury asked: "Given that our award must be based upon evidence and not speculation, how do we reconcile that with: a) the fact that we don't know the exact cost of certain expenses? b) subjective aspects of damages like 'loss of enjoyment of life'?" On March 19, 2025, SCMTD proposed additional jury instructions in response to the jury's question. ECF No. 580. SCMTD's additional proposed instructions were adapted from CACI 3902, 3903, 3903A, 3903C, 3903D, 3903E. All of SCMTD's proposed additional instructions were about economic damages.

The Court discussed additional jury instructions with the parties from TT 1563:24-1611:24. The Court summarizes the arguments and objections that SCMTD made during the course of this discussion. SCMTD proposed that the Court provide an amended verdict form

24

1    dividing economic from noneconomic damages, TT 1565:15-17 (which the Court did, ECF No.

2    585), and that the Court give CACI instructions 3902, 3903, 3903A, 3903C, 3903D, 3903E

3    concerning economic damages. TT1565:15-21. With respect to noneconomic damages (question

4    B from the jury), SCMTD proposed no change to the jury instructions and that the Court "simply

5    indicate that: The instructions I have given you are the law you must apply to guide you in your

6    decision regarding Question B." TT 1567:8-10. SCMTD made clear that its concern was about

7    economic damages:

> MR. CRIDLAND: The Defense's concern is based on the fact that this
> is a diversity case; that the California law of damages applies. And it
> appears that the jury's question is essentially an indication that the jury
> is considering speculating about what economic damages may be at
> issue in the case with respect to their Question A. There is clear
> California law that there must be proof of the reasonable necessity of
> a particular amount of economic damages for those damages to be
> awarded; and there's a concern that if these instructions are not given,
> that the jury will simply speculate about the amount of those damages.

13   TT 1568:2-12.

14          The Court then took a break and filed its proposed additional jury instructions (ECF No.

15   581). TT 1569:19-1570:10. These were CACI 3902, 3903, 3903A, 3903C, 3903D, 3903E, 3905,

16   3905A and 3932. As noted, CACI 3902, 3903, 3903A, 3903C, 3903D and 3903E are about

17   economic damages. CACI 3905 and 3905A are about noneconomic damages. CACI 3932 is

18   about life expectancy.

19          The Court then resumed the discussion with the parties. TT 1570:18-22. Plaintiff

20   proposed a number of edits to the Court's proposed instructions. TT 1579:8-1587:21. SCMTD

21   agreed with the Court's proposed additional instructions, except that it objected to CACI 3932 "on

22   the basis previously stated, that there's no evidence that comports with Evidence Code Section 701

23   and 702 of lifetime damages as to the plaintiff. With that expectation, we would argue that all of

24   these instructions should be given as stated." TT 1587:24-1588:8.

25          The Court then took another recess and proposed the additional jury instructions at ECF

26   No. 583. TT 1589:17-1590:11. SCMTD objected to the Court's additional proposed jury

27   instruction 2 concerning economic damages because it "fails to answer the Jury's Question []A. It

28   does not give them the standard under California law for the economic damages they are expected

United States District Court
Northern District of California

to identify and award, and it does not state that standard as it's stated in the CACI instruction and, instead, omits the language that states that standard." TT1597:19-24.[9]  With respect to proposed instruction 3 concerning noneconomic damages, SCMTD did not object to the Court's proposed instruction, but did object to Plaintiff's request to delete the last two paragraphs (TT 1599:21-23), which Plaintiff argued were repetitive.  TT 1595:4-17.  SCMTD continued to object to the life expectancy instruction for the reason previously stated.  TT 1599:24-1600:1 ("further additional Instruction Number 4 is unchanged and I don't believe needs to be further discussed at this time.").

To summarize, here are SCMTD's timely objections to the jury instructions and additional jury instructions:

Instruction 29:  SCMTD objected to lines 16 through 22 of Instruction 29 "BASED ON THE LACK OF EVIDENCE IN THE RECORD OF THE REASONABLE VALUE OF MEDICAL CARE, THE REASONABLE VALUE OF NECESSARY MEDICAL CARE IN THE FUTURE, AND THE REASONABLE VALUE OF WAGES OR EARNING CAPACITY." TT1441:23-1442:4.

Additional Instruction 2:  SCMTD objected to the whole thing and said CACI should be used instead.  TT 1597:9-24.

Additional Instruction 3:  SCMTD objected to the removal of the third and fourth paragraphs from the draft in ECF No. 583.  TT 1595:4-17, TT 1599:21-23.

Additional Instruction 4:  SCMTD objected to the inclusion of this instruction because "there's no evidence that comports with Evidence Code Section 701 and 702 of lifetime damages as to the plaintiff."  TT 1588:5-7.

> **3.    Discussion**
>
> > **a.    Waiver**

SCMTD argues in Section VII of its motion for a new trial that the jury was incorrectly instructed on damages.  However, SCMTD does not link its arguments to objections it previously

---

[9] The transcript says counsel was objecting to "Instruction Number 1," (TT 1597:16-18) but he is clearly talking about instruction 2.

United States District Court
Northern District of California

1    made.  Rather, SCMTD presents argument as if there were no requirement to make timely

2    objections to jury instructions and does not discuss the subject of objections at all.  Further, plain

3    error is not just for the Court of Appeals to think about.  Federal Rule of Civil Procedure 51(d)(2)

4    says that "[a] court may consider a plain error in the instructions that has not been preserved as

5    required by Rule 51(d)(1) if the error affects substantial rights."  SCMTD does not contend that

6    any of the Court's rulings on jury instructions were plain error, and does not discuss plain error at

7    all in connection with the jury instructions.

8            Many of SCMTD's arguments concerning the jury instructions are waived.  For example,

9    SCMTD argues:

            The jury instructions on both economic and noneconomic damages
            misstated the law. Such instructions were inherently prejudicial,
10           which shifts the burden to AMJ to show the same verdict would have
            been reached. The instructions regarding damages (Instruction
11           Number 29) originally instructed the jury had to award damages
            "based upon evidence and not upon speculation, guesswork or
12           conjecture." [Painter Decl., Ex. V, at 32 (emphasis added).] But that
            instruction did not delineate between the differing elements of
13           economic and noneconomic damages. [*Id.*] The instructions did not
            adhere to the relevant CACI instructions that explain the standard to
14           prove each type of economic and noneconomic damages.

15

16    Mot. at 9 (emphasis omitted).  But the only timely objection SCMTD made to Instruction 29 was

17    to the inclusion of three specific line items about economic damages.  None of the above

18    arguments were made at the time; they are all waived.

19            In addition, SCMTD contends:

            [T]he instructions do not specify that the jury should consider specific
20           proof of medical expenses and that of AMJ's losses (including lost
            earning capacity and income) AMJ sustained from the injury, or that
21           AMJ's lost income/earning capacity would be offset by the amounts
            AMJ is otherwise capable of earning. These omissions were fatal to
22           the jury's understanding and legally incorrect. *Even after the jury
            asked for clarification* of the damages standards, the jury received
23           inadequate guidance.

24

25    Mot. at 11-12 (emphasis added).  The reference to "even after the jury asked for clarification"

26    makes clear that everything preceding that was a criticism of Instruction 29.  But SCMTD did not

27    timely make those objections to Instruction 29.

28            Indeed, all of SCMTD's challenges to the jury instructions concerning noneconomic

United States District Court
Northern District of California

1    damages in Instruction 29 are waived.  The only timely objection to Instruction 29 was to the

2    inclusion of three line items concerning economic damages that SCMTD said had no evidence to

3    support them.

4               **b.    Merits**

5          Having said that, the Court thinks that none of SCMTD's arguments about jury

6    instructions in its motion for a new trial, whether waived or not waived, have any merit.

7          Let's go through them.  Paragraph 1 in section VII of SCMTD's motion for a new trial

8    states the standard of review and does not argue the jury instructions were erroneous.  Paragraph 2

9    argues:

> The jury instructions on both economic and noneconomic damages
> misstated the law. Such instructions were inherently prejudicial,
> which shifts the burden to AMJ to show the same verdict would have
> been reached. The instructions regarding damages (Instruction
> Number 29) originally instructed the jury had to award damages
> "based upon evidence and not upon speculation, guesswork or
> conjecture." [Painter Decl., Ex. V, at 32 (emphasis added).] But that
> instruction did not delineate between the differing elements of
> economic and noneconomic damages. [*Id.*] The instructions did not
> adhere to the relevant CACI instructions that explain the standard to
> prove each type of economic and noneconomic damages. Defense
> counsel also proposed the verdict separate economic and
> noneconomic damages for clarity, but the verdict was ultimately
> submitted with only one line for all damages. [Ex. S, at 1443:5-12;
> Ex. W.]

18   SCMTD does not explain how Instruction 29 supposedly "misstated the law."  It is based

19   on Ninth Circuit model jury instructions 5.1 and 5.2, instructions federal courts use all the time.

20   Also, SCMTD does not explain how Instruction 29 was "inherently prejudicial."  SCMTD says

21   that the instruction "did not delineate between the differing elements of economic and

22   noneconomic damages."  That is untrue.  Instruction 29 delineated each different type of economic

23   and noneconomic damages Plaintiff was claiming, stated that "[t]he plaintiff has the burden of

24   proving damages by a preponderance of the evidence," and that "[y]our award must be based upon

25   evidence and not upon speculation, guesswork or conjecture."  This is fully consistent with

26   California law.  If SCMTD's delineation argument is that economic and noneconomic damages

27   have to be in separate jury instructions, or that each type of economic damage must be in a

28   separate jury instruction, it provides no law to that effect.  "Prejudicial error results from jury

United States District Court
Northern District of California

28

1   instructions that, when viewed as a whole, fail to fairly and correctly cover the substance of the

2   applicable law." *White*, 312 F.3d at 1012. Because jury instructions must be "viewed as a

3   whole," details about how they are organized likely do not matter, provided the organization is not

4   confusing. Here, there was nothing about Instruction 29 that was confusing.

5       SCMTD is right that Instruction 29 followed the Ninth Circuit's model jury instructions

6   rather than CACI. SCMTD does not cite any legal authority to suggest that CACI instructions are

7   mandatory for a claim arising under California law. California state courts do not think CACI

8   instructions are mandatory:

9           Use of the Judicial Council instructions is strongly encouraged. If the
            latest edition of the jury instructions approved by the Judicial Council
10          contains an instruction applicable to a case and the trial judge
            determines that the jury should be instructed on the subject, it is
11          recommended that the judge use the Judicial Council instruction
            unless the judge finds that a different instruction would more
12          accurately state the law and be understood by jurors. Whenever the
            latest edition of the Judicial Council jury instructions does not contain
13          an instruction on a subject on which the trial judge determines that the
            jury should be instructed, or when a Judicial Council instruction
14          cannot be modified to submit the issue properly, the instruction given
            on that subject should be accurate, brief, understandable, impartial,
15          and free from argument.

16  Cal. R. Ct. 2.1050(f). The issue is not whether the Court's instruction is identical to CACI but

17  whether it fairly states the law. It does.

18      Further, SCMTD's complaint about the verdict form is odd, as the Court revised the

19  verdict form to break out economic and noneconomic into separate awards, and the jury awarded

20  them separately. ECF No. 586.

21      For what it's worth, with one exception, Instruction 29 is not meaningfully different from

22  the CACI instructions that SCMTD proposed in any way that is relevant to this case. The Court

23  did give CACI 3902 in Additional Instruction 1, when the Court revised the verdict form to break

24  out economic and noneconomic damages separately. CACI 3903 enumerates the categories of

25  economic damages sought by the Plaintiff, but that content is already in Instruction 29. CACI

26  3903A, 3903C, 3903D and 3903E break out medical expenses, lost earnings, lost earning capacity,

27  and loss of ability to provide household services and then reiterate the burden of proof in each

28  instruction. Instruction 29 includes each item of economic damages in one place and states the

1    burden of proof.  The difference is largely organizational.  The one substantive difference between

2    Instruction 29 and the CACI instructions SCMTD proposed is that the Court did not include loss

3    of household services (CACI 3903E) in Instruction 29, but otherwise there is no meaningful

4    difference in the instructions in terms of substance.  Presumably SCMTD has no objection to the

5    Court's not including household services damages in Instruction 29, as it contends that "AMJ

6    made no attempts to provide such evidence."  Mot. at 11.

7    The Court's Additional Instructions also correctly state the law.  As to both Instruction 29

8    and the Additional Instructions, SCMTD is not able to identify any manner in which they

9    supposedly misstate California law.[10]  SCMTD's argument really seems to be that the CACI

10   instructions are mandatory and that any departure from them, even a difference in wording that is

11   not different in substance, is not permitted.  But as noted, that's wrong.

12   SCMTD argues that:  "A new trial is warranted because the additional instructions

13   misstated California's law on damages and directly led to the jury's confusion as well as an

14   excessive damages award.  AMJ sought economic damages in the form of past and future medical

15   expenses, lost future earnings, lost earning capacity, and necessary past and future 'services.'"

16   Mot. at 10.  With respect to the burden under California law for past and future medical expenses,

17   at page 10 of its motion, SCMTD cites *Bermudez v. Ciolek*, 237 Cal. App. 4th 1311, 1328 (2015),

18   which held:

19           Tort damages consist of "the amount which will compensate for all
20           the detriment proximately caused" by the breach at issue. (Civ.Code
             § 3333.) "Detriment is a loss or harm suffered in person or property."
21           (Civ.Code § 3282.) "Damages must, in all cases, be reasonable...."
             (Civ.Code § 3359.) The jury was properly instructed in this case to
22           determine "the reasonable cost of reasonably necessary medical care
             that [Bermudez] has received" and "the reasonable cost of reasonably
23           necessary medical care that [Bermudez] is reasonably certain to need
             in the future."

24   That is consistent with Instruction 29, which stated in relevant part:

25           If you find for the plaintiff on her negligence claim, you must
26           determine the plaintiff's damages. The plaintiff has the burden of
             proving damages by a preponderance of the evidence. Damages

27

28   ────────────────────
     [10] Additional Instruction 1 is CACI 3902.  SCMTD does not assert there is any error in this
     instruction.

                                                    30

means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant. You should consider the following:

[¶¶]

The reasonable value of necessary medical care, treatment, and services received to the present time;

The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;

Similarly, Additional Instruction No. 2 stated in relevant part:

If you find for the plaintiff on her negligence claim, you must determine the plaintiff's economic damages. You should consider the following:

A. The reasonable value of necessary medical care, treatment, and services received to the present time;

B. The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future

In fact, the language in the cited case law concerning medical expenses is almost verbatim the same as the jury instructions in this case.

As to lost future earnings, on page 11 of its motion for a new trial, SCMTD argues that Plaintiff must be "reasonably certain" to lose those earnings in the future, citing *Atkins v. City of Los Angeles*, 8 Cal. App. 5th 696, 738 (2017), which held:

Courts reviewing damages for the loss of future earnings have held such damages are recoverable "'where the evidence makes *reasonably certain* their occurrence and extent.'" (Toscano, at p. 694, 21 Cal.Rptr.3d 732; see Licudine v. Cedars-Sinai Medical Center (2016) 3 Cal.App.5th 881, 887, 208 Cal. Rptr.3d 170 ["the jury must fix a plaintiff's future earning capacity based on what it is *'reasonably probable'* she could have earned"].) Indeed, "[d]amages must, in all cases, be reasonable." (Civ.Code § 3359; see Licudine, at p. 891, 208 Cal.Rptr.3d 170; Bermudez, supra, 237 Cal.App.4th at p. 1328, 188 Cal.Rptr.3d 820.) Requiring the plaintiff to prove future economic losses are reasonably certain "ensures that the jury's fixing of damages is not wholly, and thus impermissibly, speculative." (Licudine, at p. 895, 208 Cal.Rptr.3d 170; see Piscitelli, at p. 989, 105 Cal.Rptr.2d 88 ["it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery' "].)

Presumably, SCMTD's objection is that Instruction 29 and Additional Instruction 2 said "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and

31

1  employment opportunities that with *reasonable probability* will be lost in the future," rather than

2  with *reasonable certainty*.  But look again at the language the Court bolded in the above case cited

3  by SCMTD.  California case law treats "reasonably certain" and "reasonably probable" as

4  synonyms on this issue, using the terms interchangeably:

> *The first, threshold requirement is met only if the plaintiff is "reasonably certain to suffer a loss of future earnings." But how certain must the jury be in fixing what the plaintiff could have earned without the injury?* We know that a jury may not award "speculative damages," and the cases reviewing lost earning capacity awards seem to apply a consistent, yet unstated standard.  No case has yet articulated what that standard is. *Today, we hold that the jury must fix a plaintiff's future earning capacity based on what it is "reasonably probable" she could have earned.*

10  *Licudine v. Cedars-Sinai Medical Ctr.*, 3 Cal. App. 5th 881, 887 (2016) (emphasis added).

11  Accordingly, there was no error in the Court's instructions, which accurately reflect California

12  law.

13  　　　SCMTD argues:  "Likewise, as to lost earning capacity, AMJ must specifically prove it is

14  reasonably certain the injury sustained will cause AMJ to earn less money in the future than AMJ

15  otherwise could have earned as well as the reasonable value of that loss."  Mot. at 11 (cleaned up).

16  For that proposition, SCMTD cites *Licudine*, which held that "reasonably probable" and

17  "reasonably certain" are the same thing.  Accordingly, Instruction 29 and Additional Instruction 2

18  accurately reflect California law in requiring Plaintiff to prove lost earning capacity with

19  "reasonable probability."

20  　　　SCMTD makes a confusing argument that:  "Further, it is unclear whether the term

21  'services' in the jury instructions relates to medical services or household services.  Under

22  California law, AMJ can only recover for loss of *ability* to provide future household services as

23  part of a loss of future earnings.  CACI 3903E; *see also Overly v. Ingalls Shipbuilding, Inc.*, 74

24  Cal. App. 4th 164, 171 n. 5 (1999).  AMJ made no attempts to provide such evidence."  Mot. at 11

25  (emphasis original).  In the cited footnote, *Overly* explained:

> Although the parties do not distinguish between the different types of lost years damages that were awarded, we note that lost household services damages are different than the other types of future earnings included in this category. Generally, household services damages represent the detriment suffered when injury prevents a person from

United States District Court
Northern District of California

contributing some or all of his or her customary services to the family unit. (Cal. Tort Damages (Cont.Ed.Bar 1988) § 1.64, p. 44.) The justification for awarding this type of damage as part of the loss of future earnings award is that the plaintiff should be compensated for the value of the services he would have performed during the lost years which, because of the injury, will now have to be performed by someone else. It could also be argued that limiting household services damages to the period of actual life expectancy would grant the defendant a windfall for shortening a plaintiff's life as opposed to permanently disabling him.

The Court agrees that Plaintiff did not provide any evidence of household services damages. However, that is a reason *not* to give CACI 3903E. Further, the jury instructions were perfectly clear. Instruction 29 and Additional Instruction 2 both referred in separate paragraphs to:

> The reasonable value of necessary medical care, treatment, and services received to the present time;

> The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;

> The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.

Anyone who can read understands that in the first two paragraphs, "medical" modifies "care," "treatment," *and* "services." There is no error here.

SCMTD argues that "[p]rejudicial error also occurred when the jury was not instructed as to the standard for each element of economic damages. Rather, the jury was told to 'determine the plaintiff's economic damages,' by merely *considering* '[t]he reasonable value of necessary medical care, treatment, and services received to the present time;' '[t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;' and '[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.'" Mot. at 11 (emphasis original).

But that's not true. Instruction 29 stated the standard: "The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant." And for each category of damages Plaintiff was claiming, Instruction 29 stated the standard of reasonableness:

33

> The disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;
>
> The physical pain and suffering experienced and that with reasonable probability will be experienced in the future;
>
> The reasonable value of necessary medical care, treatment, and services received to the present time;
>
> The reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;
>
> The reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future.

Instruction 29 concluded:  "Your award must be based upon evidence and not upon speculation, guesswork or conjecture."  Additional Instruction 2 reiterated the relevant standard:

> Plaintiff Amanda Jones has the burden of proving by a preponderance of the evidence the amount of money that will reasonably and fairly compensate the plaintiff for these items of economic damage. Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

It also stated the reasonableness requirement for each element of economic damage.

SCMTD argues that "the instructions do not specify that the jury should consider specific proof of medical expenses and that of AMJ's losses (including lost earning capacity and income) AMJ sustained from the injury, or that AMJ's lost income/earning capacity would be offset by the amounts AMJ is otherwise capable of earning."  Mot. at 11-12.  But that's not true either.  As noted above, Instruction 29 and Additional Instruction 2 did tell the jury to consider "[t]he reasonable value of necessary medical care, treatment, and services received to the present time; [t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future;" and "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future."  As for "AMJ's lost income/earning capacity would be offset by the amounts AMJ is otherwise capable of earning," that's just a redundant argument that Plaintiff can't be awarded damages for lost income or earning capacity if they didn't really lose the income or earning capacity.  A redundant jury instruction is not required.  Instruction 29 and Additional Instruction 2 already stated that Plaintiff has the burden to prove their damages and that the

damages can't be speculative or based on guesswork or conjecture.

    With respect to economic damages, SCMTD also argues that Plaintiff did not submit sufficient evidence to warrant giving the jury instructions.  For two of the categories, the Court disagrees.  The first category of economic damages in Instruction 29 and Additional Instruction 2 is "[t]he reasonable value of necessary medical care, treatment, and services received to the present time."  Plaintiff provided sufficient evidence to warrant an instruction on this point.  There was voluminous documentation of the medical care, treatment and services Plaintiff received.  Exs. 37A, 37B, 31A, 31B, 31C, 31D, 31E, 31F, 31G, 31H, 31I, 31J, QQ-A.  Further, the Court finds that medical care includes the cost of a wheelchair or mobility device that is necessitated by a medical condition.  This is true as a matter of common sense:  a wheelchair or mobility device is "medical care" when it is needed as a result of a medical condition, here Plaintiff's left knee injury.  In addition, there was evidence at trial that a wheelchair is something that a health care provider may prescribe, which is an additional reason why it qualifies as medical care.  TT 646:21-23 (Plaintiff); 1393:8-16 (Cross).  There was also evidence at trial that the cost of a wheelchair can be out of pocket because insurance companies won't pay for a wheelchair replacement sooner than every five years, which can be, and for Plaintiff was, significantly longer than how long the wheelchair lasted.  TT 651:7-25 (Plaintiff).  Plaintiff personally paid $3000 for the scooter that they rode to court, and their insurance company refused to cover the cost because it deemed it a "personal mobility device."  TT 646:17-20, 651:22-25 (Plaintiff).  Even if insurance companies draw a distinction between a "wheelchair" and a "personal mobility device," there was evidence at trial that under the ADA, the definition of "wheelchair" includes scooters (TT 876:18-23 (Cross)), so there is sufficient evidence to conclude that the cost of a scooter necessitated by a medical condition constitutes medical care.

    The second category of economic damages in Instruction 29 and Additional Instruction 2 is "[t]he reasonable value of necessary medical care, treatment, and services that with reasonable probability will be required in the future."  Because there is evidence that Plaintiff is permanently disabled as a result of their left knee injury, it is a reasonable inference that they will incur additional out of pocket costs in the future for wheelchairs and scooters, and Plaintiff's testimony,

1    cited above, establishes how much they cost.

2        The third category of economic damages in Instruction 29 and Additional Instruction 2 is

3    "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and

4    employment opportunities that with reasonable probability will be lost in the future." Here, the

5    Court agrees with SCMTD that the evidence at trial did not support this portion of the jury

6    instructions. There was ample evidence at trial to support a finding that Plaintiff's wages,

7    earnings, earning capacity, salaries, employment, and employment opportunities will be reduced

8    in the future. Plaintiff is an Ivy League graduate. TT 584:12-13 (University of Pennsylvania).

9    They moved to Los Angeles in 2016. TT 644:11-16. But for their disabling injury, they would be

10   a strong job candidate with their solid education and in a major metropolitan market with lots of

11   jobs. However, Plaintiff testified that their disability significantly affected their ability to obtain

12   employment, both because of the tremendous difficulties in getting to a job and because of the

13   discrimination they faced as a result of their disability. TT 640:23-643:10. However, there is

14   nothing in the evidence at trial that would allow the jury to determine the "reasonable value" of

15   the injury to Plaintiff's earnings that "will be lost in the future." Just nothing. That is largely

16   because of the Court's in limine and evidentiary rulings. In any event, the Court's view is that in

17   light of all the evidence that was admitted at trial, there is simply nothing that would allow the jury

18   to determine this category of economic damages without speculating. Below the Court issues a

19   remittal as to Plaintiff's economic damages. If Plaintiff accepts the remittal, the Court will enter

20   an amended judgment, and if the Plaintiff declines the remittal, the Court will order a new trial.

21   This remedy cures the error in the Court's giving a jury instruction on this category of economic

22   damages.

23       With respect to Additional Instruction 4 concerning life span, SCMTD does not discuss

24   that instruction in section VII of its motion. It addresses it in section VIII.A, which discusses the

25   damages awards. Accordingly, the Court discusses Additional Instruction 4 in connection with

26   damages as well.

27       Finally, with respect to Additional Instruction 3, SCMTD objected to the removal of the

28   third and fourth paragraphs from the draft in ECF No. 583. SCMTD does not discuss that issue at

United States District Court
Northern District of California

all in the motion for a new trial, so it is waived.  Regardless, the argument has no merit.  Here is the edit the Court made:

> The following are the specific items of noneconomic damages claimed by Plaintiff Amanda Jones: the nature and extent of the injuries; the disability, disfigurement, loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future; the physical pain and suffering experienced and that with reasonable probability will be experienced in the future;
>
> No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense.
>
> ~~To recover for future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering, Plaintiff Amanda Jones must prove that she is reasonably certain to suffer that harm.~~
>
> ~~For future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering, determine the amount in current dollars paid at the time of judgment that will compensate Plaintiff Amanda Jones for future nature and extent of the injuries, disability, disfigurement, loss of enjoyment of life and physical pain and suffering.~~

The stricken paragraphs were redundant.  Paragraph 3 was redundant of paragraph 1, which already explained the burden of proof as to future noneconomic injury ("that with reasonable probability will be experienced in the future").  Paragraph 3 says "reasonably certain," but as explained above, California law treats that as a synonym for reasonably probable.  Paragraph 4 was duplicative of Instruction 31, which explained that economic damages must be reduced to present cash value, but noneconomic damages are not.

Accordingly, with the exception of the instruction concerning "[t]he reasonable value of wages, earnings, earning capacity, salaries, employment, and employment opportunities that with reasonable probability will be lost in the future," the Court rejects SCMTD's challenges to the jury instructions.  Concerning that exception, the Court finds that the remittal of economic damages cures the error.

## E.   Damages Awards

Next, SCMTD argues that the noneconomic and economic damages awards are excessive.  First, SCMTD says there is insufficient evidence to support the damages awards.  Second,

United States District Court
Northern District of California

1   SCMTD contends that Plaintiff's counsel inflamed the jury during her closing argument.  Third,

2   SCMTD argues that comparable verdicts show the noneconomic damages award is an outlier.  The

3   Court addresses these argument in turn.

### 1.   Sufficiency of the Evidence to Support the Damages Awards

5   Because Plaintiff's negligence claim arises under California law, the Court applies

6   California law for measuring excessiveness.  *See generally Gasperini v. Center for Humanities*,

7   518 U.S. 415, 419 (1996) ("We hold that New York's law controlling compensation awards for

8   excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if

9   the review standard set out in [New York law] is applied by the federal trial court judge, with

10  appellate control of the trial court's ruling limited to review for 'abuse of discretion.'").  Under

11  California law, "'[t]he measure of damages suffered is a factual question and as such is a subject

12  particularly within the province of the trier of fact.'"  *Behr v. Redmond*, 193 Cal. App. 4th 517,

13  533 (2011) (quoting *Bertero v. National General Corp.*, 13 Cal. 3d 43, 65 n.12 (1974)).  "When,

14  however, the evidence is insufficient to establish that alleged prospective damages are reasonably

15  certain to occur, a jury's award of such damages cannot be sustained on appeal.  When the

16  evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to

17  the amount supported by the evidence."  *Id*.  "[I]t is not the function of a reviewing court to

18  interfere with a jury's award of damages unless it is so grossly disproportionate to any reasonable

19  limit of compensation warranted by the facts that it shocks the court's sense of justice and raises a

20  presumption that it was the result of passion and prejudice."  *Seffert v. Los Angeles Transit Lines*,

21  56 Cal. 2d 498, 508 (1961).

### a.   Economic Damages

23  The jury's award of $368,000 in economic damages is not supported by the evidence.  As

24  noted above, there is substantial evidence of Plaintiff's surgery, physical therapy and many

25  medical appointments, but aside from wheelchair and scooter costs, there is no quantification of

26  past or future medical costs.  As to lost earnings, and so on, there is substantial evidence of the

27  fact that the disabling injury to Plaintiff's left knee substantially affected their ability to obtain

28  employment.  However, there is simply nothing that allowed the jury to quantify that.

United States District Court
Northern District of California

Accordingly, the Court will remit the economic damages.  The Court must therefore determine "the maximum amount sustainable by the proof."  *Oracle*, 765 F.3d at 1094.  The Court thinks the only amount that can be sustained by the proof is the cost of wheelchairs and scooters.[11] The Court interprets Plaintiff's testimony at TT 646:17-20 and 651:7-25 to mean that since the time of the incident Plaintiff purchased, at a minimum, a "main chair" and a "back-up chair," and that the "back-up chair" costs $3,000.  That's two chairs in approximately ten and a half years. Assuming an average life expectancy, they are expected to live another 38.33 years (*see* Additional Instruction No. 4, ECF No. 584).[12]  If we extrapolate that Plaintiff's future need for chairs is similar to their past need, we can assume they will need to buy two additional chairs for each of the next ten and a half years.  That's approximately seven more chairs for the remainder of their life.  Including the two chairs they already bought, that's nine chairs, which can be valued at $27,000.

Accordingly, the Court remits Plaintiff's economic damages to $27,000.

### b.    Noneconomic Damages

The jury's award of $12,631,250 in noneconomic damages is supported by evidence.  As a result of SCMTD's negligence, Plaintiff suffered a permanent, disabling injury to their left knee. For the rest of their life they will not be able to walk unassisted.  The loss of a functioning limb is a grievous, life-altering injury.  Strolling down the sidewalk, walking through a park, climbing a trail, playing most sports, dancing with a loved one – these pleasures of life that most of us take for granted are now forever denied to Plaintiff.

Look at it this way:  When you were 33 years old, if someone had offered you $12.6 million in exchange for disabling your knee beyond repair such that you would never walk again

---

[11] Plaintiff testified that service dogs cost $25,000 to $30,000, but they also said that's why they didn't buy one.  They paid an undisclosed adoption fee for what they (jokingly) called their "bootleg service dog."  TT 650:12-651:5.  Plaintiff also testified that they incurred several hundred thousand dollars in student loans.  TT 638:25-639:11.  However, Plaintiff never requested a jury instruction that included debt or educational expenses as a form of economic damage.  Instruction 29 and Additional Instruction 2 therefore did not include them as items of economic damage, and thus they cannot be a basis for the jury award.

[12] SCMTD argues that we should not assume an average life expectancy for Plaintiff because they have MS.  However, as explained later in this order, Defendant did not proffer any evidence at trial that MS affects life expectancy.

United States District Court
Northern District of California

1    without assistance, would you have taken that deal?  Perhaps some people would.  But to many

2    people, bodily integrity and basic mobility are so core to their sense of self that this trade would

3    not be worth it.  And how can we say that a deal that many people would reject is too good for a

4    Plaintiff who had no choice in the matter?

5         Plaintiff's testimony about the profound impact this permanent injury had on their life

6    amply supports the award of noneconomic damages.  The effect on their career, on their mental

7    state, on their self-care, on their ability to maintain friendships and participate in society, on their

8    love life, on their relationships with family – their whole life changed as a result of this injury.  TT

9    636-656.

10        SCMTD states that the jury "had no idea how to calculate an award of noneconomic

11   damages that would not be speculative."  Mot. at 13.  That's not true.  Instruction No. 29 stated in

12   relevant part:

> If you find for the plaintiff on her negligence claim, you must
> determine the plaintiff's damages. The plaintiff has the burden of
> proving damages by a preponderance of the evidence. Damages
> means the amount of money that will reasonably and fairly
> compensate the plaintiff for any injury you find was caused by the
> defendant. You should consider the following:
>
> The nature and extent of the injuries;
>
> The disability, disfigurement, loss of enjoyment of life experienced
> and that with reasonable probability will be experienced in the future;
>
> The physical pain and suffering experienced and that with reasonable
> probability will be experienced in the future;
>
> ¶
>
> It is for you to determine what damages, if any, have been proved.
> Your award must be based upon evidence and not upon speculation,
> guesswork or conjecture.

24        And remember:  The above portion of Instruction 29 was not objected to by SCMTD.

25   Defendant objected only to the portion of Instruction 29 concerning economic damages.

26        Further, in response to the jury's question, the Court gave Additional Instruction No. 3,

27   which gave additional guidance:  "No fixed standard exists for deciding the amount of these

28   noneconomic damages.  You must use your judgment to decide a reasonable amount based on the

United States District Court
Northern District of California

1   evidence and your common sense." That language, taken right out of CACI 3905A (and CACI is

2   where SCMTD argues that jury instructions should come from), and also not objected to by

3   SCMTD, told the jury how to calculate an award of noneconomic damages: evidence and

4   common sense.

5      SCMTD argues: "Regarding AMJ's noneconomic damages, AMJ's testimony

6   encompassed their experiences after the accident, which included depression, weight gain,

7   mobility loss and an inability to continue their studies. As discussed above, those experiences

8   were likely caused—at least in part—by the MS that would have affected AMJ's recovery from

9   the incident." Mot. at 13. That argument is made up out of nothing. Plaintiff's testimony is that

10   these were effects of their left knee injury. There is no evidence that their MS caused or

11   contributed to their left knee injury, and also no evidence that MS contributed to their depression,

12   weight gain, mobility loss or inability to continue their studies. SCMTD is just making that up.

13   SCMTD never proffered any evidence to support those assertions.

14      SCMTD argues that the Court should not have given Additional Instruction 4 concerning

15   life expectancy because Plaintiff's MS reduced their life expectancy below the actuarial estimate.

16   However, there are several problems with this argument. First, it is waived. SCMTD's only

17   objection to Additional Instruction 4 was: "We object to additional Instruction Number 4 on the

18   basis previously stated, that there's no evidence that comports with Evidence Code Section 701

19   and 702 of lifetime damages as to the plaintiff." TT 1588:4-7. When SCMTD stated that it

20   objected to the instruction "on the basis previously stated," it was referring to the charging

21   conference at which Plaintiff had initially proposed the life expectancy instruction. SCMTD said:

22          MR. CRIDLAND: YES, YOUR HONOR. THE DEFENSE
            OBJECTS TO THE INCLUSION OF THIS PARTICULAR JURY
23          INSTRUCTION ON MULTIPLE GROUNDS. I THINK THE
            PRIMARY GROUND WOULD BE THAT THERE'S NO
24          EVIDENCE IN THE RECORD TO SUPPORT LIFETIME
            DAMAGES IN THE FIRST INSTANCE. THERE WAS NO
25          MEDICAL TESTIMONY THAT SHE WILL SUFFER DAMAGES
            FOR THE REST OF HER LIFE, AND THE JURY HAS NO BASIS
26          TO CONSIDER LIFE EXPECTANCY ON THE EVIDENCE
            THAT'S IN THE RECORD, AND, THEREFORE, THIS WOULD
27          INVITE THE JURY TO SPECULATE WITHOUT EVIDENCE,
            WITHOUT ADDING ANYTHING ABOUT THEIR ABILITY TO
28          CONSIDER THE CASE.

United States District Court
Northern District of California

TT 1421:22-1422:6.

The parties then argued:

> THE COURT: PLAINTIFF, PLEASE RESPOND.
>
> MS. AIKENS: I DON'T THINK THAT IS TRUE. I THINK WE HAVE ELICITED TESTIMONY RELATED TO THE PERMANENCY AS OF THE TIME. I THINK THE ISSUE WAS -- THAT THEY HAD RAISED WITH RESPECT TO DR. PRIMUS AND WHETHER SHE WAS GOING TO BE DISABLED AT THE POINT THAT HE TALKED TO HER ON THE PHONE.
>
> BUT AT THE TIME THAT HE HAD SEEN HER, I THINK HE SUFFICIENTLY STATED THAT HE DID NOT EXPECT IT TO IMPROVE. THERE'S DR. NASSOS WHO SAW HER ROUGHLY FIVE YEARS LATER AND WAS STILL HAVING ISSUES.
>
> I THINK ESPECIALLY WHEN HE TALKS ABOUT THINGS WRAPPING UP IN SIX MONTHS AND THERE'S STILL PROBLEMS GOING INTO SEVERAL YEARS, THAT IT WOULD BE -- THAT THAT TESTIMONY CERTAINLY HAD BEEN GIVEN WITH RESPECT TO PERMANENCY AND DISABILITY GOING INTO THE FUTURE.
>
> MR. CRIDLAND: YOUR HONOR, IF I MAY RESPOND BRIEFLY?
>
> THE COURT: GO AHEAD.
>
> MR. CRIDLAND: DR. PRIMUS WAS A TREATING PHYSICIAN. HE'S ONLY PERMITTED TO TESTIFY AS TO HIS OPINIONS DEVELOPED IN THE COURSE OF HIS TREATMENT WHICH ENDED BACK IN 2016 AND DURING WHICH HE EXPRESSED NO OPINIONS ON PERMANENCY.

TT 1422:7-1423:2. The Court at the time declined to give that instruction for other reasons. TT 1423:17-1425:19.

At the charging conference, SCMTD's objection to the life expectancy instruction was that there was no evidence that the Plaintiff was permanently disabled, i.e., that they would suffer damages for the rest of their life. That was the objection SCMTD renewed in response to proposed Additional Instruction 4: "We object to additional Instruction Number 4 on the basis previously stated, that there's no evidence that comports with Evidence Code Section 701 and 702 *of lifetime damages* as to the plaintiff." TT 1588:4-7 (emphasis added). That objection was wrong, and the Court overruled it, because there was evidence of the permanency of Plaintiff's injury.

United States District Court
Northern District of California

In its motion for a new trial, SCMTD does not renew the objection it made at trial to Additional Instruction 4 (no evidence of permanent disability), so that is waived. Instead, SCMTD now makes a new and completely different argument that "[i]n light of AMJ's [MS] diagnosis, this projection of AMJ's estimated lifespan is inaccurate." Mot. at 14. But SCMTD did not object at trial to the *accuracy* of the life expectancy information stated in Additional Instruction 4. And SCMTD certainly did not make the new argument that Plaintiff's MS affected their life expectancy. This is a brand new argument that surfaced for the first time in SCMTD's motion for a new trial. It is not proper to wait until after the jury returns a verdict to dream up new objections to the jury instructions. *See* Fed. R. Civ. Proc. 51(b)(2)(c)(2). That objection is waived.

The undersigned judge is not a medical doctor and does not know whether MS affects life expectancy, and if it does, whether that is true for everyone who has the condition or just some people. But any argument to that effect would obviously need to be supported by evidence. SCMTD never argued or suggested during trial that MS affects life expectancy, and also did not proffer any evidence that it is in fact true that MS affects life span. Further, although a motion for a new trial in not a proper vehicle to proffer evidence that was not offered during trial, SCMTD also doesn't offer any evidence in its motion for a new trial that MS affects life span, let alone that it does so for everyone who has that condition. SCMTD's new argument that MS affects life expectancy is just attorney say-so. It is unsupported by any evidence, and it is a new argument that SCMTD came up with after the jury verdict.

In its reply brief, SCMTD offers a new argument, not set forth in its motion, that "AMJ did not present any testimony by a life expectancy expert. AMJ's counsel merely stated without support that AMJ is likely to live another 38.33 years . . ." Reply at 6. The Court is not sure what argument SCMTD is making, but whatever it is, it is waived because this argument was not in SCMTD's motion. A new argument in reply is not permitted because Plaintiff had no opportunity to respond to it.

In any event, the Court observes that SCMTD cites to nothing in the record in support of this argument. The Court has reviewed Plaintiff's counsel's closing argument, and she did not say

that Plaintiff is likely to live another 38.33 years.  Rather, Additional Instruction 4 said:

> If you decide that Plaintiff Amanda Jones has suffered damages that will continue for the rest of her life, you must determine how long she will probably live. According to the Social Security Administration's actuarial table, a 43-year-old female is expected to live another 38.33 years. This is the average life expectancy. Some people live longer and others die sooner.
>
> This published information is evidence of how long a person is likely to live but is not conclusive. In deciding a person's life expectancy, you should also consider, among other factors, that person's health, habits, activities, lifestyle, and occupation.

If SCMTD meant to say in its reply brief that the Court should not have given Additional Instruction 4 because Plaintiff did not present testimony by a life expectancy expert, that argument is doubly waived.  SCMTD waived it the first time at trial by not objecting to proposed Additional Instruction 4 on that basis.  And SCMTD waived it a second time by not making that argument in its motion for a new trial.

Further, on the merits, SCMTD's reply brief does not explain why a life expectancy expert was necessary to give Additional Instruction 4 or cite to any legal authorities in support of that argument.  Plaintiff's negligence claim arises under California law, and under California law, "life expectancy . . . is a question of fact for the jury to decide, considering all relevant factors including the [person's] health, lifestyle and occupation.  Life expectancy figures from mortality tables are admissible but are not conclusive." *Allen v. Toledo*, 109 Cal. App. 3d 415, 424 (1980).  And such life expectancy figures are properly included in a jury instruction:  "Here the jury was correctly told the figure given was not conclusive evidence of Charlene's life expectancy.  It was merely 'a factor which you may consider,' along with the evidence of Charlene's health, habits, occupation and activities."  *Id*.  Additional Instruction 4 in this case properly instructed the jury in accordance with California law.

SCMTD's new argument in its reply brief that a life expectancy expert was required is also hard to square with California case law holding that "absent mortality tables, the trier of fact may still approximate the life expectancy of a statutory beneficiary who appeared in court." *Francis v. Sauve*, 222 Cal. App. 2d 102, 121 (1963); *see also Kawamura v. Honek*, 127 Cal. App. 509, 511 (1932) ("It is obvious that the jury could take the testimony given them, including its own view of

1   respondent and his demeanor, and with the aid of common knowledge approximate the latter's age

2   and life expectancy."); *Rickards v. Noonan*, 40 Cal. App. 2d 266, 274 (1940) ("Although the

3   evidence does not disclose the age of the father, the trial court remarked, after seeing the witness

4   on the stand, that in this regard he used his own judgment and considered his personal experience

5   and to him he appeared to be a little older than 53 years.  It has been held, under such

6   circumstances, that a trier of facts may approximate the witness's age and life expectancy.").

7       SCMTD also complains about a slide Plaintiff's counsel briefly showed to the jury during

8   closing requesting that Plaintiff receive $418,00 per year for the rest of her life.  Here is what

9   happened:

> AND TO PAY FOR THAT IS $414,078.67 PER YEAR. AND I
> CAME UP WITH THAT BASED ON --
>
> MR. CRIDLAND: I'LL OBJECT, YOUR HONOR. BEYOND THE
> EVIDENCE.
>
> THE COURT: SUSTAINED.
>
> MS. AIKENS: CAN I MAKE A RECORD?
>
> THE COURT: OKAY.
>
> MS. AIKENS: ALL RIGHT. UNDER CALIFORNIA LAW I
> BELIEVE WE ARE ALLOWED TO PROVIDE WHAT WE
> BELIEVE TO BE A REASONABLE NUMBER. I'M NOT AWARE
> OF ANY AUTHORITY TO THE CONTRARY.
>
> THE COURT: THERE'S NO EVIDENCE OF THIS, AND YOU
> ARE AT 28 MINUTES.
>
> MS. AIKENS: OKAY. ALL RIGHT. I'LL TAKE IT DOWN
> FOR THIS ONE.

22  TT 1480:4-18.

23      On the left hand side of the trial transcript, the time is noted in hours and minutes, and you

24  can see the slide was on the screen for less than a minute.  There was no prejudice to SCMTD.

25  Defendant objected to the slide and the Court immediately sustained the objection.  In response to

26  the Court's ruling, Plaintiff's counsel told the jury "you're to disregard that."  TT 1481:1.

27  SCMTD complains that the Court did not admonish the jury, Mot. at 13-14, but SCMTD did not

28  request an admonition.  Further, the jury was instructed that arguments by lawyers, including

United States District Court
Northern District of California

1    closing arguments, are not evidence (ECF No. 574, Instruction 5) and that it must decide the case

2    based solely on the evidence (*id*., Instruction 1). There is no reason to think the jury did not

3    follow these instructions.

4         Next, SCMTD advances another new argument in its reply brief: "AMJ provided no

5    admissible medical testimony on causation" and the only testimony about causation was that

6    "AMJ . . . self-diagnosed as disabled due to the 2014 incident." Reply at 6. This argument is

7    waived because it was not made in SCMTD's motion. On the merits, the argument is also wrong.

8    But first please note the argument that SCMTD is now making. At trial, as discussed above,

9    SCMTD objected to proposed Additional Instruction 4 on the ground that there was no evidence

10   of the permanence of Plaintiff's disability. After the jury verdict, SCMTD has now completely

11   reversed course and argues – without any evidence at all – that Plaintiff's permanent disability was

12   caused by her MS, not the injury on the bus. In other words, SCMTD's new, post-verdict position

13   is that Plaintiff *is* permanently disabled, but that the cause was MS. Mot. at 13 ("By preventing

14   the jury from hearing about AMJ's MS, the jury was left to conclude that AMJ is now wheelchair

15   bound due to the incident."); Reply at 6 ("That AMJ is now disabled and wheelchair bound is a

16   result of the progression of MS—not tipping over while riding a bus.").

17        Thus, the new argument in reply is not a quibble about permanence but about causation,

18   i.e., linking the left knee injury to the fall on the bus. Here, SCMTD is wrong that there is no

19   medical evidence of causation. Plaintiff's orthopedic surgeon, Dr. Primus, gave this causation

20   testimony. TT 1000:13-1004:5, 1022:13-1023:13.[13] This testimony was admitted. Further,

21

---

22   [13] In its reply brief, SCMTD also raises a new argument (not contained in its motion for a new
     trial, and thus, one that Plaintiff had no opportunity to respond to) that (1) Primus's "testimony as

23   to AMJ's current condition was beyond the scope of his treatment, which concluded in 2016, and
     SCMTD's objection to Dr. Primus's testimony was sustained." Reply at 6 (citing nothing in the

24   trial transcript.); and (2) "Primus last treated AMJ on August 12, 2016. However, Dr. Primus
     testified at trial regarding AMJ's future treatment options and current condition far beyond 2016.

25   [Exh. Q, 1036:2-25.] Dr. Primus gave this testimony over SCMTD's recurring objections that such
     testimony exceeded the scope of his opinions." Reply at 15. The Court does not know what

26   SCMTD is complaining about on page 6 of its reply because there are no citations to the record.
     But because SCMTD reports that its objection was sustained, SCMTD is not saying the Court

27   made an error. As to page 15 of the reply, the citation to Exhibit Q (ECF No. 621-3) enables the
     Court to see that SCMTD is referring to TT 1030:15-1031:4, the lines that it underlined in Exhibit

28   Q. True, the reply brief refers to TT 1036:2-25 on page 15, but that's cross-examination, and
     SCMTD is not allowed to complain about the questions it asked at trial. As for the exchange at

Plaintiff's physical therapist, Jamie Jackson, also gave testimony on causation. TT 676:20-677:15. This testimony was also admitted.

Further, although SCMTD is not now contesting permanence, the evidence at trial supported such a finding. Plaintiff testified (without objection) that their chiropractor determined the injury was permanent. TT 617:23-618:13. The jury was also permitted to infer that an injury that had not gotten better in the ten and a half years since the incident was permanent. Jackson likewise testified that Plaintiff's knee condition was "chronic." TT 673:12-674:7, 678:10-13. Further, SCMTD's orthopedic surgeon, Dr. Jonathan Nassos, while disputing that the fall on the bus caused a serious injury, acknowledged that during his examination of Plaintiff in 2019, Plaintiff needed help ambulating, wasn't lying or faking, and he couldn't explain the continued symptoms. TT 1134:21-1135:18; *see also* TT 1144:8-10 ("AND THEN I'M NOT SURE WHAT HAPPENED AFTER THAT, THERE ARE MORE COMPLAINTS, AND SHE REMAINS IN THE SCOOTER. I CAN'T EXPLAIN IT. I REALLY CAN'T."). Nassos also basically testified to permanence. TT 1135:19-20 ("AND SHE SUBSEQUENT UNDERWENT ANOTHER SURGERY, RIGHT? AND DID SHE GET BETTER? IT DOESN'T APPEAR SO.").

Accordingly, for all these reasons, the Court rejects SCMTD's challenges to the jury's award of noneconomic damages.

## 2. Alleged Misconduct by Counsel

SCMTD contends that Plaintiff's closing argument inflamed the jury.

### a. Legal Standard

"A trial lawyer's job . . . is to present his client's case in the most sympathetic light consistent with the evidence. Using some degree of emotionally charged language during closing argument in a civil case is a well-accepted tactic in American courtrooms." *Settlegoode v. Portland Public Schools*, 371 F.3d 503, 518 (9th Cir. 2004). "Generally, misconduct by trial

---

TT 1030:15-1031:4, Primus was testifying about what he expected back in August 2016, when he was treating Plaintiff, their future medical care needs would likely be. That was not beyond the scope of his treatment and is not testimony about Plaintiff's current condition. *See* TT 1036:14-15 (Primus explaining he was referring "to the possible treatment options in the future"). There was no error in admitting that testimony.

47

counsel results in a new trial if the 'flavor of misconduct sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (quoting *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1994)).   The Ninth Circuit has "held that where offending remarks occurred principally during opening statement and closing argument, rather than throughout the course of the trial, we are less inclined to find the statements pervaded the trial and thus prejudiced the jury." *Settlegoode*, 371 F.3d at 518.

"The federal courts erect a high threshold to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings*, 285 F.3d at 1193.  "The rationale for this high threshold is two-fold.  First, raising an objection after the closing argument and before the jury begins deliberations permits the judge to examine the alleged prejudice and to admonish . . . counsel or issue a curative instruction, if warranted." *Id.* (cleaned up).  "The second rationale stems from courts' concern that allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id*.

Overturning a jury verdict based on an improper closing argument is a "remedy" that "is available only in extraordinary cases." *Id*.; *see also Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (declining to find reversible error where "the alleged misconduct occurred only in the argument phase of the trial . . . the remarks were isolated rather than persistent, . . . most of counsel's comments were not objected to at trial and appellants did not move for a mistrial at the end of the argument").

### b.    Analysis

In its motion for a new trial, SCMTD complains about several portions of Plaintiff's closing.  They are TT 1466:13-1467:13 (objection by SCMTD), 1468:7-9 (no objection), 1479:25-1481:7 (objection by SCMTD), 1481:9 (objection by SCMTD), 1481:15-16 (no objection), 1482:7-8 (no objection), 1482:15-1483:5 (no objection), 1484:17-1486:18 (no objection), 1540:3-5 (no objection).  Mot. at 17-18.

For two thirds of these portions, SCMTD did not make a contemporaneous objection.  Thus, for the most part, SCMTD's claims of improper closing argument were "raised for the first

48

1   time after trial" and are therefore subject to a "high threshold."  *Hemmings*, 285 F.3d at 1193.

2   Several of these unobjected-to portions were summaries of the evidence in a way that was

3   sympathetic to the Plaintiff and were plainly proper.  TT 1481:15-16 ("YOU MISSED OUT ON

4   SCHOLARSHIPS AND FELLOWSHIPS YOUR CLASSMATES RECEIVE."), TT 1482:15-

5   1483:5 ("NEVER SLEEP WELL, NEVER SLEEP ON YOUR LEFT SIDE. HAVE KNEE

6   SURGERY. RESTART YEARS OF PHYSICAL THERAPY. NEVER KNOW WHEN YOUR

7   LEG MIGHT GIVE OUT AS YOU'RE DOING ANYTHING, INCLUDING CROSSING THE

8   STREET. NEVER RUN AGAIN. NEVER TRAVEL ANYWHERE ON A PLANE DUE TO

9   SWELLING IN THE KNEE. NEED SERVICE PETS. RELOCATE TO A WARMER CLIMATE

10  AND MOVE TO A PLACE THAT'S MORE EXPENSIVE WHERE YOU DON'T KNOW

11  ANYONE AND YOU HAVE NO FAMILY OR FRIENDS. LOSE FAMILY, FRIEND, AND

12  DATING RELATIONSHIPS. INCUR HUNDREDS OF THOUSANDS IN DEBT.

13  EXPERIENCE LIFE AS A DISABLED PERSON IN A WORLD NOT BUILT FOR YOU.

14  TAKE MORE TIME TO DO EVERYTHING.").  And, yes, there were a couple of objections that

15  the Court sustained.  After the closing argument, SCMTD did not move for a mistrial.

16      Let's remember that to result in a new trial, the misconduct has to "permeate[] an entire

17  proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching

18  its verdict."  *Hemmings*, 285 F.3d at 1192.  And "where offending remarks occurred principally

19  during opening statement and closing argument, rather than throughout the course of the trial, we

20  are less inclined to find the statements pervaded the trial and thus prejudiced the jury."

21  *Settlegoode*, 371 F.3d 518.  Here, the allegedly offending remarks – mostly not objected to, and

22  some that were not offending – occurred solely in closing.  "The question is whether counsel's

23  misconduct so permeated the trial as to lead to the conclusion the jury was necessarily influenced

24  by passion and prejudice in reaching its verdict."  *Cooper*, 945 F.2d at 1107.  The answer is no.

25  SCMTD comes nowhere close to establishing that.

26      **3.    Whether Comparable Verdicts Show the Noneconomic Damages Award Is an Outlier**

27

28      Some courts have held that "[i]n order to determine whether a particular award is

49

excessive, courts have found it useful to review awards in other cases involving similar injuries, while bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Nairn v. National R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988). Others disagree. *See Dolenz v. United States*, 443 F.3d 1320, 1322 (10th Cir. 2006) ("[I]t is a difficult and often fruitless task to compare damages in one case with those in another, and we do not generally countenance such comparisons."). Regardless, "such comparisons are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009). Courts should also be mindful about the cherry-picking problem: "[C]ourts have upheld or set aside jury verdicts in significantly differing amounts and in significantly different circumstances. Invariably, one could find a case to support nearly any award of damages in nearly any amount." *Thornton v. Kaplan*, 958 F. Supp. 502, 505 (D. Colo. 1996).

SCMTD's "comparable verdicts" argument has a huge cherry picking problem. SCMTD provides three California Superior Court jury verdicts *from the last two decades* and says these are the comparable ones. Painter Decl., Exs. DD (2004 verdict), EE (2018 verdict), FF (2019 verdict), ECF Nos. 622-8, 622-9, 622-10. California is the largest state in the country and likely has the most litigation of any state. Every year its Superior Courts have hundreds of jury verdicts in civil matters. The idea that you could show that one particular verdict is an outlier by searching through electronic databases of jury verdicts to find three among the thousands of jury verdicts in the state over the past 21 years is ridiculous. That methodology could prove that every jury verdict is an outlier and also that every jury verdict is not an outlier because with a diligent search you could always find three jury verdicts for similar injuries that are similar to or very different from the verdict in your case. The Court rejects SCMTD's argument about comparable verdicts because the methodology it employes is so manipulable that it is meaningless.

Having said that, let's look at the three cases SCMTD came up with to see if they are comparable. This case is about a then-33 year old (Ex 37A (subtract date of birth from date of visit to get Plaintiff's age)) who suffered a permanently disabling injury to their left knee. So, a comparable case would be a disabling knee injury to someone of approximately Plaintiff's age.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In Ex. EE (ECF No. 622-9), SCMTD provides a summary of *Marie Green v. Empire Transportation, Inc., et al*. In that case, a 77 year old disabled woman was in her wheelchair on a public bus traveling in Paris when the wheelchair tipped and fell. The main issue at trial was that Green claimed she sustained a traumatic brain injury, and as a result she needed to live in a facility 24 hours a day, seven days a week for the rest of her life. Defendant denied that Green suffered a traumatic brain injury and argued that Green already had a 24/7 caretaker (her son) for the last 17 years due to prior age-related degeneration.

A 77 year old woman is not similar to our then-33 year old Plaintiff. The injury in dispute in that case – traumatic brain injury – has nothing to do with a knee injury. And the causation defense (she was already under 24/7 care) is also not similar to this case. SCMTD did not contend at trial that Plaintiff was permanently disabled *before* they got on the bus. This case is not comparable.

In Ex. FF (ECF No. 622-10), SCMTD offers *Laura Rubin v. One Level World Inc., et al.* In that case, a 68 year old disabled woman alleged that she sustained neck and back injuries when her wheelchair lift in her condominium failed and she was ejected onto the staircase with the wheelchair strapped to her back. Once again, this is an elderly woman who was permanently disabled before the alleged injury happened. *See id*. ("The plaintiff's physical rehabilitation expert opined that Rubin was recovering from her 2013 fall, which made the wheelchair necessary for the rest of Rubin's life, at the time of the subject fall," which was in 2014). This is not comparable to a young adult who *became* permanently disabled *because* of Defendant's conduct. Notice, also, that the injury in that case (neck and back problems) is not similar to the injury in this case (disabling knee injury). This is not a comparable case.

SCMTD does better in Ex. DD (ECF No. 622-8) with *Borja v. Santa Clara County Transportation Authority*. The case is from 21 years ago, but defense counsel are probably patting themselves on the back that they found it. Plaintiff was a 54 year old woman. She was using a three-wheeled electric motor scooter (it was a three-wheeled electric motor scooter in this case too) and wanted to take the #77 bus. The driver, April Jones, lowered the passenger lift, and Plaintiff maneuvered her scooter onto the lift and was able to board the bus. Jones raised the seats

51

1    designated as the securement area (there was a securement area in this case too).  "At this point,

2    the stories of plaintiff and Jones conflict."  (Plaintiff and the bus driver disagreed in this case too.)

3    Plaintiff said she asked Jones for help securing the scooter onto the bus with the use of a seatbelt.

4    Jones said she offered the seatbelt and plaintiff refused it.  (The bus driver said that in this case

5    too.)  In any event, plaintiff was not properly secured, and when the bus took a right turn (it was a

6    right turn in this case too), "the centrifugal forces were great enough to tip plaintiff's scooter

7    over."  The claimed injuries included a "left knee contusion," though it appears that the permanent

8    loss of use was to her left arm.

9        This is a comparable case.  It's not exactly the same, as lifetime noneconomic damages are

10   larger for a then-33 year old than for a then-54 year old.  But it also involves the permanent loss of

11   function of a limb.  But notice something else:  The damages the jury awarded in *Borja* --

12   $2,165,327 – are far larger than in the two non-comparable cases cited by SCMTD.  So, it seems

13   that the points of distinction the Court has been emphasizing (age of the plaintiff, whether the

14   injury caused the disability) are relevant.  The jury's award of noneconomic damages in this case

15   was about 5.8 times the size of the verdict in *Borja*, but that verdict was 21 years ago and that

16   plaintiff was 21 years older at the time of the injury.  Once you account for inflation and the fact

17   that our Plaintiff likely had twice as long left to live as Borja did, the jury verdict in this case is

18   still larger than an adjusted *Borja* verdict, but not so much as to make this verdict an "outlier."

19       In sum, SCMTD's argument that the jury verdict in this case was an outlier is flawed

20   methodologically because it relies on cherry picking a handful of examples from thousands of jury

21   verdicts.  In addition, SCMTD did not pick good cherries.  Two of the cases are not comparable

22   and the third does not show the verdict in this case was an outlier.

23   **F.    Scope of the Retrial if the Remittitur Is Declined**

24       As noted, the Court remits Plaintiff's economic damages to $27,000.  In keeping with the

25   Seventh Amendment, Plaintiff may accept or reject this remittitur.  *See Hetzel v. Prince William

26   County*, 523 U.S. 208, 211-12 (1998).  If the Plaintiff declines the remittitur, the Court will order a

27   new trial.  The Court must decide the scope of the new trial.  *See D'Hedouville v. Pioneer Hotel

28   Co.*, 552 F.2d 886, 897 (9th Cir. 1977) (scope of new trial is within trial court's discretion).

1   "Partial retrials 'may not properly be resorted to unless it clearly appears that the issue to be

2   retried is so distinct and separable from others that a trial of it alone may be had without

3   injustice.'"  *Pumphrey v. K.W. Thompson Co.*, 62 F.3d 1128, 1133-34 (9th Cir. 1995) (quoting

4   *Gasoline Products Co., Inc. v. Champlain Refining Co.*, 283 U.S. 494, 500 (1931)).

5   It would not be just to have a retrial limited to economic damages.  The jury's

6   determination of both economic and noneconomic damages required deciding whether Plaintiff is

7   permanently disabled and, if so, whether Plaintiff's injury on the bus is the cause of that.  The two

8   measures of damages cannot sensibly be tried separately from each other.

9   However, damages are distinct and separable from liability.  Accordingly, as SCMTD

10   requests, "if AMJ does not consent to the remittitur," the Court will "hold a partial new trial

11   limited to the issue of damages."  Mot. at 1.

### III.    CONCLUSION

13   SCMTD's motion for a new trial is **CONDITIONALLY DENIED** based on Plaintiff

14   accepting a remittitur to $27,000 in compensatory damages, for a total damages award of

15   $12,658,250.  Plaintiff shall file a notice on the docket within 30 days stating whether they accept

16   or reject the remittitur (and a proposed amended judgment if they accept it).  At that point the

17   Court will, as appropriate, either enter an order granting a new trial on damages or enter a final,

18   appealable order denying SCMTD's motion for a new trial.

19   **IT IS SO ORDERED.**

21   Dated: May 15, 2025

THOMAS S. HIXSON
United States Magistrate Judge